# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| WILLIAM LEROY BARNES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:08CV271 |
| | ) | |
| GERALD BRANKER, Warden, | ) | |
| Central Prison, Raleigh, | ) | |
| North Carolina, | ) | |
| | ) | |
| Respondent. | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner William Leroy Barnes, a North Carolina death row inmate, has filed in this court a habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his 1994 state court conviction and sentence for first-degree murder. The jury recommended a sentence of death and the trial court imposed that sentence. Petitioner seeks a writ of habeas corpus discharging him from his confinement and restraint, and relieving him of his sentence of death. Petitioner was represented at trial by attorneys Michael D. Lea and William F. Fritts. He was represented on direct appeal by appointed counsel Janine M. Crawley. Petitioner is represented in this proceeding by attorneys M. Gordon Widenhouse, Jr. and George B. Currin. Respondent Gerald Branker, Warden of Central Prison ("the State"), is represented by the North Carolina Attorney General.

## THE STATE COURT PROCEEDINGS

Petitioner Barnes was convicted of first-degree murder at the January 24, 1994 Criminal Session of the Superior Court of Rowan County, North Carolina. Petitioner's conviction and sentence of death were affirmed by the Supreme Court of North Carolina on February 10, 1997. *See State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44 (1997). On March 23, 1998, the United States Supreme Court denied certiorari review. *Barnes v. North Carolina*, 523 U.S. 1024 (1998).

On February 10, 1999, Petitioner filed a Motion for Appropriate Relief ("MAR"), North Carolina's procedural mechanism for state post-conviction review. After his initial MAR was filed, Petitioner, *pro se*, filed a Petition for Writ of Certiorari in the North Carolina Supreme Court for appointment of new counsel to replace one of his appointed post-conviction lawyers, who was alleged to have a conflict of interest. On January 24, 2001, an Amended MAR ("AMAR") was filed by Petitioner's subsequently appointed post-conviction counsel. On May 1, 2002, the State filed its response to the AMAR. On September 4, 2002, a third MAR, entitled Amendments to the Amended Motion for Appropriate Relief ("AAMAR"), was filed by Petitioner's third post-conviction counsel. On February 20, 2004, the State filed its Response to the AAMAR. The matter was assigned to Superior Court Judge John W. Smith. On March 19, 2007, an evidentiary hearing was held on certain, but not all, of the issues raised by Petitioner. On May 31, 2007, Judge Smith entered an Order denying Petitioner's Motions for Appropriate Relief. On March 6, 2008,

-2-

the Supreme Court of North Carolina denied Petitioner's request for certiorari review. *State v. Barnes*, 362 N.C. 239, 660 S.E.2d 53 (2008).

On April 17, 2008, Petitioner filed his Petition for Writ of Habeas Corpus with this court. Respondent timely filed its Answer to the Petition for Writ of Habeas Corpus. The petition is now before this Court for consideration.

## THE CLAIMS OF THE HABEAS CORPUS PETITION

Petitioner Barnes presents the following twelve claims in his habeas petition:

I.      The state court unreasonably applied clearly established federal law in rejecting the claim that the prosecutors discriminated against prospective African-American jurors in their peremptory challenges.

II.     The state court unreasonably applied federal law in denying William Barnes a new sentencing hearing where he presented undisputed evidence of juror misconduct that brought external influences into and tainted the sentencing deliberations.

III.    The Superior Court erroneously denied William Barnes a new sentencing hearing because trial counsel ineffectively failed to investigate and present compelling mitigating evidence.

IV.     After conducting an evidentiary hearing, the state court unreasonably applied *Brady v. Maryland* in rejecting the claim that the prosecution failed to disclose before trial the material statements of three witnesses.

V.      The state court unreasonably applied *Brady v. Maryland* in rejecting the claim that the prosecution failed to disclose exculpatory evidence that would have led at least one juror to return a sentence less than death.

VI.     The state post-conviction court erred in denying the claim that the State failed to disclose evidence suggesting Greg Pulliam was involved in these crimes.

-3-

VII.    The state court erred in denying the claim that the State failed to disclose material evidence that a witness had seen two persons approaching the Tutterow residence at the time of the crime.

VIII.   The state court unreasonably applied established federal law in finding trial counsel were not ineffective in failing to show the co-defendants had committed a similar crime together and without William Barnes a few months before these crimes.

IX.     The state court unreasonably applied established federal law in rejecting a claim of ineffective assistance because counsel did not impeach Maurice Alexander about his pending charges or make an offer of proof.

X.      The state court unreasonably applied established federal law in denying William Barnes relief for ineffective assistance of appellate counsel when his lawyer failed to raise an issue that would have resulted in a new trial.

XI.     The state court unreasonably applied clearly established federal law when it held the co-defendants' extra-judicial statements were admissible at the joint trial.

XII.    The state court's decision that upheld the trial court's denial of Williams Barnes' motion to change venue was contrary to and involved an unreasonable application of clearly established federal law.

The State concedes in its Answer to the Petition that Petitioner Barnes has exhausted his state court remedies with respect to all twelve claims.

## THE EVIDENCE PRESENTED AT TRIAL

The Supreme Court of North Carolina summarized the evidence presented at Petitioner's trial[1] in 1994 as follows:

> On 29 October 1992, all three defendants went to the Salisbury home of B.P. and Ruby Tutterow to rob the Tutterows. Defendant Chambers had met B.P .while incarcerated at the Rowan County jail, where B.P. cooked part-time and served as a deputy sheriff. B.P. was known to carry significant amounts of money in his wallet and had given defendant Chambers money to buy cigarettes and food while Chambers was in jail.

> Chambers was released from jail on the afternoon of 29 October, and shortly thereafter met up with defendant Blakney and Antonio Mason at a nearby convenience store. Chambers told Blakney and Mason that he had been released from jail without any money and that he knew someone who lived nearby who had plenty of money. Chambers said that he was willing to kill someone if it was necessary to get some money. After being unable to convince Mason to cooperate in their efforts, Chambers and Blakney joined up with defendant Barnes, who was at that time in the convenience store parking lot. Chambers, Blakney, and Barnes then went with others to the apartment of Cynthia Gwen, where the three defendants talked together about "mak[ing] a lick," or robbing someone. Barnes got into an argument with another man while at Gwen's apartment, and Gwen asked him to leave. The three defendants then left Gwen's apartment together around 10:00 p.m.

> Patricia Miller was speaking with B.P. Tutterow on the phone around 10:00 p.m. that evening when she heard a commotion on the line and the phone went dead. After attempting to reach the Tutterows several times, Miller telephoned the police around 11:30 p.m. Salisbury police officers arrived at the Tutterow home around 12:30 a.m. on 30 October and found the Tutterows dead and the house ransacked.

---

[1] Petitioner was tried with two co-defendants, Frank Junior Chambers and Robert Lewis Blakney.

The Tutterows' daughters determined that several things were missing from their parents' home including B.P.'s .357 Magnum pistol and a .38-caliber revolver, B.P.'s gold wedding band and gold watch, several items of jewelry, two bank bags that usually contained cash, and a bag of antique coins including some Susan B. Anthony dollars and Kennedy half-dollars.

Physical evidence in the home tied defendants Blakney and Chambers to the crime. The DNA profile of a sample drawn from one cigarette butt found in the house matched that of Chambers, and the profile on another butt matched that of Blakney. A latent fingerprint on a money box found in one bedroom matched Chambers' left middle finger. A print obtained from another money box matched that of Blakney's left palm.

Around 11:00 p.m. on the night of the murders, Barnes, Blakney, and Chambers went to the apartment where Antonio, Sharon, and Valerie Mason lived. Blakney and Chambers told Sharon that they would pay her for the use of her car to go to Kannapolis to dispose of some guns. Although Sharon refused, Blakney gave the two women around twenty to forty dollars and gave Valerie a wedding band with one small diamond. When Valerie asked Blakney where he got the ring, he replied that "we f----- up a police" and that it was a "three-person secret." Blakney further told Valerie that he, Barnes, and Chambers had some jewelry and guns. Barnes and Chambers each then showed Valerie and Sharon a gun.

Defendants then left with Antonio to buy drugs. They bought about sixty dollars worth of crack at a nearby apartment complex and returned to the Mason apartment to smoke it, after which defendants left the apartment again. Shortly thereafter, Antonio, Sharon, and Valerie heard sirens and followed the sounds to the Tutterow home, where they learned of the murders. Valerie told an officer at the scene that "[Blakney] shouldn't have killed those people like that" and went to the police department around midnight to tell the police what she knew.

Some time after midnight, Everette Feamster, a Salisbury cab driver, drove defendants to the Bradshaw Apartments in Salisbury. Feamster and a passenger in the cab, Charles Fair, testified that they heard defendants talking about money and saw them passing money back and forth. Upon arriving at the Bradshaw Apartments, Barnes purchased three hundred dollars' worth of crack cocaine from Wayne Smith and brought more crack from Willie Peck.

-6-

Barnes later sold B.P.'s .38-caliber revolver for five rocks of crack. Defendants then went to several other parties throughout the early morning, during which time they bought as much as one thousand dollars' worth of crack from Smith and varying amounts of crack from other sellers. At the home of Paula Jones, Smith saw Barnes with a pistol in his pants and Blakney with a pistol in his pants. Blakney then gave his pistol to Chambers.

During the early morning of 30 October 1992, Blakney pawned two rings – a "mother's ring" with three birthstones and a wedding band – and some antique coins. Barnes attempted to sell a gold watch with diamonds on the face to Joseph Knox. Chambers attempted to hide Mr. Tutterow's .357 Magnum pistol at the home of Carl Fleming. Barnes was taken into custody on the morning of 30 October, Blakney was arrested that afternoon, and Chambers turned himself in that afternoon.

All three defendants later made statements to police, but each denied having been involved in the killings of the Tutterows. Chambers admitted to having been in the Tutterow home and told Rachel Eberhart, "Hell yeah, I killed the m----- f-----," although he later said he was merely kidding. Blakney told police that he took items from the bedrooms but that he did not take part in the shootings. Barnes denied having seen Blakney or Chambers on 29 October 1992 and stated that he had nothing to do with the killings. Special Agent Michael Creasy testified that the palms of Barnes' hands had indications of gunshot residue on them and explained that the concentrations on Barnes' palms could have been a result of Barnes having merely handled a gun rather than having actually shot one. Gunshot residue was also found on the waistbands of Barnes' and Chambers' pants. Furthermore, during court proceedings in November, Barnes wore a gold necklace and a watch belonging to the Tutterows.

Dr. Brent Hall testified that Ruby Tutterow died as a result of multiple gunshot wounds. She suffered ten wounds in all, four of which were to the head. Hall testified that two of these wounds, one to the head and one to the back, had the potential to be rapidly fatal. Dr. Deborah Radisch testified that B.P. Tutterow also suffered multiple gunshot wounds and died as a result of a gunshot to the chest in combination with several shots to the face and head. B.P. had also been beaten and had suffered a number of defensive wounds. Special Agent Thomas Trochum testified that the Tutterows were shot with

both a .357 Magnum revolver and a .38 caliber revolver, although he added that he could not say whether a third gun was involved.

*See State v. Barnes*, 345 N.C. at 200-02, 481 S.E.2d at 51-53.

## THE HABEAS CORPUS STANDARD OF REVIEW

### A.    Procedural Default

Federal courts generally are barred from reviewing habeas claims that were not reached on the merits in state court because of a petitioner's non-compliance with "independent and adequate" state procedural rules. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *McNeill v. Polk*, 476 F.3d 206 (4th Cir. 2007). A State has an interest in its rules and procedures and in the finality of its judgments, which "would be undermined if the federal courts were too free to ignore procedural forfeitures in state court." *Reed v. Ross*, 468 U.S. 1, 10 (1984). A state procedural rule is considered "adequate if it is regularly or consistently applied by the state courts, . . . and it is independent if it does not depend on a federal constitutional ruling." *McNeill*, 476 F.3d at 211 (citing *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) and *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).

There are two exceptions to the procedural default bar. First, a habeas court may review an otherwise procedurally defaulted claim if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman*, 501 U.S. at 750; *see also McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000). To demonstrate "cause," a petitioner may make "'a showing that the factual or legal basis for

-8-

a claim was not reasonably available to counsel.'" *McCarver*, 221 F.3d at 591 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). To establish "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 592 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Second, a habeas court may review an otherwise procedurally defaulted claim if the petitioner can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see also McCarver*, 221 F.3d at 588. The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey*, 499 U.S. at 494. Therefore, in order to establish a "fundamental miscarriage of justice," a petitioner must show actual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 346-47 (1992); *see also Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir. 1994). In the context of a capital proceeding, a death-penalty petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." *Sawyer*, 505 U.S. at 336.

B.     **Review on the Merits**

Review of a state court decision on the merits of a prisoner's habeas corpus claims is governed by the deferential standard of review set forth in 28 U.S.C. § 2254(d), part of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d)

provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in
> > the State court proceeding.

28 U.S.C. § 2254(d). After concluding that both the "contrary to" and "unreasonable

application" clauses of Section 2254(d)(1) must be given independent meaning, the United

States Supreme Court articulated the following standard of review:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court
> has on a set of materially indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring). This "highly

deferential" standard is "difficult to meet" and "demands that state-court decisions be given

the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. ____, ____, 131 S. Ct. 1388, 1398

(2011); *see also Harrington v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 786 (2011) ("If

-10-

this standard is difficult to meet, that is because it was meant to be."). The petitioner carries

the burden of proof to meet this standard. *Pinholster*, 131 S. Ct. at 1398.

A legal principle is "clearly established" under Section 2254(d)(1) "only when it is

embodied in a holding of [the Supreme Court]." *Thaler v. Haynes*, 559 U.S. ___, ___, 130

S. Ct. 1171, 1173 (2010). A state court's decision must be substantially different from

relevant Supreme Court precedent before relief may be granted under the "contrary to"

clause. *Williams*, 529 U.S. at 405 (noting that the word "contrary" is commonly understood

to mean "diametrically different," "opposite in character or nature," or "mutually opposed").

Under the "unreasonable application" clause, "the most important point is that an

unreasonable application of federal law is different from an incorrect application of federal

law." *Id.* at 410. Therefore, "a federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly. Rather, that application must also

be unreasonable." *Id.* at 411; *see also Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000).

Section 2254 precludes *de novo* federal habeas corpus review of state court decisions

on the merits of a petitioner's claim. *Bell v. Jarvis*, 236 F.3d at 159-60 (overruling *Cardwell

v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998)). Even a summary adjudication, wherein the

state court fails to articulate any rationale for its decision, is considered an adjudication on

the merits and should be accorded deference under Section 2254(d)(1). *See id.* at 163. When

faced with a state court decision that does not explicitly cite or apply federal law, the habeas

court should conduct an "independent examination of the record and the clearly established Supreme Court law." *Id.* at 158. Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable." *Id.* at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

Finally, AEDPA did not substantially alter the standard of review concerning state court factual determinations. Factual determinations made by a state court are afforded a presumption of correctness. 28 U.S.C. § 2254(e)(1). In order to rebut the presumption of correctness, a petitioner must present clear and convincing evidence. *Id.*; *see also Lenz v. Washington*, 444 F.3d 295, 300-01 (4th Cir. 2006).

## DISCUSSION OF CLAIMS

In accordance with 28 U.S.C. § 2254(d), this court must determine whether the state court's adjudication of Petitioner's claims was contrary to, or involved an unreasonable application of, clearly established federal law.

## CLAIM I - Jury Selection (*Batson* issue)

Petitioner first claims that the State discriminated against prospective African-American jurors in its peremptory challenges and that the state courts unreasonably applied federal law in concluding that the prosecution's challenges did not violate his equal protection rights. The Supreme Court has long held that "racial discrimination by the State in jury selection offends the Equal Protection Clause." *Georgia v. McCollum*, 505 U.S. 42, 44 (1992) (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)). Every defendant has "the

-12-

right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986), but not every strike of a racial minority results in a violation of that right. *See United States v. Jones*, 224 F.3d 621, 623-24 (7th Cir. 2000).

In *Batson*, the Supreme Court established a three-step framework for evaluating claims of discriminatory exercise of peremptory challenges:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Golphin v. Branker*, 519 F.3d 168, 179 (4th Cir. 2008) (quoting *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)). Under this analysis, "the decisive question [is] whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365. At the second step of the analysis, age, occupation, and demeanor can be legitimate, race-neutral reasons to strike a juror. *United States v. Grimmond*, 137 F.3d 823, 834 (4th Cir. 1998); *United States v. Whitfield*, 314 Fed. App'x 554, 556 (4th Cir. 2008). Courts have held that a juror's "body language" can be a legitimate, race-neutral reason for a peremptory strike. *See Jones*, 224 F. 3d at 625 (finding that "intuitive assumptions" are often a permissible basis for peremptory strikes, as long as they are race-neutral).

-13-

Petitioner complains of specific peremptory challenges used by the State to strike two African-Americans: Melody Hall and Elana Jones. The trial court ruled that "no prima facie case has been made which shows that the jury is being selected in any other manner than a racially neutral manner and that the State is not required to give a statement. . . ." Out of "an abundance of caution," however, the court asked the State to explain the basis for its peremptory strikes so it would be a matter of record. (Jury Selection Tr.[2] Vol. I at 370-71.) Petitioner argues that the trial court erred first by "requir[ing] the prosecutors to proffer reasons for excusing various African-American prospective jurors without determining if a *prima facie* case had been shown." (Docket No. 12, Brief in Support of Petition[3] at 8.) Petitioner argues that in North Carolina the normal practice of proceeding as if a prima facie case has been established, thus moving to the second step of the *Batson* analysis, "results in the trial court failing to weigh the strength of defendant's prima facie case of discrimination in evaluating whether the prosecutor's reasons are race-neutral." *Id.* According to Petitioner,

---

[2] The five-volume transcript of the jury selection proceedings is numbered separately from the trial transcript and the sentencing proceeding transcript. The jury selection transcript will hereinafter be identified as "Jury Tr. Vol. ___."

[3] Petitioner's Brief in Support of Petition for a Writ of Habeas Corpus will hereinafter be identified as "Pet. Br."

this is contrary to *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*).[4]

As noted, the trial court in this case did in fact rule that Petitioner had not established a prima facie case of discrimination. The court did not engage in a detailed analysis, but noted that with regard to juror Jones: "she was the only, out of five prior peremptories by the State that one of those was against a black individual, that being Mrs. Jones." (Jury Tr. Vol. I at 370). The court noted other peremptory challenges as to both African-American and Caucasian individuals. The Fourth Circuit, moreover, has expressly approved the procedure often used in North Carolina:

> As a matter of North Carolina state law, when the trial court does not explicitly rule on whether the defendant made a *prima facie* case under step one, and the State proceeds to the second prong of *Batson* by articulating its explanation for the challenge, the question of whether the defendant established a *prima facie* case becomes moot.

---

[4] Under *Miller-El II*, to determine whether purposeful discrimination was present in the selection of a jury, a court may consider a variety of factors, including: (1) the percentage of African-American venire members who are the subject of the strike; (2) "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" in order to determine whether "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve," 545 U.S. at 241; (3) the prosecutor's use of procedural mechanisms to move African-American venire members to the back of the panel where they are less likely to be selected, *id.* at 253-55; (4) evidence of a contrast between the prosecutor's "voir dire questions posed respectively to black and nonblack panel members," *id.* at 255, where such contrast indicates an intent to load the questions in order to "make a case for excluding black panel members opposed to or ambivalent about the death penalty," *id.* at 260, or "to create cause to strike," *id.* at 261; and (5) evidence of a systematic policy or practice within the prosecutor's office of "excluding blacks from jury service." *Id.* at 263.

*Golphin*, 519 F.3d at 179 (citing *State v. Williams*, 343 N.C. 345, 471 S.E.2d 379, 386

(1996)).  In other words, "once the Government has offered a race-neutral explanation for

the peremptory challenge and the trial court has ruled on the ultimate question of intentional

discrimination, the preliminary issue of whether the defendant had made a prima facie

showing becomes moot."  *United States. v. Goodson*, 319 Fed. App'x. 222, 223 (4th Cir.

2009) (citing *Hernandez*, 500 U.S. at 359 (internal citations omitted).

 The prosecutor cited several reasons for striking juror Melody Hall, a thirty-two-year

old African-American female:

> [Ms. Hall] ... in the first instance is the same age as these defendants,
> she is 32 years old, according to what she stated, she is physically attractive
> and she is single.  In addition to that, which I would contend that Mr. Blakney
> at least, has been described by his psychiatrist as attractive ... She has
> expressed that in her associations that she stated that returning a guilty verdict
> of first degree murder and returning a death sentence that she would be subject
> to criticism from her acquaintances.  When I asked her the first time about
> whether that would affect her ability to decide this case, there was a long
> period of hesitation before she said there was not.  That is essentially the
> answer that [another juror] and other people that we have exercised
> peremptory challenges, have been hesitant or unclear in their answers, which
> would lead me to conclude that they were unclear if the answer they were
> giving was, in fact, correct.  She, I think, was rehabilitated from that position
> by the Court, but when I asked her those questions, she was slow.  My
> recollection is that she would not maintain eye contact with me during the time
> that I was asking those questions.  I would say that her hairstyle and personal
> appearance would indicate potentially a nonconformist or non-traditional
> approach to her life.  She lives — she works in Charlotte, therefore, is not a
> local person and is subject to whatever conversation she would have at that
> time on her job.  She is - - I think I mentioned that she is single and mentioned
> that in terms of her age group and this group of defendants and would say that
> her being single indicates that she is less stable in her life-style and potentially
> less responsible.  Those are all things that are at least factors.

-16-

(Jury Tr. Vol. I at 371-72.)  The trial court found that "the reasons given [by the State] are not pretextual." (*Id.* at 375.)  On direct appeal, the North Carolina Supreme Court upheld the trial court, noting:

> The prosecutor's questioning techniques throughout the jury selection process for jurors black and white alike focused on age, marital status, and circumstances involving racial sensitivity or favoritism.  The trial court's determination that the dismissal of Hall was not the product of discriminatory intent was not clearly erroneous and will be upheld.

*Barnes*, 345 N.C. at 212, 481 S.E.2d at 59.

The trial court similarly found that no prima facie case of discrimination existed with regard to the prosecution's peremptory challenge of juror Jones but again asked the prosecutor to offer an explanation for the record.  The prosecutor stated:

> [Lana Jones] is 22 years old.  She stated she went to school with a State's witness, Curtis Cowan, who we know to be a convicted felon.  She said that she had no prior knowledge of this case at all and my recollection is that she may be the only one that has said they haven't heard anything about this.  Her work - - she is 22 and as I understood it had only been working since August and that would indicate a lack of stability.  I would also point out at the same exercise of peremptory challenges we excused a 20 year old white male at the same time we excused Mrs. Jones.

(Jury Tr. Vol. I at 375.)  The trial court found that the reasons given by the State were race-neutral.  (*Id.* at 376).  On appeal, the North Carolina Supreme Court found that the trial court's conclusion was not clearly erroneous, noting that:

> [A]ge was one of a number of important factors in the prosecutor's strategy for the jury selection process.  With respect to the other factors, Jones' familiarity with a witness who was a convicted felon and the absence of any work history

-17-

are both legitimate race-neutral reasons for the prosecutor's exercise of the peremptory challenge.

*Barnes*, 345 N.C. at 212-13, 481 S.E.2d at 59. The court further found: "[e]ach of the prosecutor's reasons are supported by the record and are facially race-neutral. As we cannot say that the trial court's rulings with respect to venire members Hall [and] Jones . . . were clearly erroneous, we therefore conclude that these assignments of error are without merit."

*Id.* at 213, 481 S.E.2d at 59.[5]

On post-conviction review, the MAR court summarily rejected Petitioner's *Batson* claim, holding:

> This issue is procedurally barred. This issue was presented in Defendant's direct appeal.... The [MAR] does not present any new evidence which was not available at the time of his initial appeal which would entitle him to relief. The motion for appropriate relief as to this ground is without merit, and no further hearing is required for this ruling.

(MAR Order, Ex. 2, at 15.)

*Miller-El II* did not change the analysis a court must undertake in considering a *Batson* claim. *See Golphin*, 519 F.3d at 186; *United States v. Barnette*, 644 F.3d 192, 204-05 (4th Cir. 2011), *petition for cert. filed* (Oct. 28, 2011) (No. 11-7257, 11A216). The ultimate burden still rests with the opponent of the challenge to prove purposeful discrimination.

---

[5] In the trial court and on direct appeal in state court, Petitioner complained of peremptory strikes as to three jurors: Hall, Jones, and Cherry. In his brief in support of his habeas petition, however, Petitioner refers only to jurors Hall and Jones. He therefore has abandoned any claim as to juror Cherry.

-18-

"Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Hernandez*, 500 U.S. at 360. Petitioner contends that the prosecutor's reasons for striking juror Hall "were contrived at best" (Pet. Br. at 9), and that the prosecutor's mention of Hall's appearance, especially in connection with the similar "attractiveness" of one of the defendants, represented several "astonishingly race-based assumptions," notably, that physical attraction between human beings is only intra-racial and that, with regard to African-Americans, this attraction is "irresistible." *Id.* On review, this court is not convinced that the race-based "assumptions" identified by Petitioner underlay the State's peremptory strike. The trial court was in the best position to judge these objections and the tone, demeanor and responses of the jurors. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (stating that "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance").

The State articulated several legitimate, race-neutral explanations for striking Hall, including her age, marital status, residence, and the fact that she did not make eye contact with the prosecutor while he was questioning her. By articulating race-neutral reasons for the strikes, the State satisfied its burden at the second step of the analysis. The mention by the prosecutor of Hall's appearance, while perhaps of less relevance, does not outweigh the

-19-

fact that the State articulated several legitimate, race-neutral reasons for striking Hall. Hall's initial response to the questions about the death penalty was equivocal at best. She indicated that she would be subject to criticism from friends if she returned a verdict of death. (Jury Tr. Vol. I at 342.) This fact alone would be sufficient to cause concern to the prosecutor. Hall's age was a proper consideration, and the record shows that it was a matter of primary consideration for the prosecution in this case. Moreover, this court is unwilling to make the assumptions urged by Petitioner - - that is, that the mention of the "attractiveness" of an African-American juror and an African-American defendant somehow implies that only an African-American juror would be attracted to an African-American defendant, or that an attractive African-American female would be unable to consider impartially the case against an African-American male. The attractiveness of a juror or a defendant is, on its face, a race-neutral consideration. Although a prosecutor must present a comprehensible reason for the strike, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam) (internal quotations omitted)).

The reasons given by the State for its peremptory strike of juror Jones were similarly race-neutral. Again, Jones was young and had not been in the work force for long. Additionally, Jones was acquainted with one of the State's witnesses, who was a convicted felon. These explanations for striking Jones were facially valid, race-neutral reasons. At the

second step, the prosecutor's explanation need not be persuasive; it need only be based on some factor other than the juror's race. *See Hernandez*, 500 U.S. at 360.

Once the first two steps of analysis are completed, the trial court must then decide whether the State's explanation is pretextual and whether the opponent of the strike has met the burden of proving purposeful discrimination. The defendant must "show *both* that [the Government's stated reasons for a strike] were merely pretextual *and* that race was the real reason for the strike." *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994) (emphasis in original). In making this showing, the "defendant may rely on all relevant circumstances to raise an inference of purposeful discrimination." *Miller-El II*, 545 U.S. at 240. The defendant need not "point to an identical juror of another race who was not peremptorily challenged." *Golphin*, 519 F.3d at 179. Rather, "direct comparisons between similarly situated venire-persons of different races" are probative. *Id*. at 179-80 (quoting *Miller-El II*, 545 U.S. at 247 n.6.)

Petitioner challenged the State's race-neutral explanations for striking the two jurors in question, arguing that the reasons "are not racially neutrally sufficient enough based on the other jurors that have been over there in that same situation some of which were passed by the State." (Jury Tr. Vol. I at 374.) One of the attorneys representing another defendant also argued that the reasons given as to juror Hall were not appropriate, and that the juror's age, occupation, and residence show "somebody who is in touch with the world at large" rather than an unstable individual. Additionally, defense counsel argued that two out of

-21-

seven peremptory challenges exercised by the State were against black female jurors (Hall

and Jones). As noted by the prosecutor, however, at the same time juror Jones was

challenged, the State exercised a peremptory challenge as to excuse a 20-year-old white male.

No detailed hearing was held on these challenges.[6] The trial court heard the brief

arguments of counsel, and then found that the State's reasons were not pretextual. A trial

court's resolution of this issue rests largely on credibility determinations, however, and

therefore its findings must be given great deference. *Jones v. Plaster*, 57 F.3d 417, 421 (4th

Cir. 1995) ("[T]he [trial court] is especially well-suited to resolve challenges to peremptory

strikes of jurors because it has observed with its own eyes the very act in dispute."); *see also*

*Snyder*, 552 U.S. at 477 (noting that step three of the *Batson* analysis involves evaluation of

prosecutor's credibility and, often, a juror's demeanor, making the trial court's first-hand

observations of both even more important).[7] The State provided race-neutral explanations

---

[6] As noted by the Fourth Circuit, *Batson* hearings are almost invariably "contemporaneous, adversarial proceedings, typically conducted in the midst of, or immediately at the conclusion of, the [trial] court's voir dire process." *Barnette*, 644 F.3d at 208. Such proceedings are acceptable and reasonable as courts carry out their obligations sensitive to both the "duty to combat invidious discrimination in jury selection" and the "implementation of the necessary procedural incidents of [jury selection]." *Id.*

[7] In *Snyder*, decided long after the trial in this case, the Supreme Court held that when discriminatory intent is a substantial or motivating factor for a peremptory strike, the prosecution must show, at a minimum, that the impermissible motive was not "determinative" before the strike can be sustained. 552 U.S. at 485. Here, because the state supreme court found that the prosecutor's stated reasons for striking Hall were race-neutral, it is not necessary to determine whether any mixed-motive analysis was required under clearly established federal law at the time of Petitioner's trial.

for the challenged strikes. As such, the burden shifted to Petitioner to prove that the explanations given by the State were pretexts for discrimination. The trial court held that Petitioner did not meet this burden.

The reasons given by the State for striking Jones were her age, a scant work history which suggested instability, and the fact that she testified she knew nothing about the case. Additionally, the prosecutor noted that Jones had testified that she knew one of the witnesses who might be called by the State, and who was an incarcerated felon. The trial court found these reasons to be not pretextual. The trial court was in the best position to judge the responses and the nuances present in the exchange between the prosecutor and Jones. Age is a permissible consideration in jury selection, and it was clearly an important factor considered by the State in this prosecution. Other younger jurors, both African-American and Caucasian, were stricken by the prosecution. (*See, e.g.*, Jury Tr. Vol. I at 170; Vol. II at 11, 134; Vol. III at 64; Vol. IV at 94). The additional reasons cited by the prosecution, i.e., Jones' relative instability and her acquaintance with a potential witness, are not indicative of any kind of discriminatory intent. Given the trial court's experience in making credibility determinations, and its first-hand observation of the voir dire exchange, it is proper to defer to its findings and judgment. The state court did not err in finding that the State's reasons for striking juror Jones were not pretextual.

In this habeas proceeding, Petitioner contends that the jury selection notes made by the prosecutor affirmatively show that the State discriminated in the jury selection process.

-23-

The notes compiled by the prosecutor contain a notation regarding the race of the juror being considered. (*See* Pet. Br., Ex. 5.) As to juror Hall, the notes read: "age, race, G + d.pen. crit." Petitioner attempts to read into these notes a purpose more sinister than simple identification of the juror: "[t]here could hardly be more compelling evidence of racial motivation than the prosecutor's use of the word 'race' to describe his concern about Hall." (Pet. Br. at 14.) Petitioner argues that these notations establish that race was a criterion for Hall's removal or, at the least, that the prosecutor's stated reasons for the peremptory strike of Hall were pretextual. The Court observes that the handwritten notes in question are difficult to decipher and were obviously written in shorthand form for contemporaneous use by the prosecutor. It also must be noted that the prosecutor had other similar notations beside other members of the jury panel, noting race, age, gender, and other characteristics. As such, the notations appear to be more a "method of identification not discrimination." *See Harris v. Haeberlin*, Civil Action No. 3:03CV-P754-H, 2009 WL 1883934, at *8 (W.D. Ky. June 30, 2009).

As discussed earlier, this case is governed by section 2254 of AEDPA; the petition for habeas corpus may not be granted unless the state court's adjudication of Petitioner's claim resulted in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law," or "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2). This court also presumes the state court's factual findings correct unless rebutted by clear and convincing

-24-

evidence. *See* 28 U.S.C. § 2254(e)(1). Under this standard, and for all the reasons discussed above, the state court's finding of no discriminatory intent in the State's use of peremptory challenges has not been shown to be incorrect or unreasonable.

## CLAIM II - Juror Misconduct

Petitioner claims that he was denied a fundamentally fair trial and sentencing hearing because of juror misconduct. At trial, following the sentencing recommendation of the jury, defense counsel asserted to the trial court that a juror had taken a Bible into the jury room and read to other jury members, and that another juror had called her minister to ask a question about the death penalty. All defendants raised this issue on direct appeal. The North Carolina Supreme Court noted the following exchange which took place at trial:

> THE COURT: No evidence that anybody discussed the particular facts of this case with anyone outside the jury. Is that correct?
>
> [DEFENSE COUNSEL]: No evidence that they did or did not as far as the conversation with the minister is concerned.
>
> THE COURT: No evidence that they did though. Is that correct?
>
> [DEFENSE COUNSEL]: No sir.
>
> THE COURT: All right. Well, I'm going to deny the request to start questioning this jury about what may or may not have taken place during their deliberations of this trial.

*Barnes*, 345 N.C. at 225, 481 S.E.2d at 66-67. On appeal, the North Carolina Supreme Court held that the trial court did not abuse its discretion in not investigating the alleged juror misconduct and in denying a motion for mistrial:

-25-

Assuming *arguendo* that defense counsel's assertions were accurate, there still was no assertion that the juror's reading from the Bible was accomplished in the context of any discussion about the case itself or that it involved extraneous influences as defined by this Court. The issue, therefore, is whether the trial court abused its discretion by failing to inquire further into the alleged Bible-reading incident when faced with the mere assertion that a juror read the Bible aloud in the jury room prior to the commencement of deliberations and prior to the trial court's instructions to the jury. As there is no evidence that the alleged Bible reading was in any way directed to the facts or governing law at issue in the case, we cannot say that the trial court's actions were an abuse of discretion.

With respect to a juror's alleged actions in calling a clergy member, a similar analysis applies. The trial court was faced with the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty. Nothing in this assertion involved "extraneous information" . . . or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case. We cannot say under the particular circumstances of this case that the trial court's actions in failing to probe further into the sanctity of the jury room was abuse of discretion.

*Id.* at 228, 481 S.E.2d at 68.

The state MAR court similarly dismissed this claim, without an evidentiary hearing:

Defendant's argument that there is now additional evidence which was not available at that time is without foundation or support, and defendant seeks to present anew the same contentions and inferences raised in his initial appeal. The issue was also before the Supreme Court in his oral motion for appropriate relief made at trial raising this issue and also rejected by the Supreme Court. The allegedly new evidence adds nothing to the issue as it was presented during defendant's initial appeal, and the allegations are subject to the same analysis inherent in that decision. The motion based upon this allegation is summarily denied as procedurally barred and without merit.

(MAR Order at 12-13.)

-26-

Post-conviction counsel conducted interviews with some of the jurors and discovered that several jurors had been upset by the argument of one of the defense attorneys during the sentencing phase of the trial. In his argument, the defense attorney argued (improperly) that the jurors - like the defendants on trial - would have to face the judgment of God if they imposed the death penalty. One juror, Hollie Jordan, was so offended that she called her minister that evening, and he gave her a biblical passage for consideration. The next day, the juror brought her Bible into the jury room and read the passage to the other jurors.[8] (Pet. Br.,

---

[8] Petitioner has attached as an exhibit to his Petition an "Interview Summary," referencing an interview of juror Jordan. The interview was conducted by Janine Crawley and Alexander McCoy; at the bottom of the summary, Hollie Jordan's signature appears following this statement: "The summary is an accurate description of what I said to Janine Crawley and Alexander McCoy on May 31, 1995." The signature is dated June 1, 2000. The statement is not notarized. The summary reads, in part:

> Ms. Jordan told the interviewers that she was offended by one of the closing arguments made by one of defendant Chambers' attorneys. This attorney argued that if jurors voted for the death penalty, they would one day face God's judgment for killing these defendants.
>
> Ms. Jordan, herself, did not accept the attorney's argument but she noticed that another juror, a female, seemed visibly upset by the argument.
>
> To remedy the effect of the argument, Ms. Jordan brought a Bible from home into the jury deliberation room. She read an unspecified passage from the Bible stating that it is the duty of Christians to abide by the laws of the state. Ms. Jordan knew the passage from church. Ms. Jordan read the passage to all the jurors, in the jury room, during regular deliberations.

(Pet. Br., Ex. 6.) This statement contains no mention of any communication Jordan had with her pastor regarding this passage. An affidavit of Cynthia F. Adcock, an attorney with the North Carolina Resource Center, recounts interviews with other jurors, at least two of whom stated that Jordan had talked with her pastor. (Pet. Br., Ex. 8.)

-27-

Ex. 4, Affidavit of Daniel C. Williams; Ex. 6, Statement of Hollie Jordan; Ex. 7, Affidavit

of Ardith Funderburk Peacock; Ex. 8, Affidavit of Cynthia F. Adcock).  The gist of the

Biblical passage was that Christians should abide by the laws of the State.  The incident took

place during the sentencing deliberations.

> The Sixth Amendment states in pertinent part:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and
> public trial, by an impartial jury . . . and to be informed of the nature and cause
> of the accusation; to be confronted with the witnesses against him; to have
> compulsory process for obtaining witnesses in his favor, and to have the
> Assistance of Counsel for his defen[s]e.

U.S. Const. amend. VI.[9]  The United States Supreme Court has clearly established that an

extrinsic influence on a jury's deliberations violates a defendant's Sixth and Fourteenth

Amendment rights to an impartial jury, to confront witnesses against him, and to be present

at all critical stages of trial.  *See, e.g., Remmer v. United States*, 347 U.S. 227, 229 (1954);

*Rogers v. United States*, 422 U.S. 35, 39-40 (1975); *Parker v. Gladden*, 385 U.S. 363, 364-66

(1966); *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).  There is a presumption of

prejudice to the defendant when there is "any private communication, contact, or tampering

directly or indirectly, with a juror during a trial about the matter pending before the jury. . ."

*Remmer*, 347 U.S. at 229.  However, this presumption arises only when the defendant

---

[9]  The U.S. Supreme Court has held that the Fourteenth Amendment makes the
Confrontation Clause and Impartial Jury guarantees of the Sixth Amendment obligatory upon
the States. *See, e.g.*, *Pointer v. Texas*, 380 U.S. 400 (1965); *Duncan v. Louisiana*, 391 U.S.
145 (1968).

establishes that extra-judicial contacts occurred which cast doubt on the validity of the jury's verdict. *Stockton v. Virginia*, 852 F.2d 740, 747 (4th Cir. 1988).

The Supreme Court has distinguished between external jury influences and internal jury influences. "Under clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case . . . or (2) is an outside influence upon the partiality of the jury, such as private communication, contact, or tampering with a juror." *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006) (citing *Remmer*, 347 U.S. at 229) (internal quotation omitted); *see also Wolfe v. Johnson*, 565 F.3d 140 (4th Cir. 2009). Given the threat to impartial jury verdicts, claims of external jury influences require a thorough judicial inquiry, while no such hard and fast obligation inures to internal jury influence claims. *Robinson*, 438 F.2d at 363.

The United States Supreme Court has also observed that stated communications, or "private talk," between an outside party and the jury may constitute an "outside influence" necessarily implicating the Sixth Amendment. *Parker*, 385 U.S. at 364-65. Outside influences are constitutionally suspect because they are not subject to full judicial protection of the defendant's Sixth Amendment rights to confrontation and cross-examination. *See id.* Moreover, even if only one juror's impartiality is overcome by an improper extraneous influence, the defendant's right to an impartial jury has been denied. *Id.* at 366 ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

-29-

As the Fourth Circuit Court of Appeals has noted, "there is no Supreme Court authority clearly articulating the specific circumstances under which an extraneous influence might prejudice a juror, and each case must turn on its special facts." *McNeill v. Polk*, 476 F.3d 206, 226 (4th Cir. 2007) (internal quotation omitted). In *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006), the court considered the claim of a habeas petitioner who alleged that a bailiff had given a Bible to the jury during the sentencing phase of his trial and that a juror read aloud a passage containing the "eye for an eye" language in an attempt to persuade his fellow jurors to vote for the death penalty. The state court denied Robinson's claim without an evidentiary hearing, determining that even if the allegations were true, the defendant's rights had not been violated. The Fourth Circuit concluded that the state court's decision was not an "unreasonable application of" clearly established federal law. 438 F.3d at 366. The majority opined that the Bible was arguably an "internal" influence within the meaning of clearly established Supreme Court law because "reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence." *Id*. at 364. The majority further found that whether the Bible constitutes an external or an internal influence is therefore not clearly established under Supreme Court law, noting that "the reading of Bible passages invites the listener to examine his or her own conscience from within." *Id*. at 363. The Fourth Circuit concluded that it would therefore have been "reasonable for the [state] court to conclude that the Bible is not

analogous to a private communication, contact, or tampering with a juror, and that the common-law rule against allowing juror testimony applied." *Id.* Finally, the court noted that

> [T]he safeguards of the trial process -- in particular, the fact that jurors' religious views can be examined at voir dire . . . and that the defendant can request a jury charge explaining to the jurors their duty to follow the law. . .-- provide an adequate protection of a defendant's right to be sentenced by a jury free of improper influences such that a post-verdict examination into Bible reading is unnecessary.

*Id.* at 364; *see also Lenz v. Washington*, 444 F.3d 295, 312 (4th Cir. 2006) (no habeas relief on Bible claim where a juror, not a bailiff, brought Bible into jury room, juror did not appear to use the Bible to advance a pro-death penalty agenda, and there was no evidence that any passages relating to the sentencing decision were read).

Here, Petitioner contended in the state courts that his Sixth Amendment rights were violated because one juror consulted with her pastor for guidance during the sentencing phase of the trial and she and perhaps other jurors brought Bibles into the jury room and read passages aloud. While this court is cognizant of Fourth Circuit caselaw holding that a Bible is not an "external" influence, it is clear that communication in this case between a juror and her pastor removes the case from the realm of the standard "Bible in the jury room" fact pattern. In other words, the communication between the juror and her pastor was clearly an external influence, i.e., one that did not relate to the jury's internal processes. The state trial court did not question the jurors regarding the reading of Bible passages in the jury room, nor did the court specifically question the juror who contacted her minister during the sentencing

-31-

phase of the trial. The MAR court, similarly, did not conduct an evidentiary hearing on this issue.

That said, it is not necessary to decide whether there was potential juror misconduct here because, even assuming there was, there is simply no evidence or persuasive argument that juror Jordan's contact with her minister and the reading of the Bible passage in question had any substantial and injurious effect or influence in determining the jury's sentencing decision. Petitioner's evidence is that the pastor may have pointed a juror to a Biblical passage urging Christians to abide by the law of the state; this is not a message that conflicts with the juror's oath or would suggest that the juror disregard the law or the facts. None of the jurors' statements or affidavits indicate that the incident impacted their decision. Indeed, this court may not consider any evidence as to the effect of information or outside influence on a jury's deliberative process. *See McNeill,* 476 F.3d at 226 (noting that "generally, of course, once a verdict has been rendered, jurors are not entitled to impeach it."); Fed. R Evid. 606(b) (prohibiting juror from testifying as to effect of anything upon a juror's mind or emotions to influence the juror's decision). Clearly, the jury had enough time in this case to

sort through the evidence and reflect on whether the ultimate penalty was the right penalty.[10]

As the Fourth Circuit has instructed:

> [W]hile a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked. For that reason, we have held that to trigger a *Remmer* presumption, the defendant bears the initial burden of establishing both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict.

*United States v. Baptiste*, 596 F.3d 214, 221 (4th Cir. 2010)(internal quotations omitted).

Petitioner Barnes has clearly not met this burden.

The jury was instructed to base its decision on the facts and the law as stated by the judge, regardless of whether a juror agreed with it. We presume that jurors follow the instructions. *Kansas v. Marsh*, 548 U.S. 163, 179 (2006); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (applying "the almost invariable assumption of the law that jurors follow their instructions"). Further, while it might have been improper for the juror to consult with her pastor, and for her or others to bring a Bible into the jury room, there is simply no evidence that such occurrences had a substantial and injurious effect or influence in the jury's determination of the verdict in this case. Petitioner was not deprived of his Sixth

---

[10] As noted above, the affidavits submitted by Petitioner indicate that the Bible verse referenced here was one stating that it is the duty of Christians to abide by the laws of the State. Such a well-known Biblical aphorism in a capital sentencing proceeding is certainly more innocuous than urging jurors to follow the Old Testament "eye for an eye" passage, *see Robinson*, 438 F.3d at 364, or a Biblical command directly tracking specific facts of a murder case, *see Oliver v. Quarterman*, 541 F.3d 329, 339 (5th Cir. 2008), yet no prejudice was found in those cases.

-33-

Amendment right to an impartial jury and the state court's ruling to this effect was not

contrary to, or an unreasonable application of, clearly established federal law.

## CLAIM III - Ineffective Assistance of Counsel ("IAC")

Petitioner Barnes asserts that his conviction and sentence are unconstitutional because

he was denied his right to the effective assistance of counsel under the Sixth Amendment.

The merits of Petitioner's claim are squarely governed by the Supreme Court's holding in

*Strickland v. Washington*, 466 U.S. 668 (1984).

Under the two-part test established in *Strickland*, a defendant first "must show that

counsel's performance was deficient." *Id.* at 687. To prove deficiency, the defendant "must

show that counsel's representation fell below an objective standard of reasonableness." *Id.*

at 688. Second, the defendant must show that the deficient performance actually prejudiced

him. The defendant bears a "'highly demanding' and 'heavy burden'" in establishing actual

prejudice." *Williams v. Taylor*, 529 U.S. 362, 394 (2000); *see also Strickland*, 466 U.S. at

694.

To establish prejudice, a defendant "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694. "Indeed, it is insufficient to show only that the errors

had some conceivable effect on the outcome of the proceeding, because virtually every act

or omission of counsel would meet that test." *Williams*, 529 U.S. at 394; *see also Strickland*,

466 U.S. at 694. Review of counsel's performance is "highly deferential." *Strickland*, 466

U.S. at 689. "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*,

559 U.S. ____, ____, 130 S. Ct. 1473, 1485 (2010).

In addition, competency is measured against what an objectively reasonable attorney

would have done under the circumstances. *Strickland* 466 U.S. at 687-89. Counsel are

afforded a strong presumption that their performance was within the broad range of

professionally competent assistance. *Id.* at 689. In the context of a capital sentencing

proceeding, a demonstration of prejudice requires a showing that "there is a reasonable

probability that, absent the errors [of trial counsel], the sentencer . . . would have concluded

that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*,

466 U.S. at 695. To make such a showing, a petitioner need not establish a reasonable

probability that the entire jury would have voted against the death sentence, rather that "there

is a reasonable probability that at least one juror would have struck a different balance."

*Wiggins v. Smith*, 539 U.S. 510, 537 (2003). In determining whether a petitioner has carried

his burden of showing that there is a reasonable probability that at least one juror would have

declined to impose a death sentence if presented with certain mitigating evidence, a court

must "reweigh the evidence in aggravation against the totality of available mitigating

evidence." *Id.* at 534.

To establish deficient performance under *Strickland*, a petitioner "must show that

counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466

-35-

U.S. at 688. The performance of counsel must be measured under "prevailing professional norms," and in light of the facts "as seen from counsel's perspective at the time." *See Wiggins*, 539 U.S. at 523. When evaluating the adequacy of a trial counsel's preparation under the deficient performance prong of *Strickland*, "[c]ounsel's conduct is generally presumed to be a reasonable strategic choice, but is not reasonable to the extent that the choice of strategy does not rely upon either a full investigation of the law and facts or an abbreviated investigation of the law and facts limited only by reasonable professional judgments." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006) (internal quotation and citation omitted). In capital cases, the Supreme Court has held that trial counsel's mitigation strategy "should comprise efforts to discover *all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (emphasis in original) (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") (1989 ed.) 11.4.1(C)). This obligation includes interviewing "witnesses familiar with aspects of the client's life history" that might uncover "possible mitigating reasons for the offense(s)." *Id.* at Guidelines 11.4.1(D)(3)(B); *see also* ABA Guidelines (2003 ed.) 10.7, cmt. ("It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client.")). *Strickland* does not require defense counsel to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing in every case." *Wiggins*, 539 U.S. at 533. Rather, it imposes upon counsel a duty to make reasonable

-36-

investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.*

Petitioner contends that counsel was ineffective in the sentencing phase in at least five respects: (1) failure to present evidence of Petitioner's "adjustment to incarceration"; (2) failure to properly prepare witness Michael Barnes, Petitioner's brother; (3) failure to prepare Willie Mae Barnes, Petitioner's grandmother, for her testimony; (4) failure to call Anthony Barnes, another of Petitioner's brothers; and (5) failure to interview or call as a witness Della Barnes, Petitioner's mother. The State argues that Petitioner is procedurally barred from presenting the ineffective assistance of counsel claim with regard to Michael Barnes, Willie Mae Barnes, and Anthony Barnes.

At the sentencing phase of the trial, Petitioner presented six witnesses in mitigation. (Sentencing Tr. Vol. VII at 462-546.) Dr. William Scarboro, a licensed psychologist, testified about psychological studies regarding development of children who are exposed to violence and children who lack male role models. He further testified that he was asked to look at Petitioner's childhood history and gather information to form opinions about Petitioner's upbringing. He noted that Petitioner was neglected as a child and that both of his parents were alcoholics, factors which often result in psychological problems for children. Dr. Scarboro also testified that Petitioner's problems seemed to present themselves around the time that his mother went to prison; Dr. Scarboro's opinion was that Petitioner had no positive role model in his life. (*Id.* at 518.)

-37-

Vanessa Davis, Petitioner's former girlfriend, testified that she met Petitioner when they were both working at a fast-food restaurant when he was on work release in 1992. Davis testified that Petitioner was an excellent worker and that he got along well with the managers. After his release from prison, Petitioner lived with Davis and continued to work. At some point, according to Davis, Petitioner stopped going to work and was drinking and doing drugs. Davis testified that Petitioner was "different" when he was under the influence of drugs and alcohol. According to Davis, Petitioner stayed with her until a week before the Tutterow murders. She also testified that she knew Petitioner's father, that Petitioner loved his father but his father had not been around much when Petitioner was growing up, and "he wasn't a father to him." (*Id.* at 479.)

Ronnie Miller, Petitioner's cousin, testified that he and Petitioner were best friends and that Petitioner had a problem with drugs and alcohol, but that he was a good guy when he was not drinking or using drugs. He also testified about a fight Petitioner had at a club. Miller also testified that Petitioner's father was not around much when Petitioner was growing up. (*Id.* at 488-99.)

Willie Barnes, Petitioner's grandmother, testified that Petitioner lived with her while he was growing up because his mother was in prison. Petitioner's father was not around much. (*Id.* at 529-31.)

Michael Barnes, Petitioner's older brother, testified that their mother went to prison when Petitioner was around ten years old, and they lived with their grandmother in the

projects. Petitioner began to get in trouble around that time. Michael also mentioned that his mother would not be in court to testify because she was having some health problems, though under cross-examination, he admitted that part of the reason she would not testify is because she would not put up with Petitioner's bad conduct. (*Id.* at 545.)

Finally, Larry Murphy, a food services supervisor at Central Prison testified about Petitioner's job as a cook in the prison kitchen during his detention awaiting trial for the murders of the Tutterows. According to Murphy, Petitioner started as a general laborer but worked his way up to head cook. Murphy testified that Petitioner supervised three or four people and "worked great, had no problems at all." (*Id.* at 464.)

### A. Failure to present evidence of Petitioner's prison conduct

Petitioner first argues that counsel was ineffective for failing to present evidence of Petitioner's good conduct in prison. The United States Supreme Court has held that evidence of adjustment to prison life is "by its nature relevant to the sentencing determination" because it might convince the jury that the defendant "would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment." *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986).

At the MAR hearing, Petitioner presented prison documents and records which showed that he had successfully completed an educational program at Cleveland Community College during a previous incarceration, including courses in "vocational basic arithmetic," "communication skill," and "human relations." This evidence was not before the jury at trial,

though according to Petitioner, his trial counsel were in possession of the prison records showing his completion of the college course work. With regard to this claim, the MAR court held:

> Defendant argues that the jury should have been informed he had good conduct while in prison and made high grades in courses he took during a previous incarceration. The certificate and transcript, which was introduced during the hearing . . . does show that, but also shows one of the courses was "Human Relations." The implications for damaging use of the transcript by the state would cause a reasonable attorney to weigh carefully its use. When objectively considered, the failure to use that transcript, if counsel were aware of it, would not have been unreasonable. Therefore, defendant has failed to show prejudice whether his trial attorneys were aware or unaware of the existence of the transcript.

(MAR Order 11.)

Petitioner contends that counsel were ineffective for failing to put forth evidence of his good conduct in prison. The prison records which were introduced at the MAR hearing included documents showing that he had received merit points from Cleveland Correctional Center for working overtime. Petitioner argues that "[t]his evidence would have supported important mitigating circumstances related to [Petitioner's] ability to live in and better himself in prison." (Pet. Br. at 23.) At the MAR hearing, Mr. Lea, one of Petitioner's trial attorneys, testified that the defense did not have these records at the time of the trial, but that the information contained in the records would have been consistent with the mitigation strategy, which was to show that Petitioner could adapt to prison and "be an asset." (MAR Ex. 12 at 75.)

-40-

Evidence of a "defendant's disposition to make a well-behaved and peaceful adjustment to life in prison" can be relevant mitigating evidence. *Skipper*, 476 U.S. at 7. Under *Skipper*, therefore, the evidence of Petitioner's prison course work and good behavior credits would undoubtedly have been admissible. However, *Skipper* does not require that every piece of evidence regarding a defendant's behavior in prison be introduced. Indeed, during the sentencing proceeding in this case, counsel for Petitioner did present direct testimony from Petitioner's supervisor in the prison kitchen about Petitioner's work and good behavior while detained on the murder charges. Additional evidence of good time credits and educational courses taken during a *previous* incarceration would thus have been partially cumulative and, perhaps, even damaging in that such evidence would highlight the fact that Petitioner had previously been in prison, and that despite his "good behavior" still had participated in the murders of the Tutterows shortly after he was released from prison.

Under the second prong of *Strickland*, Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Here, there is no reasonable probability that the additional evidence of Petitioner's good behavior, or successful course work, in prison during a previous incarceration would have changed the outcome of the sentencing proceeding. It was not unreasonable for the state court to conclude that trial counsel's failure to introduce this evidence of Petitioner's conduct in prison was not objectively unreasonable and did not prejudice Petitioner under *Strickland*.

-41-

**B.** **Failure to properly investigate and/or present mitigating evidence of Petitioner's troubled childhood**

Petitioner argues that counsel did not comply with the requirements of *Strickland* and *Wiggins* during the sentencing phase because counsel failed to present evidence of Petitioner's "dysfunctional family." Specifically, Petitioner contends that he received ineffective assistance of counsel because his attorneys did not interview or call Della Barnes, Petitioner's mother, as a witness.

Petitioner presented evidence on this claim at the MAR hearing. Della Barnes testified at the hearing, recounting Petitioner's childhood, her abusive relationship with her boyfriend, and her conviction for involuntary manslaughter for killing the boyfriend when Petitioner was ten years old. Della also testified that she never spoke with Petitioner's trial attorneys. In his testimony at the MAR hearing, Mike Lea, one of Petitioner's attorneys, stated an opinion that Della Barnes would have made a better witness than Petitioner's grandmother, who did testify.

The MAR court found:

> Both of defendant's trial counsel were experienced and specifically considered but concurred in rejecting using [Della Barnes] as a witness. The testimony she provided at this hearing was cumulative and not substantially different from that provided by the grandmother and the other witnesses who testified. Furthermore, the substance of the beneficial information was elicited at trial through the use of a potentially sympathetic witness (grandmother) as opposed to the use of a witness who had the potential of being very unsympathetic (the homicidal mother who had just been released from prison). The testimony would have invited potentially damaging cross-examination by the state, the potential effect of which objectively justifies trial counsel's reasoned decision

-42-

not to put her on the stand. Defendant has failed to show by any measure that counsel's failure to call his mother as a witness following her release from prison for a homicide conviction was deficient. Defendant has failed to show that there is a reasonable possibility of a different result had the witness been called. No prejudice has been shown.

(MAR Order at 12.)

Once an individual has been found to be eligible for the death penalty, the sentencer must then consider relevant mitigating evidence, allowing for "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse." *Wiggins,* 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Thus, the sentencer in a capital case must consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (right to individualized sentencing in capital cases violated by Ohio statute that permitted consideration of only three mitigating factors). Of course, while the sentencer must not be foreclosed from considering relevant mitigation, the weight to be given such evidence is up to the sentencer. *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982).

-43-

Petitioner complains of several alleged deficiencies of counsel with regard to this issue:

### (1) Failure to investigate and call Della Barnes

Della Mae Barnes, Petitioner's mother, was not called as a witness at trial. At the post-conviction hearing, however, Ms. Barnes testified about her background and Petitioner's childhood. Among other things, she testified that she had five sons, fathered by four different men, that her first son was conceived as a result of rape, that Petitioner never had the benefit of a positive role model when he was growing up, that her children lived with her mother, and that one of her boyfriends was physically abusive towards both her and her children, including Petitioner. Ms. Barnes eventually shot the boyfriend and served time in prison for involuntary manslaughter.

Petitioner's trial attorneys testified at the MAR hearing about their decision to not call Della as a witness. Mike Lea, one of the attorneys, testified that he was advised that Della would not make a good witness. Bill Fritts, Lea's co-counsel, testified that, while he could not remember specifics, his time records indicated that he interviewed Della Barnes on at least one occasion, for more than thirty minutes.

It is well established that defense counsel must "conduct a thorough investigation of the defendant's background" to identify potential mitigating evidence. *Williams*, 529 U.S. at 396 (2000). A court considering a petitioner's challenge to counsel's failure to present specific mitigating evidence must determine "whether the investigation supporting counsel's

-44-

decision not to introduce [the evidence] . . . was itself reasonable." *Wiggins*, 539 U.S. at 523. Under the ABA Guidelines, investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines 11.4.1(C) (1989), *quoted in Wiggins*, 539 U.S. at 524. Topics counsel must consider include "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (citing ABA Guidelines 11.8.6, at 133.)

In this case, the MAR court reasonably found that counsel made an informed and reasonable decision not to call Della Barnes as a witness. Counsel spent considerable time developing and presenting to the jury a picture of Petitioner's life. Petitioner's other family members who did testify provided substantial information about Petitioner's childhood, including the fact that his father was not involved in Petitioner's life and his mother went to prison for manslaughter. The other witnesses also testified about Petitioner's problems with drugs and alcohol. Moreover, trial counsel testified that they formed the opinion that Della Barnes would not be a good witness, and the fact that she was a convicted felon would have made using her as a mitigation witness risky at best. The strategy of defense counsel was to paint Petitioner in the most sympathetic light possible. The testimony presented in mitigation was in accord with this strategy, and there is no indication that Della Barnes' testimony would have added significant support to the case in mitigation. If anything, her testimony

-45-

would have been merely cumulative to the testimony of the other family members who testified about Petitioner's childhood and family background.

### (2) Failure to prepare Petitioner's grandmother and brothers

Petitioner also contends that trial counsel were ineffective for failing to properly prepare witnesses Willie Mae Barnes (Petitioner's grandmother) and Michael Barnes (Petitioner's older brother) and for failing to prepare and call Anthony Barnes (Petitioner's younger brother). Petitioner presented no evidence on these claims at the MAR evidentiary hearing. Accordingly, the State contends that this court is procedurally barred from considering the claim as to these individual issues. However, the MAR court, while noting the lack of evidence, at least with regard to the claims involving Michael Barnes and Willie Mae Barnes, decided these claims on the merits:

> FAILURE TO PROPERLY EXAMINE MICHAEL BARNES: Defendant contends that the failure to elicit certain evidence from the mitigation witness Michael Barnes constitutes ineffective assistance. The transcript shows that the witness was called and competently and effectively examined regarding some facts which had mitigating value to the jury concerning the defendant's family background. The argument that other additional circumstances were not developed does not undermine the effectiveness of the representation the defendant in fact received in this regard. This allegation is without merit.
>
> FAILURE TO PREPARE DEFENDANT'S GRANDMOTHER AS A WITNESS: Defendant contends counsel was ineffective in adequately preparing defendant's grandmother as a witness. The transcript reflects that while the witness was hard of hearing and had a speech impediment, the decision to call her in lieu of other potential witnesses was a reasoned decision, competently made, and sympathetically executed. The argument that counsel did not ask additional questions which would further cast his mother (the witness's daughter) in a bad light relates to cumulative evidence. From the

-46-

testimony which was in fact received the record affirmatively shows that counsel prevailed in establishing the failures of both of his parents as mitigating circumstances. The defendant has failed to show that counsel's performance was deficient in any manner as to his preparation or examination of this witness. The defendant has failed to show prejudice.

(MAR Order at 11.)

While it appears to this court that Petitioner has, indeed, not preserved these issues for habeas review, it is also apparent that the claims are without merit. Counsel made the strategic decision to call Petitioner's grandmother, and she testified effectively about Petitioner's childhood and upbringing. (Sentencing Tr. Vol. VII at 526-32.) As noted by the MAR court, the grandmother was most likely a more sympathetic witness than Petitioner's mother, who had recently served time in prison. Similarly, the examination of Michael Barnes was competent and effective. The primary focus of counsel's mitigation strategy was to demonstrate that Petitioner had a troubled childhood, with a mother who was in prison and a father who was not around, and that he had problems with drugs and alcohol. Michael Barnes testified to all of this and his testimony added to similar testimony from other witnesses, including Petitioner's grandmother. Counsel was not ineffective, nor was Petitioner prejudiced by deficiencies, if any, in counsel's examination.

Rejection of this claim by the state MAR court was neither contrary to, nor an unreasonable application of, established federal law as determined by the United States

Supreme Court. *See Williams v. Taylor*, 529 U.S. at 412-13. Petitioner's Claim III is without merit.[11]

**CLAIMS IV, V and VI - *Brady* Claims**

**A.      Claim IV - Statements of Mason, McClain and Scott**

Petitioner alleges in his fourth claim that he is entitled to relief because the State failed to disclose exculpatory materials in the form of statements made by three witnesses: Antonio Mason, Sheila McClain, and Teresa Scott. Petitioner contends that these statements should have been, but were not, turned over to his trial counsel under *Brady v. Maryland*, 373 U.S. 83 (1963), because they contained exculpatory or impeaching materials. Petitioner argues that the prosecution's failure to comply with *Brady* deprived him of the right to confront witnesses, to a reliable guilt phase and sentencing proceeding and to due process, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The MAR court held an evidentiary hearing before rejecting this claim on the merits.

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

---

[11]   Petitioner also claims that trial counsel was ineffective for failing to call Anthony Barnes, another of Petitioner's brothers, as a witness. As noted by the MAR court, no witness offered any testimony in support of this contention at the MAR hearing. The MAR court did not err in denying this claim, holding that "[d]efendant has failed to make even a threshold showing of either ineffectiveness or prejudice as to this allegation."

-48-

faith of the prosecution." 373 U.S. at 87. To prove a *Brady* violation, Petitioner must establish three elements: (1) the evidence must be favorable to Petitioner, "either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) the evidence must be material. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also McHone v. Polk*, 392 F.3d 691, 697 (4th Cir. 2004). Evidence is considered material only if there is a "reasonable probability" of a different result had the evidence been disclosed to the defense. *Strickler*, 527. U.S. at 280.

### (1)    Statement of Antonio Mason

Petitioner contends that a pretrial statement of Antonio Mason was exculpatory of Petitioner. Mason, the brother of Valerie and Sharon Mason, was interviewed by SBI Agent D.A. Gale on August 19, 1993. In his statement, Mason recounts events from the day of the Tutterow murders. He states that several times on the day of the murders he saw all three defendants together. At one point all three defendants, including Petitioner, came to Sharon's house. Mason stated that he saw that Chambers had two handguns. The three defendants went into the bedroom with Valerie, and when they came out, Blakney gave Valerie and Sharon money and some jewelry. According to Mason, "[Valerie] said Bobby Blakney said he had killed somebody." The next day, Blakney returned to Sharon's apartment and he told Antonio Mason that "Chambers had shot the people, that he, himself, had not shot them." (Pet. Br., Ex. 12, Statement of Antonio Mason.)

-49-

The MAR court denied Petitioner's claim as to Mason's statement on two bases. First, the court held that Petitioner had not shown that Mason's statement was not disclosed to Petitioner's trial counsel. Second, the court held that Petitioner had failed to show that the portions of the statement cited upon by Petitioner in his MAR constituted *Brady* material.

The burden was on Petitioner to show that any alleged *Brady* material was not turned over to the defense. *See* N.C. Gen. Stat. § 15A-1420(c)(5). Petitioner failed to show the state court that the State suppressed Mason's statement, or that the defense did not have access to it. In fact, the affidavit prepared by trial counsel for the MAR hearing states that trial counsel were unable to say that they did not receive the statement. Moreover, the trial cross-examination of the witnesses referred to in the statement, Valerie Mason, Sharon Mason, and others, affirmatively shows that trial counsel were well aware of Blakney's statements that Antonio Mason was referring to in his statement. Indeed, trial counsel used the statement in cross-examination of Antonio Mason.

Mason's statement, moreover, not only contains "double hearsay," it also was not significantly exculpatory as to Petitioner. Mason stated that his sister told him that Blakney first said that he killed someone, and later that Blakney said that Chambers, not Blakney, actually shot the victims. As noted by the MAR court:

> This is not an affirmative declaration exonerating [Petitioner], but rather calls upon a weak inference from the absence of an affirmative declaration. The impeachment value of the statement and Mason's credibility was fully before the jury. Nothing in the statement in any way undermines confidence in the

outcome of the trial.  The court has assessed the question of prejudicial error
as to both the guilt/innocence phase and the sentencing phase, and finds none.

(MAR Order at 4-5.)

Based upon the foregoing, the MAR court's finding that the prosecution did not

suppress or fail to disclose the statement of Antonio Mason is not shown to be erroneous.

The MAR court's conclusion that there was no *Brady* violation with regard to this statement

was not an unreasonable application of clearly established federal law.

### (2)     Statement of Sheila McClain

Sheila McClain, the sister of Petitioner's co-defendant Blakney, did not testify at trial.

However, prior to trial, she gave a statement to the police recounting what Blakney told her

after the murders.  In the statement, McClain said that Blakney phoned her and her mother

from  jail, telling them that Chambers had shot the victims.  Blakney told them that he asked

Chambers why he shot them, and Chambers said, "I've already been in jail one time; I'm not

going back."  Petitioner contends that this statement was not turned over to his defense team,

in violation of *Brady*.

The MAR court denied this claim:

> The defendant has failed to satisfy the court that the information
> contained in the handwritten statement was not disclosed for the same reasons
> set out in the foregoing findings as to the statement of Antonio Mason.
> Counsel for defendant's codefendant testified he was aware of the contents of
> the statement during the trial.  (Hearing transcript, p. 166).  However, since
> McClain did not testify at trial, the state has implicitly conceded the possibility
> that her statement may not have been provided since the state did not deem it
> exculpatory or impeaching.  Therefore, the court determines that a full and fair

-51-

analysis of this issue requires the court to determine whether the document was exculpatory or impeaching under *Brady*, and if so whether the failure to have produced it would have been prejudicial.

(MAR Order at 5). The court went on to find that the statement was not *Brady* material and that Petitioner had not proven prejudice.

The MAR court concluded that Petitioner had access to Sheila's statement and the information contained therein prior to trial. Under AEDPA, this court must give deference to this factual finding. *See* 28 U.S.C. § 2254(e)(1). It is clear that Petitioner's trial counsel were aware that Blakney had told his sister (and his mother) that Chambers had been the shooter and that he (Chambers) said he shot the victims because he did not want to go back to jail. This summary was included in a letter sent to counsel on September 13, 1993, more than three months prior to trial. (State Court Record, Ex. 12, Defs.' Ex. 2.) At the MAR hearing, Petitioner's two trial attorneys acknowledged the letter as typical of correspondence defense counsel received from the State. (State Court Record, Ex. 12 at 45; 118.) In the letter, counsel were advised of statements made to non-law enforcement officers, including Blakney's statement to his mother and sister "that he did not participate in the shootings" and that "[Chambers] did the shooting and when he asked why [Chambers] said he had already been in jail and he was not going back." (State Court Record, Ex. 12, Defs.' Ex. 2.) This is the same information contained in Sheila McClain's statement. Because counsel had this information, Petitioner can show no prejudice, even if counsel did not receive the actual statement given by Sheila McClain.

-52-

Accordingly, Petitioner is unable to show that the MAR court's ruling is contrary to, or an unreasonable application of, clearly established federal law with respect to the guilt phase or the sentencing phase of trial.

### (3)    Statement of Teresa Scott

Teresa Scott testified that she saw the three defendants together at Cynthia Gwen's apartment, near the Tutterow home, on the night of the murders. She also testified that she saw the three defendants leave Gwen's apartment between 9:00 and 9:30 p.m. (Tr. Vol. II, at 215-24.) This testimony was significant because it placed all three defendants in the vicinity of the Tutterow home around the time that the Tutterows were murdered, and it also corroborated the testimony of Greg Pulliam.

Two law enforcement officers, Detective J.D. Barber and SBI Agent Gale, interviewed Scott the morning after the murders. Both officers recorded summaries, individually, of the interview. Petitioner contends that the two versions differ substantially and that only Barber's version was turned over to Petitioner at trial. According to Petitioner, this statement tracked Scott's trial testimony, while Gale's statement contradicted Scott's testimony.

The MAR court found that Petitioner did not establish that Gale's version of Scott's statement was not disclosed:

> The defendant has failed to satisfy the court that the statements of Teresa Scott were not disclosed for the same reasons set out in the foregoing findings as to the statement of Antonio Mason. Defendant's counsel

-53-

specifically made reference to the statement to Officer Barber (D-5) during his cross-examination of Scott on the witness stand. All of the testimony and the documents themselves show that they are notes made by the two officers, Barber and Gale, at the same interview. The defendant's attorney specifically cross-examined Teresa Scott and the transcript affirmatively shows that counsel was aware that two officers interviewed her on October 30 and that they wrote down what she said. (T. Tr. II, 226). The third handwritten document (D-7) contains the rough notes from which Gale prepared his typed notes (D-6). Defendant's trial counsel specifically testified during this hearing that "it was normally Gale's statement that we got because they were more detailed" (Lea's testimony. Hearing Transcript Page 51). Defendant has failed to satisfy the court that the documents were not furnished and the reasonable inference is that counsel had the documents in question, or at least the substantial information contained in them, available with which to cross-examine the witness if they desired to do so. Throughout the trial, counsel for the defendant were scrupulous in demanding all statements suggested by the evidence to exist, including notes made by the DA in preparing for the testimony of each witness which they insisted be filed with the court and which appear in the record and were available at the time of defendant's initial appeal.

(MAR Order 6.)

This state court finding of fact is presumed to be correct, and Petitioner has not met his burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Wolfe v. Weisner*, 488 F.3d 234, 238 (4th Cir. 2007). Accordingly, the MAR court reasonably found there was no Brady violation because there was no failure to disclose the Gale version of the Scott pretrial interview.

Even assuming, moreover, that the Gale report was not disclosed, the statement was not *Brady* material. Under *Brady*, as discussed above, the evidence must be favorable to the accused either because it is exculpatory or impeaching, it must have been suppressed, and

-54-

it must be material. *Strickler*, 527 U.S. at 281-82. Evidence is material only if there is a "reasonable probability" of a different result had the evidence been disclosed to the defense. *Id.* at 263.

> The MAR court also found that the Scott statement was not *Brady* material:
>
> The documents do not contain any exculpatory or impeaching information of which counsel was not aware. The content of the documents, assuming they accurately reflect the statements the witness made in her first interview with the officers, is corroborated by other witnesses who provided the same information; specifically, Greg Pulliam (Tr. III, 135 ff.). To the extent there are any discrepancies between the statements and the testimony, they do not rise to the level which undermines confidence in the outcome of the trial or suggest any reasonable probability of a different result.

(MAR Order at 6-7.)

Petitioner argues that the two versions of Scott's statement are inconsistent. To the Court's mind, however, the differences between the two reports are not sufficiently material to bring into play the principles of *Brady*. The notes clearly indicate that they are summaries of the same interview; that is, Officers Gale and Barber together interviewed Scott. Both versions show that Scott said Chambers and Petitioner were present at Gwen's apartment. (Docket No. 12, Exs. 13, 14.) Gale's version also indicates that Scott said Chambers left Gwen's apartment, just not precisely at the same time as Petitioner. The minor differences between the two versions, which were prepared by law enforcement soon after the interview took place, simply do not rise to the level of material information which would lead to a "reasonable probability" of a different result. Indeed, the court has considered both

-55-

summaries, together with Scott's trial testimony. The Gale summary is not as detailed as the Barber report and it does not specifically say that Scott stated all three defendants were at Gwen's apartment. However, there was other evidence as well which placed all three defendants together prior to the murders. Greg Pulliam testified that all three defendants were smoking crack together in Gwen's kitchen, and that they left together (Tr. Vol. III at 136-39; 154.) The evidence that Petitioner contends the prosecution withheld does not put the case against Petitioner in "such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The decision of the MAR court was not an unreasonable application of clearly established federal law.

**B.     Claim V - Statement of Co-Defendant**

In his fifth claim, Petitioner contends the MAR court erred in rejecting the claim that the State failed to disclose exculpatory evidence that would have led at least one juror to return a sentence less than death. Petitioner argues that he was sentenced to death because the jury believed that he was one of the two shooters based solely on the testimony of co-defendant Blakney, but that the State withheld other contradictory and exculpatory evidence, including inconsistent statements by Blakney himself.

At the sentencing proceeding, Blakney testified that he went to the Tutterows' house with Chambers and Petitioner because Chambers said they could get some money there. (Sentencing Tr. Vol. VII at 39.) Blakney further testified that Petitioner struggled with Mr. Tutterow over a rifle and that after Petitioner gained control of the rifle he held the Tutterows

at gunpoint. Blakney testified that he heard gunshots while he was ransacking one of the bedrooms and that Chambers said he had to shoot the victims because he did not want to go back to prison. (*Id.* at 41.) Blakney stated that he saw both Chambers and Petitioner with guns and that Petitioner was standing over Mrs. Tutterow, with the gun in his hand. (*Id.* at 134.) According to Petitioner, this testimony from Blakney was the most damaging evidence against him and it was the only direct evidence pointing to Petitioner as one of the shooters. This claim is based on the same evidence discussed with regard to Petitioner's fourth claim, i.e., Blakney's statement to Mason that "he killed somebody," which, Petitioner argues, would have impeached Blakney's "self-serving"sentencing testimony that Petitioner and Chambers were the only shooters. The forensic evidence suggested that there were two shooters and, according to Petitioner, there was no physical evidence placing him at the scene. Petitioner contends therefore that the "undisclosed exculpatory evidence . . . would have been extremely beneficial to [P]etitioner at sentencing" because it would have suggested that Blakney was one of the shooters. According to Petitioner, such evidence would have allowed Petitioner's attorney to impeach Blakney's testimony and discount the possibility that Petitioner was one of the shooters, thus making it likely that at least one juror would have returned a sentence less than death.

The MAR court held that the evidence in question was not *Brady* material, as discussed above, and that Petitioner had not shown that the evidence was not disclosed to the defense. The court cannot say that these findings have been shown to be incorrect.

-57-

Petitioner has not met his burden of showing that the alleged *Brady* material was withheld from the defense. Moreover, the record of the trial testimony shows that trial counsel knew of the statements made by Mason about what Blakney had said about his involvement in the murders. Accordingly, the decision of the state MAR court was not contrary to, nor an unreasonable application of, clearly established precedents of the Supreme Court.

### C.    Claim VI - Statement of Robert Lee Bailey

In his sixth claim, Petitioner contends that the MAR court erred in finding that the State did not withhold exculpatory or impeaching evidence in the form of a statement summary indicating that another individual was seen near the Tutterow home on the night of the murders. The summary in question involved a statement of Robert Lee Bailey, who told police that he saw Greg Pulliam, a key witness for the prosecution, outside a convenience store near the Tutterow residence at approximately 10:00 p.m. on the night of the murders, and that Pulliam told Bailey "to go to the Tutterows' house and get some greens." (Pet. Br., Ex. 20.) Bailey said that Pulliam meant "cooking greens from the Tutterows' back yard." According to Bailey, neither he nor Pulliam went by the Tutterow residence.

Petitioner asserts this summary was never turned over to defense counsel. Pulliam testified at trial that he saw the three defendants together at Cynthia Gwen's apartment on October 29, 1992, and that he overheard one of them suggest to the others that they "make

a lick,"[12] though this was not mentioned in his initial statement to the police. (Tr. Vol. III at 136-37.) He further testified that about 9:30 or 10:00, just before the break-in at the Tutterows' residence, he saw the three defendants leave Gwen's apartment together. (*Id.* at 139.)

Petitioner argues that forensic evidence suggests that there was a fourth person involved in the Tutterow robbery and that Bailey's statement "suggests Pulliam may have been a co-conspirator in any robbery plan and, possibly, if he looted the house, an accessory-after-the fact to murder." (Pet. Br. at 43.) Petitioner contends that Bailey's statement would have provided valuable impeachment evidence for the defense during Pulliam's testimony.

A review of the Bailey statement leads to the conclusion that it was not *Brady* material. In the full statement, Bailey makes several incriminating points, which, if introduced at trial, would have been extremely damaging to Petitioner. For instance, Bailey told the investigators that he saw Petitioner and Chambers standing together outside the Speedy Mart "with beer in their hands" the night of the murders. Later the same evening, according to Bailey, Petitioner came back "running his mouth at Bailey like he wanted to fight [him]" and Bailey had heard earlier in the day that Petitioner had a gun. Bailey further stated that he saw Petitioner get in a car with Chambers and Blakney and drive away. In fact, if anything, the statement is inculpatory as to Petitioner. Moreover, there is little in the

---

[12] According to Pulliam, "to make a lick" means to steal or rob. (Tr. Vol. III at 137.)

statement to lend support to Petitioner's speculation that Pulliam was a co-conspirator or that he was involved in any way with the Tutterow robbery and murder.

Furthermore, Petitioner's claim that the Bailey interview summary could have been used to impeach Pulliam is without merit. Pulliam's testimony that Petitioner and his co-defendants discussed "making a lick" was corroborated by other evidence. Another witness, Wayne Brady, testified that he saw Petitioner on the afternoon of the murders and Petitioner said he was getting ready to make a "lick," the same terminology testified to by Pulliam, and that Petitioner invited him to participate. (Tr. Vol. IV at 492.) Antonio Mason testified that Petitioner was present when his two co-defendants were discussing a robbery of a man who Chambers knew had money. (Tr. Vol. I at 284-85.) Chambers himself testified that he and Petitioner and Blakney left Gwen's apartment shortly before the murders. (Tr. Vol. II at 294.) Other witnesses testified that they saw the three co-defendants at Mason's apartment after the murders and that they had jewelry and other items. The jury also heard Blakney's admission that "we f----- up a police." Any attempted impeachment of Pulliam based on Bailey's statement would have had little value in light of the other evidence, and would have not changed the result. *See United States v. Ellis*, 121 F.3d 908, 918 (4th Cir. 1997) (noting that courts do not ignore other evidence of guilt presented at trial in assessing materiality). The State did not unlawfully withhold this interview summary, and Petitioner was not prejudiced by not having the summary. As such, the decision of the state

-60-

MAR court was not contrary to, nor an unreasonable application of, clearly established precedents of the Supreme Court.

## CLAIM VII - *Brady* Claim (Police Log)

In his seventh claim, Petitioner argues that the State failed to disclose and turn over to defense counsel a police log from the night of the Tutterow murders. This log reflects a phone call from Louise Edwards, who reported that her landlord's son, Marty Manning, "saw two of the men" walking towards the victims' house around the time of the murder. (Pet. Br., Ex. 21.) Petitioner claims that the failure to disclose this log amounted to a *Brady* violation.

The MAR court did not allow an evidentiary hearing as to this issue and in its order, the court held :

> The court has examined the contention that the contents of a police log are exculpatory. The statement contended not to have been disclosed is neither exculpatory nor impeaching as a matter of law. No further hearing is necessary as to this issue. The court has considered the contents of the log as set out in the motion as well as the other factual and legal arguments in support of the motion. The court has considered the allegations to be true for the purpose of this ruling. The defendant has failed to show prejudice. There is no reasonable probability of any different result had the information been known. The motion lacks merit.

(MAR Order at 13.)

This court has examined the police log in question. The mere statement of a witness that he saw two men walking towards the Tutterow home is not significantly exculpatory as to Petitioner. Given the other extensive evidence about the three defendants being together that night, conversations they had with others, and their actions after the murders, Petitioner

-61-

has not shown a reasonable probability of a different outcome. Additionally, as admitted by Petitioner, the witness, Marty Manning, was located and interviewed by post-conviction counsel, and Manning could not then recall if he saw two or three men together near the Tutterow home on the night in question. (AMAR, Ex. 16.) Thus, it is highly unlikely that even if the information had been disclosed to Petitioner that it would have been of value to Petitioner.

This claim was adjudicated on the merits by the state MAR court, and its decision was not contrary to, nor an unreasonable application of, clearly established decisions of the United States Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. 362. The claim should be denied.

## CLAIM VIII - Ineffective Assistance of Counsel
### (failure to show that co-defendants committed similar crime)

In his eighth claim, Petitioner contends that trial counsel were ineffective for failing to introduce evidence that his two co-defendants had previously committed a similar crime. Trial counsel had information that in 1992 Chambers and Blakney had forced their way into the home of an elderly gentleman, Howard Crabb, and committed a violent assault and robbery. This information was not presented to the jury in the guilt phase of the trial.

Petitioner contends that his attorneys should have introduced this evidence to show prior bad conduct by Chambers and Blakney, and that the failure to do so amounted to ineffective assistance of counsel. He bases this argument on Rule 404(b), which provides

-62-

that "[e]vidence of other crimes, wrongs or acts is not admissible to prove character. . . It

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake. . . ." N.C. R. Evid. 404(b).

Petitioner contends that, based on the "close temporal proximity and similarity between the

Crabb assault and the Tutterow crimes" (Pet. Br. at 80), the evidence of the Crabb assault fits

into several of the Rule 404 exceptions, including evidence of *modus operandi* and pattern

(presumably of committing crimes together without the participation of anyone else).

   The MAR court considered this claim and found it to be without merit.  The court

noted that the criminal records of both Blakney and Petitioner were before the jury, and that

the decision of trial counsel to avoid raising this issue was objectively reasonable under the

circumstances.  The court further noted:

> Even assuming the evidence had shown that Blakney and Chambers had
> committed another crime together with some similarities does not raise a
> sufficient inference that [Petitioner] would not have been a participant in the
> current offense to lead the court to believe that a different result may have
> been obtained or undermine confidence in the result that was obtained.
>
> [Petitioner] has failed to show that the failure to attempt to introduce this
> evidence under 404(b) reflects a lack of competence, reasoned judgment, or
> ineffective assistance.  When viewed in context of the defense which defense
> counsel in fact presented, this allegation of failure is insubstantial and without
> merit.

(MAR Order at 9-10.)

   As pointed out by the State in its brief to this court, had Petitioner's attorneys

attempted to use this information at trial, in the guilt phase, the most damaging difference

between the two crimes would undoubtedly have been highlighted by the State, i.e., that when Petitioner was not involved in the robbery and assault, no victim was killed. The failure to use this evidence was not unreasonable under *Strickland*. Petitioner has demonstrated neither deficient performance nor prejudice.

This claim was adjudicated on the merits by the state MAR court and its decision was not contrary to, nor involved an unreasonable application of, clearly established precedents of the United States Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams, supra.*

## CLAIM IX - Ineffective Assistance of Counsel - Failure to Impeach Alexander

In his ninth claim, Petitioner asserts that his trial counsel were ineffective for failing to impeach a witness about pending criminal charges. Witness Maurice Alexander testified that Petitioner came to his house looking for money and asked Alexander if he would sell cocaine for him and offered to "do a hit" for money. (Tr. Vol. II at 318-27.) When he testified, Alexander had several criminal charges pending against him, including serious drug offenses and multiple theft crimes, and he was also on probation for possessing stolen goods. Petitioner contends that trial counsel should have cross-examined Alexander about these pending charges.

Petitioner raised this issue in the MAR proceeding, and it was dismissed by the state court without an evidentiary hearing. The court held that the claim was procedurally barred and without merit:

As to the ineffective assistance of defendant's trial counsel for failing to impeach Maurice Alexander: First, it appears that this issue is procedurally barred for the reason that the underlying issue was either raised in defendant's initial appeal or constitutes matter which could have been raised in his original appeal. Second, the court finds that this issue is without merit assuming all of the factual allegations to be true. Trial counsel cross-examined Alexander during the trial, and the transcript of which defendant requested that this court take judicial notice affirmatively reflects the testimony and the court's rulings on the objection related thereto. Some issues relating to Alexander's testimony were raised and addressed in the defendant's previous appeal as Defendant's Exception No. 31. Those that were raised were rejected. The remaining questions concerning Counsel's effectiveness as to Alexander's testimony presented in the present motion all involve issues which could have been raised in the appeal but were not. An examination of the transcript reflects a vigorous attempt at cross-examination by trial counsel. The failure to pursue attempts of cross-examination when the state's objection of the line of questions was sustained would have embarked upon a fishing expedition with unpredictable consequences, and it is apparent from the record that defendant's experienced counsel elected to not pursue that line of questioning which no evidence now suggests would have been beneficial. Any failure to "make a record" does not undermine confidence in the outcome and does not constitute ineffective assistance. These are all issues which could have been presented in defendant's previous appeal, and the defendant has failed to demonstrate that a different result could possibly have been achieved had the record been made. Defendant's previous post-conviction counsel candidly notes that although they attempted to find some evidence of a "deal" with the state, none could be found; and that in the end Alexander received a seven-year sentence for drug and property crimes. The contention that failure to make a record constitutes ineffective assistance is without merit. The present motion is without merit and should be denied.

(MAR Order at 12-13.)

At trial, Petitioner's attorney cross-examined Alexander and specifically asked him about his prior convictions. (Tr. Vol. II at 331.) Alexander responded, listing several convictions. The questioning continued:

Q:      You ever been convicted of a cocaine violation?

        MR. KENERLY:      Objection.

A:      No.

        MR. KENERLY:      Objection.

        THE COURT:      Overruled.  Just answer the question.

Q:      Have you?

A:      No.

Q:      Maintaining a dwelling to keep controlled substance?

A:      I have been convicted.

Q:      What do you mean by that?

        MR. SYMONS:      Objection, Your Honor.

        THE COURT:      Overruled.

Q:      What do you mean by that?

A:      I mean I'm still in the process of going to court.

        MR. KENERLY:      Objection and move to strike that, Your Honor.

        THE COURT:      Well, sustained. Members of the jury, don't consider that
                        in the process of going to court on the charge, please.

(Tr. Vol. II at 331-32.)  In response to a later question from trial counsel, Alexander stated

that he had not received any offer or promise in exchange for his testimony.  (*Id.* at 344.)

Trial counsel clearly knew about both Alexander's prior convictions and the pending charges against him. Counsel did not fail to impeach Alexander, as Petitioner contends. Rather, as the transcript indicates, counsel did impeach Alexander, on his prior convictions, and attempted to impeach him on his pending charges but was prohibited from doing so by the trial court's sustaining of the State's objection. Clearly, the underlying issue, i.e., the trial court's ruling, could have been, but was not, raised on direct appeal. Thus, he is procedurally barred from raising the issue on post-conviction. N.C. Gen. Stat. § 15A-1419(a)(3).

Moreover, the MAR court's decision on the merits was not contrary to, nor involved an unreasonable application of, clearly established precedents of the United States Supreme Court. Petitioner has not shown that trial counsel were ineffective where they attempted to question Alexander about his pending criminal charges but were stopped from pursuing the matter further by the trial court's ruling. In hindsight, it is often easy to come up with one more question that might have been asked or one more point that could have been highlighted in a cross-examination of an adverse witness on the stand. However, in the midst of trial, a lawyer must make split-second decisions as to how best to shape his questions in order to extract the most beneficial responses, and how far to pursue arguments following the court's rulings on objections.

Here, the trial transcript reveals that defense counsel raised the issue as to Alexander's motive in an attempt to impeach him. The court foreclosed further questioning along this line by sustaining the prosecutor's objection. Later, counsel again asked Alexander if he had

-67-

been offered anything in return for his testimony. The jury was on notice that Alexander's credibility was at issue and defense counsel highlighted that fact through questioning. Counsel clearly made the point that Alexander could have had a motive for lying, and it was not necessary for counsel to travel too far down this path. *See Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986) (in discussing the "vagaries of attempts to impeach with matters collateral to testimonial trustworthiness," court noted that in some cases an attempt to impeach by this collateral means might be "viewed by the jury as an unwarranted, desperate effort to discredit a witness whose testimony was intrinsically and by demeanor wholly credible"). Counsel's performance met the constitutionally required "objective standard of reasonableness," *see Strickland*, 466 U.S. at 687-88, and Petitioner has not shown that the failure to impeach prejudiced him or affected the outcome of the case. *See also Koon v. Rushton*, 364 Fed. App'x. 22, 29-30 (4th Cir.), *cert. denied*, ___ U.S. ___, 131 S. Ct. 270 (2010) (finding no ineffective assistance of counsel for failure to impeach prosecution witness with evidence that he had two prior convictions for giving false statements to police). The state court's denial of this claim was accordingly neither contrary to, nor an unreasonable application of, clearly established federal law, and Petitioner is not entitled to federal habeas relief on this claim.

# CLAIM X - Ineffective Assistance of Appellate Counsel

In a related claim, Petitioner contends that his appellate counsel was ineffective for failing to raise an ineffective assistance of counsel claim with regard to the failure of trial counsel to impeach Maurice Alexander on the grounds of pending charges against him.

"A defendant is constitutionally entitled to effective assistance of counsel on direct appeal, and the standards governing effectiveness at trial are equally applicable to representation on direct appeal." *Tucker v. Catoe*, 221 F.3d 600, 613 (4th Cir. 2000) (citation omitted). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's representation was objectively unreasonable and that a reasonable probability exists that, but for the attorney's error, he would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-88). Appellate counsel is not required to assert all non-frivolous issues on appeal, "but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith*, 528 U.S. at 288. Reviewing courts are called to presume that in determining which issues to appeal, appellate counsel selected those issues most likely to succeed. *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Here, the MAR court, in considering this claim, found:

> As to the ineffective assistance of appellate counsel, the Supreme Court of North Carolina had before it the record and the assigned errors relating to the testimony of Maurice Alexander. The court reviewed and specifically alluded to the trial testimony of Alexander in the opinion. Therefore, it appears that this issue is also procedurally barred. However, even had the issue been directly presented by appellate counsel, appellate counsel would not have been able to show prejudice and no different result would have been obtained in the

appellate courts. No new facts or circumstances have been alleged which would entitle the defendant to further relief. Defendant has failed to show that a different result probably would have been obtained, nor has defendant shown facts or circumstances undermining confidence in the result that was obtained. A review of the Record on Appeal affirmatively shows that appellate counsel combed the record, carried forward 91 assignments of error, with some assignments citing up to 18 separate specific assignment in the transcript. This motion presents only a question of law, which has been fully argued in the motion itself. No further hearing on this issue is necessary. This contention is without merit.

(MAR Order at 14.)

Petitioner's habeas claim on this point must fail. Appellate counsel was not ineffective by failing to raise this issue. Trial counsel attempted to impeach Alexander's credibility by questioning him about the pending charges against him. The trial court sustained the State's objections to the questioning. As pointed out by the MAR court, the North Carolina Supreme Court addressed the testimony of Maurice Alexander and the alleged errors surrounding his cross-examination. Appellate counsel could not have realistically argued that counsel was ineffective for failure to impeach Alexander's credibility. Other issues with a greater likelihood of success were raised and decided against Petitioner by the state supreme court. Appellate counsel's decision to decline to present the issue now suggested by Petitioner and to instead press only issues on appeal that counsel believed, in his professional judgment, had more merit than the issue now suggested by Petitioner was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Therefore, Petitioner is unable to

-70-

establish that the adjudication by the MAR court was contrary to, or involved an unreasonable application of, clearly established precedents of the United States Supreme Court. Accordingly, Petitioner's claim is without merit.

## CLAIM XI - Statements by Co-defendant

Petitioner contends that the trial court erred when it admitted into evidence two hearsay declarations by non-testifying co-defendants who incriminated Petitioner. Petitioner complains of two statements that were admitted: co-defendant Blakney's statement to Valerie Mason about "a three-person secret" and "we f------ up a police"; and co-defendant Chambers' statement to Reverend Betty Smith that "I shouldn't have gone with them." Petitioner contends that his Sixth Amendment right to confront and cross-examine witnesses was violated where the statements of Blakney and Chambers were introduced through the testimony of Valerie Mason and Smith. On direct appeal, the North Carolina Supreme Court rejected Petitioner's claim as to both statements.

This case again demonstrates the interplay between the Sixth Amendment Confrontation Clause and the exception to the hearsay rule. The Confrontation Clause provides that an accused in a criminal trial has the right to be confronted by witnesses against him. U.S. Const. amend. VI. In *Bruton v. United States*, the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the

-71-

co-defendant.  391 U.S. 123 (1968).  Over the years, exceptions to this general rule have developed.

The testimony of Mason and Smith clearly contains non-testimonial hearsay statements.  To be admissible and not violate the Confrontation Clause, a hearsay statement must bear sufficient indicia of reliability either by coming within "a firmly rooted hearsay exception" or having "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980).[13]  The question of whether accomplice statements fall within a firmly rooted hearsay exception is a question of federal law.  *Lilly v. Virginia*, 527 U.S. 116, 127 (1999).  Hearsay statements are generally prohibited under Federal Rule of Evidence 802, which "is premised on the theory that out-of-court statements are subject to particular hazards," including the risk of insincerity, ambiguity, erroneous perception, and faulty memory.  *Williamson v. United States*, 512 U.S. 594, 598 (1994).

There are, of course, exceptions to the hearsay rule for certain kinds of out-of-court statements which might be less susceptible to the dangers of hearsay.  *Id.*  One such exception is for statements made against the declarant's interest: statements which, when they were made, "so far tended to subject the declarant to . . . criminal liability . . . that a

---

[13]  While the Supreme Court has criticized the reliability test from *Roberts*, *see Crawford v. Washington*, 541 U.S. 36, 63 (2004) ("The unpardonable vice of the *Roberts* test, however, is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude."), with respect to non-testimonial hearsay statements, *Roberts* and its progeny remain the controlling precedents.  *See United States v. Udeozor*, 515 F.3d 260, 268 (4th Cir. 2008) (applying *Crawford* to testimonial statements).

reasonable person in the declarant's position would not have made the statement[s] unless believing [them] to be true." Fed. R. Evid. 804(b)(3). However, in *Lilly*, the court made clear that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted hearsay exception. As such, they can be admissible only if they bear "particularized guarantees of trustworthiness." *Lilly*, 527 U.S. at 135. One of the concerns attendant to the admission of a co-defendant statement or confession is that the co-defendant has a motive to fabricate, to shift or share the blame with another or to curry favor with the prosecution. *Id.* at 133. Thus, the primary inquiry is whether, considering all of the circumstances pertaining to the making of the statement, the declarant had a motive to fabricate. *Id.* at 126.

Here, the trial court overruled Petitioner's hearsay objection and gave a limiting instruction to the jury as to the testimony of both Mason and Smith. Petitioner contends, however, that the statements made by Blakney and Chambers were not entirely inculpatory and thus do not fall within the exception set forth in Rule 804(b)(3). The North Carolina Supreme Court rejected this argument on direct appeal, concluding that "the *Williamson* test is satisfied in this case and [] Blakney's statements would not violate federal Rule 804(b)(3)," *Barnes*, 345 N.C. at 216, 481 S.E.2d at 61, and that Chambers' statements were distinguishable from the statements at issue in *Bruton* because they "did not clearly identify [Petitioner] or create a substantial risk that the jury would ignore the trial court's instructions in its determination of [Petitioner's] guilt." *Id.* at 218, 481 S.E.2d at 62.

Blakney's statement to Valerie Mason (regarding the "three-person secret" and "we f----- up a police") clearly subjected him to criminal prosecution; viewed in context, where two people, one a former police officer, had been robbed and killed, and Blakney gave Mason money and jewelry which she had not previously seen, the statement was "sufficiently against [Blakney's] penal interest that a reasonable person in [his] position would not have made the statement unless believing it to be true." *Williamson*, 512 U.S. at 603-04. There were no non-self inculpatory elements in these statements. By using the terms "three-person secret" and "we," Blakney clearly incriminated himself. Moreover, it is important to note that these statements of Blakney were not obtained during a custodial interrogation, but rather were made by Blakney to a friend. Blakney clearly was not trying to downplay his involvement in the crime by implicating someone else. Rather, he was relaying, to a friend, what happened, in response to a question from her about where he had obtained a ring. Blakney's statement clearly was not coerced and the substance of the information concerned a recent event, one in which Blakney was a direct participant. Blakney had no motive to fabricate in providing this information to Valerie Mason. Mason, of course, was fully subject to cross-examination as to the circumstances surrounding the conversation. All of these factors provide guarantees of trustworthiness making it particularly likely that Blakney was telling the truth when he made the statements to Mason. As such, the North Carolina Supreme Court, on direct appeal, did not unreasonably apply the reasoning of *Bruton* and *Williamson* to the facts of the case with regard to Blakney's statements to Mason.

Similarly, the trial court did not err in allowing Betty Smith to testify about Chambers' statement to her that "I shouldn't have gone with them." Petitioner contends that the use of the pronoun "them" was "particularly significant in the context of this case" because it suggested that Chambers was with more than one other person, impliedly Blakney and Petitioner, his two co-defendants. Moreover, according to Petitioner, because the evidence tended to show two triggermen, Chambers' statement in which he says he did not hurt anyone implies that Petitioner was one of the shooters.

The North Carolina Supreme Court rejected Petitioner's claim on direct appeal, holding that the facts in this case were easily distinguishable from the facts in *Bruton*. The court noted:

> Chambers' reference to "them" was not made in the context of any specific statements about the killings, and the trial court cautioned the jury with respect to Chambers' statement. The Supreme Court observed in *Bruton* that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions . . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." We conclude that Chambers' statement did not clearly identify [Petitioner] or create a substantial risk that the jury would ignore the trial court's instructions in its determination of [Petitioner's] guilt.

*Barnes*, 345 N.C. at 217-18, 481 S.E.2d at 62 (citations omitted).

Chambers' statement to Smith implicating Petitioner bore sufficient indicia of reliability because it was voluntarily made to a friend. To the extent the statement inculpated Petitioner, there was no basis to conclude that Chambers intentionally made the statement to

-75-

curry favor with the authorities or to draw attention away from his involvement. As such, Chambers' non-testimonial statement made spontaneously to a friend was properly admitted under *Roberts* because it bore particularized guarantees of trustworthiness. Thus, the decision of the state court was not contrary to or an unreasonable application of any clearly established Supreme Court precedent. This claim is without merit.

## CLAIM XII - Change of Venue

Petitioner alleges in his final claim that the trial court erred in denying his motion for a change of venue. This claim was raised on direct appeal, and it was denied on the merits. Petitioner argued that widespread pre-trial publicity had so infected the local community that he (and his co-defendants) could not receive a fair trial in Rowan County.

The trial court conducted hearings on the motion to change venue. Evidence was presented to the court regarding the publicity in the community concerning the murders, the fact that the victims were fairly well known in the community, and the fact that local defense lawyers had conflicts, resulting in the trial court appointing counsel from a neighboring county. Following the hearing, the trial court denied the motion. At trial, Petitioner requested individual voir dire of the potential jurors regarding their exposure to pre-trial publicity. The trial court denied this motion as well.

"The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. ___, ___, 130 S. Ct. 2896, 2912-13 (2010). The Court of Appeals for the Fourth Circuit has held that

In an era of rapid and widespread communications, trial courts must be vigilant to ensure that jurors are not biased and trials are not compromised by media attention surrounding a case. At the same time, "it is not required ... that jurors be totally ignorant of the facts and issues involved . . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

*United States v. Bakker*, 925 F.2d 728, 734 (4th Cir. 1991) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)). As explained by the Fourth Circuit, courts considering a motion for a change of venue must engage in a two-step analysis. First, the trial court must determine if the publicity is so inherently prejudicial that the trial proceedings "must be presumed to be tainted." *Id.* at 732. In such situations, a motion for change of venue should be granted before jury selection begins; it is only in rare instances that "may prejudice be presumed from the existence of pretrial publicity itself." *Id.* (citing *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987)). In most cases, a court will take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists. *Id.* A change of venue is warranted "[o]nly where voir dire reveals that an impartial jury cannot be impanelled." *Id.* The voir dire process allows the court to inquire about each juror's personal opinions about a case and the impact of any past or future media attention. *Id.* at 733.

The trial court here did not presume prejudicial publicity, instead dealing with the issue through voir dire. Voir dire and jury selection took place over several days and all potential jurors were questioned as to what they had heard or read about this case. While almost all of the jury pool members had some knowledge about the facts of the murders,

there were a significant number who stated that they could set aside what they had read or heard and decide the case solely on the evidence presented at trial. The voir dire conducted by the court was more than adequate to determine whether the pre-trial publicity in this case was so prejudicial as to taint the jury pool. As the Supreme Court has noted:

> [O]ur own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

*Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). The state court's determination here that under the totality of the circumstances there was not a reasonable likelihood that pre-trial publicity prevented Petitioner from receiving a fair trial and that the trial court did not err in denying the motion for change of venue was not contrary to, and did not represent an unreasonable application of, federal law.

## CONCLUSION

For reasons set forth above, **IT IS RECOMMENDED** that the Petition for a Writ of Habeas Corpus be denied and dismissed.

/s/ P. Trevor Sharp
United States Magistrate Judge

Date: February 3, 2012