IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


WILLIAM LEROY BARNES,          )
                               )
           Petitioner,         )
                               )
      v.                       )     1:08-cv-00271
                               )
KENNETH LASSITER,[1]           )
                               )
           Respondent.         )


**<u>MEMORANDUM OPINION AND ORDER</u>**

THOMAS D. SCHROEDER, District Judge.

        Petitioner William Leroy Barnes ("Barnes" or "Petitioner")
brings this habeas proceeding under 28 U.S.C. § 2254,
challenging his underlying conviction and death sentence
resulting from his role in the 1992 murders of B.P. and Ruby
Tutterow.   Barnes' petition was referred to the United States
Magistrate Judge, who entered a Recommendation to deny the
petition.  (Doc. 22.)   Notice was served on the parties, and
Barnes filed timely objections.  (Doc. 26.)   For the reasons set
forth below, the Recommendation will be adopted, as further
explained herein, and the petition will be denied.

---

[1]  At the time the petition for writ of habeas corpus was filed, the
named Respondent was Gerald Branker, the Warden of North Carolina's
Central Prison.    Since then, Mr. Branker has retired.    Kenneth
Lassiter, who is now the Warden, will be substituted as Respondent.
<u>See</u> Fed. R. Civ. P. 25(d).

## I. BACKGROUND

Barnes was convicted of first-degree murder on January 25, 1994, in the Superior Court of Rowan County, North Carolina. His conviction and death sentence were affirmed by the Supreme Court of North Carolina, State v. Barnes, 345 N.C. 184, 481 S.E.2d 44 (1997), and the United States Supreme Court denied certiorari review, Barnes v. North Carolina, 523 U.S. 1024 (1998).

In February 1999, Barnes activated North Carolina's procedural mechanism for state post-conviction review by filing a Motion for Appropriate Relief ("MAR").[2] An evidentiary hearing was held on certain, but not all, issues raised by Barnes. On May 31, 2007, the trial court entered an Order denying the MAR. The Supreme Court of North Carolina subsequently denied certiorari review. See State v. Barnes, 362 N.C. 239, 660 S.E.2d 53 (2008).

Barnes filed his present petition on April 17, 2008. (Doc. 12.) The United States Magistrate Judge reviewed the petition and issued a Recommendation denying all twelve claims. (Doc. 22.) Barnes now objects to several aspects of the Magistrate Judge's Recommendation. (Doc. 26.)

_____

[2] Barnes amended his MAR on January 24, 2001 and on September 4, 2002. The court refers to the most current version simply as the MAR.

The facts underlying Barnes' conviction are set forth in the Recommendation and will not be repeated here. However, specific facts will be addressed below in connection with each objection raised by Barnes.

Although Barnes' habeas petition raised twelve specific challenges concerning his state court conviction, his objections to the Recommendation's conclusions can be grouped into the following claims: discriminatory use of peremptory challenges against an African-American prospective juror; the prejudicial misconduct of a juror who contacted her pastor and read the Bible during the trial's penalty phase deliberations; ineffective assistance of trial counsel in failing to investigate and present mitigation evidence; and the State's alleged failure to disclose three witness statements and a police log.

This court reviews timely objections to a Magistrate Judge's recommendation *de novo*. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). Where a party fails to object to a recommendation, however, the court's review is for clear error. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).

## II. ANALYSIS

As the Magistrate Judge recognized in his thorough recitation of the standard of review, the Antiterrorism and

3

Effective Death Penalty Act of 1996 ("AEDPA") establishes a "deferential and highly constrained" scope of review for federal courts engaged in "collateral review [of] a state court proceeding that adjudicated a claim on the merits." Golphin v. Branker, 519 F.3d 168, 216 (4th Cir. 2008). A federal court may grant Barnes' petition only if it determines that the underlying state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Jackson v. Johnson, 523 F.3d 273, 276 (4th Cir. 2008) (citing 28 U.S.C. § 2254(d)(1)). A state court unreasonably applies federal law when it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362, 413 (2000) (opinion of O'Connor, J., for the Court). A state court's factual determinations, meanwhile, are presumed to be correct absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. 231, 240 (2005).

### A. **Batson** Claim

Barnes first objects to the Magistrate Judge's recommendation that this court deny his challenge to the State's use of a peremptory challenge to strike prospective juror Melodie Hall ("Hall"), a 32-year-old African-American woman. Petitioner argues that under Batson v. Kentucky, 476 U.S. 79

4

(1986), the North Carolina Supreme Court's rejection of this claim was contrary to and an unreasonable application of clearly established federal law. He contends that the Magistrate Judge overlooked the fact that the prosecutor's notes on a jury selection chart include the notation "age, race, G + d. pen. crit." under Hall's name, the fact that the state court failed to conduct an evidentiary hearing, statistical evidence that Barnes contends shows a pattern of impermissibly striking African-American jurors based on their race, and North Carolina's "misguided approach" to resolving questions about the use of peremptory challenges.

These objections are without merit. Even assuming that Barnes can rely on a notation contained in the prosecutor's copy of a jury selection sheet, see United States v. Barnette, 644 F.3d 192, 210 n.* (4th Cir. 2011) (finding no error in trial court's refusal to allow defendant to review prosecutor's jury selection notes),[3] the ambiguous notation "age, race, G + d. pen. crit." is not indicative of a discriminatory intent on the part of the prosecutor. The prosecutor articulated a number of non-pretextual reasons for striking Hall from the jury: her proximity in age to the defendants, her concern that her

---

[3]   Cf. Miller-El, 545 U.S. at 266 (relying on prosecutor's jury selection notes).

acquaintances might criticize her in the event she participated in the imposition of a death sentence, and her inability to maintain eye contact during questioning.[4]  State v. Barnes, 345 N.C. 184, 211, 481 S.E.2d 44, 58 (1997).  In addition, although none of the prosecutor's other notations appears to indicate a juror's race, nearly all jurors' names have some shorthand phrase scribbled nearby (see Doc. 12-5), making it equally likely that the prosecutor was using his notes to provide "quick access to information about each juror" and to help "deal with any potential Batson challenges."  Barnette, 644 F.3d at 211. Barnes' citation to the prosecutor's shorthand notation, therefore, does not undermine the trial court's factual determination that the prosecutor did not engage in purposeful discrimination in striking Hall from the jury.

Barnes' other arguments are equally unpersuasive.  He argues that North Carolina's courts apply a misguided approach to resolving Batson challenges in light of Miller-El, 545 U.S. at 265, which instructs courts to "cumulatively" view the

_____

[4] Although the trial court determined that a prima facie case of discrimination had not been shown, it asked the prosecutor to list his reasons for striking Hall out of "an abundance of caution."  State v. Barnes, 345 N.C. 184, 210, 481 S.E.2d 44, 58 (1997).  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  Hernandez v. New York, 500 U.S. 352, 359 (1991) (plurality opinion).

evidence when evaluating claims of potential discrimination in juror selection. Yet Barnes' statistical evidence that 6 of 9 (66%) eligible African-American jurors were struck in comparison to 10 of 54 (19%) eligible white jurors is insufficient by itself to show that the Supreme Court of North Carolina unreasonably applied federal law. See Golphin, 519 F.3d at 187 (finding no Batson violation where the prosecution struck 71% of eligible African-American jurors and explaining that "statistical evidence . . . alone cannot carry the day").

Barnes argues that the prosecutor's reasons for striking Hall were pretextual because many of the reasons -- the fact that Hall was single and in the approximate age range as Barnes and his co-defendants -- could apply equally to white jurors who were accepted. However, Barnes overlooks a key distinction between the white jurors that the State accepted and Hall: their comfort with the death penalty. When asked whether her friends or co-workers might criticize her if she returned a verdict of guilty and a sentence of death, Hall hesitated, was reluctant to make eye contact, and indicated that she would be criticized.[5]

_____

[5] The trial judge indicated that he was "not in a position to determine whether eye contact has been made with any lawyer" (Trial Transcript ("Tr."), Vol. I at 374), but after considering the prosecutor's reasons for striking juror Hall, determined that the stated reasons were "not pretextual" (id. at 375). "[T]he trial judge was in the best position to evaluate the credibility of the prosecutor's demeanor-based reasons" and, thus, deference to the trial court's

7

(Trial Transcript ("Tr."), Vol. I at 342.)  Hall ultimately expressed support for the death penalty, but her hesitation stands in contrast to potential jurors Franklin Hess (Tr., Vol. II at 146), Myra Poteat (id. at 145), Micky Deutsch (id. at 230-31), Kelly Irvin (Tr., Vol. I at 351), Carl Wilson (Tr., Vol. II at 242-43), and Timothy Archie (Tr., Vol. III at 53-54), all of whom were either single or close to the defendants' age but who expressed unequivocal support for the death penalty.[6]  Because a "juror's demeanor (e.g., nervousness, inattention)," Snyder v. Louisiana, 552 U.S. 472, 477 (2008), and opposition to the death penalty, Taylor v. Roper, 577 F.3d 848, 857 (8th Cir. 2009) (concluding that a prospective juror's "previous answers suggesting reluctance to impose a sentence of death furnished substantial grounds for the trial court to find that the prosecutor's race-neutral explanation was credible"), can serve as a race neutral reason for exercising a peremptory challenge,

conclusions of fact in such situations is proper.  Briggs v. Grounds, 682 F.3d 1165, 1178 (9th Cir. 2012).

[6]  Barnes does not mention jurors Phyllis Wilkes or Connie Hess, both of whom also indicated that they might be subject to criticism from co-workers or acquaintances for participating in a first degree murder case.  (Tr., Vol. I at 358, 360-61.)  However, when these two jurors were later questioned, both clarified that they would be criticized if they *did not* return a death verdict.  (Id. at 362.)  Thus, their answers are distinguishable from Hall's.  The record also does not appear to indicate whether Wilkes or Hess (or both) were African-American.

Barnes' argument, for this reason alone and certainly when viewed with the other reasons, is without merit.

Barnes has failed to demonstrate that the Supreme Court of North Carolina's decision to deny a new trial based on his allegation that the prosecution struck Hall from the jury because of her race was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. Accordingly, this objection to the Recommendation will be overruled.

**B. Sixth Amendment Claim**

Barnes' next argument is that the state court unreasonably applied established federal law in finding that juror misconduct did not violate his Sixth Amendment rights to "enjoy the right to a . . . trial[] by an impartial jury . . . [and to] be confronted with the witnesses against him." U.S. Const. amend. XI. Barnes contends that juror Hollie Jordan ("Jordan") subjected herself and other jurors to external influences when, in response to a co-defendant's closing admonition that God will hold jurors who impose the death penalty accountable for their decision, she sought Biblical guidance from her pastor and read an unidentified passage from the Bible during jury deliberations. Barnes contends that the North Carolina courts' denial of his claim unreasonably applied clearly established federal law and that, at a minimum, the state MAR court should

9

have conducted an evidentiary hearing. Barnes also argues that the Magistrate Judge's Recommendation improperly saddled him with the burden of establishing prejudice despite Supreme Court authority that any private communication with a juror during a trial about the matter pending before the jury is presumptively prejudicial. (Doc. 22 at 28 (citing <u>Remmer v. United States</u>, 347 U.S. 227, 229 (1954)).)[7] Each argument will be addressed below.

---

[7] Barnes contends that the "state post-conviction court failed to adjudicate the merits of [his] properly presented claim" and, thus, this court "must review [his claim] de novo." (Doc. 12 at 16.) It is true that if "a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits" the court will review "questions of law and mixed questions of law and fact . . . de novo." <u>Fisher v. Lee</u>, 215 F.3d 438, 445 (4th Cir. 2000); <u>cf.</u> <u>Johnson v. Williams</u>, --- S. Ct. ----, 2013 WL 610199, at *3, *6 (Feb. 20, 2013) (noting that federal claims in state actions are presumed to be adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary).

   In this case, Barnes' initial premise -- that North Carolina's courts failed to adjudicate the merits of his claim -- is mistaken. According to the MAR court, Barnes' claim was "procedurally barred *and without merit*" because it "was presented in [his] direct appeal . . . [and] was directly addressed by the Supreme Court of North Carolina, and rejected by that court." (MAR Order at 12-13 (emphasis added).) Though the MAR court did not cite authority for its imposition of a procedural bar, the court presumably applied N.C. Gen. Stat. § 15A-1419(a)(2), which prevents MAR review of a claim that has been raised on direct appeal and rejected on its merits. <u>See</u> <u>Ward v. French</u>, 989 F. Supp. 752, 758 (E.D.N.C. 1997) (applying section 15A-1419(a)(2) in an analogous situation where the North Carolina MAR court failed to identify which subsection of section 15A-1419 it was applying). Barnes, in fact, concedes that the MAR court applied section 15A-1419(a)(2) in holding that his claim was procedurally barred. (Doc. 12 at 15.) Yet the Fourth Circuit has held that section 15A-1419(a)(2) "is not a state procedural bar for purposes of federal habeas review," <u>Brown v. Lee</u>, 319 F.3d 162, 170 n.2 (4th Cir. 2003), because "a denial under this section is clearly based on the merits," <u>Smith v. Dixon</u>, 996 F.2d 667, 674 n.10 (4th Cir. 1993). Thus, *de novo* review of Barnes' claim is inappropriate, and 28 U.S.C. § 2254(d) bars

## 1. Improper Contact

Barnes' first argument[8] is that Jordan tainted the jury's sentencing deliberations by consulting with her pastor, Tom Lomax ("Pastor Lomax"), in the wake of the closing argument of a co-defendant's attorney that jurors returning a death sentence would face God's judgment for their actions. Barnes argues that the North Carolina MAR court erred by not granting him a new sentencing or evidentiary hearing when post-trial interviews demonstrated that at least one juror was improperly exposed to extraneous information. (Doc. 12 at 17-18.)

To establish that a third party's unauthorized communication with a juror resulted in "actual juror partiality," a petitioner must "first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." Stockton v. Virginia, 852 F.2d 740, 743 (4th Cir. 1988). Thus, "[t]he party who is attacking the verdict bears

---

habeas relief unless Barnes can demonstrate that the state court's decision was "either 'contrary to' or involved an 'unreasonable application of'" clearly established federal law. Page v. Lee, 337 F.3d 411, 414-15 & n.1 (4th Cir. 2003).

[8] For purposes of Barnes' habeas petition, the court will accept as true the factual allegations contained in his evidentiary affidavits presented to the MAR court. See Bacon v. Lee, 225 F.3d 470, 485 (4th Cir. 2000) (accepting the truth of evidentiary affidavits submitted in support of a petitioner's habeas claim where the MAR court denied an evidentiary hearing on the claim).

the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions." United States v. Basham, 561 F.3d 302, 319 (4th Cir. 2009) (alteration in original) (citation and internal quotation marks omitted). If that "minimal" burden is satisfied, the government bears the responsibility of proving that there is no reasonable possibility that the improper communication influenced the jury's verdict. Id.; see also Remmer, 347 U.S. at 229. When making this determination, the court must "examine the entire picture, including the factual circumstances and the impact on the juror." United States v. Cheek, 94 F.3d 136, 142 (4th Cir. 1996) (internal quotations omitted).

But while this accurately describes the underlying legal standards, in the habeas context this court has a more deferential standard. United States v. Lawson, 677 F.3d 629, 644 (4th Cir. 2012). As noted, Barnes must demonstrate that the state court's decision was one contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. Moreover, "[b]ecause of the threat collateral attacks pose to 'finality, comity, and federalism,' habeas petitioners may secure the writ only if the error 'actual[ly] prejudice[d]' them." Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011) (alterations in original) (internal citations omitted). This

12

requires a showing that any error had a "substantial and injurious effect or influence in determining the jury's verdict." _Lawson_, 677 F.3d at 644 n.19 (quoting _Brecht v. Abrahamson_, 507 U.S. 619, 637 (1993)).

Barnes raises several arguments in support of his claim that Jordan's contact with her pastor tainted the jury's decision to recommend death. First, he contends that the Magistrate Judge improperly placed the burden on him to establish that Jordan's extrajudicial communication resulted in prejudice rather than presuming the existence of prejudice as he claims Supreme Court precedent requires. Barnes' argument, however, misreads the case law and the Magistrate Judge's Recommendation. True, _Remmer_ establishes a presumption of prejudice, _Basham_, 561 U.S. at 319, but this presumption is inapplicable when the court is reviewing under the deferential standards of 28 U.S.C. § 2254(d). _Lawson_, 677 F.3d at 644 (citing _Vigil v. Zavaras_, 298 F.3d 935, 941 n.6 (10th Cir. 2002)). Moreover, where applicable, that presumption "is not one to be casually invoked." _United States v. Baptiste_, 596 F.3d 214, 221 (4th Cir. 2010) (quoting _Stockton_, 852 F.2d at 745). The presumption only arises after a petitioner has established that the unauthorized contact "was of such a character as to reasonably draw into question the integrity of

the verdict." <u>Fullwood v. Lee</u>, 290 F.3d 663, 678 (4th Cir. 2002) (quoting <u>Stockton</u>, 852 F.2d at 743).

Barnes asserts that not only was Jordan's conversation with her pastor more than innocuous, it cast a pall of prejudice on the jury's decision to recommend a sentence of death. Like the Magistrate Judge, however, this court concludes that Barnes' allegations, taken as true, are not of such a character as to reasonably draw into question the integrity of the jury's verdict.

Barnes' evidence of improper contact is that Jordan, evidently offended by a defense attorney's closing argument that "quot[ed] scripture out of context," called her pastor to discuss the lawyer's argument.[9] (Doc. 12-6.) Pastor Lomax

---

[9] The closing argument in question appears to be that of William Causey, an attorney for defendant Franklin Chambers, which reads, in part, as follows:

> If you're a true believer [in Jesus Christ] and you believe that Frank Chambers will have a second judgment day, then we know that all of us will too. All of us will stand in judgment one day. And what words is it that a true believer wants to hear? ["]Well done, my good and faithful servant. You have done good things with your life. You have done good deeds. Enter into the Kingdom of Heaven.["] Isn't that what a true believer wants to hear? Or does a true believer want to explain to God, yes, I did violate one of your commandments. Yes, I know they are not the ten suggestions. They are the ten commandments. I know it says, ["]Thou shalt not kill,["] but I did it because the laws of man said I could. You can never justify violating a law of God by saying the laws of man allowed it.

(Tr., Final Arguments at 401.)

directed her to "another [B]ibilical passage which contradicted the passage relied upon by the defense attorney," and the following day, Jordan "read the passage suggested to her by Reverend Lomax to all of the jurors." (Id.) Jordan cannot recall the passage she read, but in general, it stated "that it is the duty of Christians to abide by the laws of the state." (Doc. 12-12.)

The North Carolina Supreme Court concluded that the trial court was presented only with "the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty" and that "[n]othing in this assertion involved 'extraneous information' . . . or dealt with the fairness or impartiality of the juror." Barnes, 345 N.C. at 228, 481 S.E.2d at 68. The MAR court found that Barnes' new evidence "add[ed] nothing" apparently because it was silent as to any communication Jordan had with her pastor.[10] (MAR Order at 13.)

---

[10] The only affidavit signed and notarized by an actual juror makes no mention of Jordan's conversation with her pastor. (Doc. 12-14.) Similarly, a summary of an interview that took place in 1995 between Jordan and two individuals working on Barnes' behalf, which Jordan apparently acknowledged and signed in June 2000, indicates that although Jordan brought a Bible into the jury room, she read a passage that she knew from church. (Doc. 12-6.) The summary makes no mention of a conversation with her pastor. (Id.) At least one juror, Wanda Allen, recalls that one of the jurors -- she apparently doesn't recall who -- mentioned a conversation with a pastor. (Doc. 12-19.) However, Allen's statement does not indicate which juror made the statement about the pastor, when the statement was made, or what

Jordan's contact with her pastor was unquestionably a contact with a third party. The question is whether the conversation can fairly be said to "reasonably draw into question the integrity of the verdict," Stockton, 852 F.2d at 743, or whether the communication was merely "innocuous," Basham, 561 F.3d at 319. In determining whether a third-party's contact with a juror was more than innocuous, the Supreme Court has identified five factors that it "deemed important" to the decision. See Cheek, 94 F.3d at 141. Those "factors" are: "(1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." Id. (citing Remmer, 347 U.S. at 229).

Here, Barnes has demonstrated that, by virtue of Jordan's telephone conversation with Pastor Lomax the night before the jury began deliberating in the sentencing phase, a third party

information, if any, was relayed to the jury about the conversation. (Id.) Pastor Lomax, for his part, does not recall any conversation with Jordan, although he stated that it was possible that he talked to her about the death penalty while she was a juror. (Doc. 12-4.) Thus, the only information about the conversation comes from an affidavit by Daniel Williams, one of Barnes' private investigators, which recounts a June 1, 2000 conversation that he had with Jordan. According to Williams, Jordan told him that she believed one of the lawyers had quoted scripture out of context during a closing argument and, in response, that she called Lomax to "discuss[] the lawyer's argument." (Id.) Williams states that Jordan told him that "Lomax told Ms. Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney." (Id.) Jordan then read the passage to the other jurors. (Id.) Neither she nor the other jurors can remember the passage.

engaged in a private communication directly with a juror during the trial. However, while the contact related to the penalty phase of the case -- a matter surely before the jury -- it is not clear that Barnes has demonstrated that the substance of the communication itself was "about the matter before the jury." See Cheek, 94 F.3d at 141. Barnes' evidence indicates that during a closing argument one of his co-defendant's attorneys "quoted a scriptural passage which suggested that if jurors returned a death sentence, they, the jurors[,] would one day face judgment for their actions." (Doc. 12-4.) It was out of concern for possible spiritual condemnation that Jordan contacted her pastor and that he directed her to a (now unknown) "biblical passage which contradicted the passage relied upon by the attorney" (id.) suggesting that individuals have a duty to follow the laws of the State (id.).

Barnes' evidence does not suggest that the pastor advised her about how to make a decision concerning whether the defendants' crimes warranted death, cf. Hernandez v. Martel, 824 F. Supp. 2d 1025, 1124 (C.D. Cal. 2011) (granting habeas relief where petitioner's evidence demonstrated a juror's priest told her "that the 'only' thing or the 'main' thing she should consider [when deciding whether to impose the death penalty] was the petitioner's potential for rehabilitation"), or urged her to impose a death sentence, cf. Stockton, 852 F.2d at 745

(concluding that a man's remark to a group of jurors that they should "fry" the defendant "posed a potential for prejudice that was too serious to ignore"). Instead, he directed her to a portion of the Bible in response to a defense argument that was most assuredly *not* before the jury -- i.e., whether God would condemn a juror who voted to impose a death sentence.[11] In addition, the passage in question, as characterized by Barnes, expressed no opinion on the propriety of the death penalty and simply indicated that a Christian has a duty to follow the laws of the state, <u>cf.</u> <u>Robinson v. Polk</u>, 438 F.3d 350, 363 (4th Cir. 2006) (explaining that the Bible "invites the listener to examine his or her own conscience from within"), which, in the case of North Carolina, permitted a jury, in its discretion, to recommend that a convicted murderer like Barnes serve life in prison or be put to death, N.C. Gen. Stat. § 15A-2000(b)(3) (permitting the jury to recommend "whether the defendant should be sentenced to death or to imprisonment in the State's prison for life"). Nothing in Barnes' evidence indicates that Pastor Lomax shared his personal -- or Biblical -- view on the death

---

[11] Barnes' petition contends that "Jordan acknowledged her improper communication with her pastor . . . w[as] directly related to resolving the ultimate issue of whether the jury should impose a sentence of death on petitioner." (Doc. 12 at 18.) Barnes' characterization of Jordan's statements takes them too far. Jordan simply admits that she spoke to her pastor about whether jurors who recommend a death sentence will face God's condemnation. (Doc. 12-4.)

18

penalty, advised Jordan about how to make her decision, or even knew in what trial Jordan was serving. Consequently, Barnes did not demonstrate that Pastor Lomax's conversation with Jordan reasonably questioned the integrity of the verdict.

Finally, Barnes contends that the North Carolina courts erred by not granting him an evidentiary hearing on his claim. The only case Barnes cites for his proposition, however, does not mandate an evidentiary hearing. See Smith v. Phillips, 455 U.S. 209, 217 (1982) ("[D]eterminations [of alleged juror misconduct] *may* properly be made at a hearing." (emphasis added)). Further, both North Carolina courts accepted, and this court accepts, Barnes' claims as true when they assessed whether he had raised a constitutional claim warranting relief and determined that he had not. In such circumstances, when the "state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" Cullen v. Pinholster, 131 S. Ct. 1388, 1399 (2011) (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007)). And lastly, even if this court were to hold an evidentiary hearing, Supreme Court precedent dictates that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court" --

not after the benefit of an evidentiary hearing.  Id. at 1400-01.

The North Carolina courts' decision to deny Barnes relief on this claim based on the record before it was neither contrary to nor an unreasonable application of clearly established federal law.  Barnes has failed to show that juror Jordan's contact with Pastor Lomax had a substantial and injurious effect or influence on the jury's determination of the verdict in this case.  Barnes' objections to the Magistrate Judge's Recommendation are therefore overruled, and his claim for relief on this ground will be denied.

### 2.   Presence of the Bible in the Jury Room

Barnes also alleges that the jury deliberation process was tainted when Jordan brought her Bible into the jury room and read an unidentified passage to other jurors while the jury was beginning to discuss the imposition of a death sentence as to Barnes and his co-defendants.  This argument is similarly without merit.

The Magistrate Judge thoroughly discussed the law applicable to juror misconduct and extraneous influence claims in his Recommendation, so a detailed recitation is not required here.  Suffice it to say that while the Sixth Amendment prohibits "any private communication, contact, or tampering directly or indirectly, with a juror during the trial about a

matter pending before the jury," <u>Remmer</u>, 347 U.S. at 229, it does "not require judicial consideration of . . . allegations regarding influences internal to the [jury's] deliberation process," <u>Robinson</u>, 438 F.3d at 363.

In <u>Robinson</u>, a habeas petitioner alleged that a juror improperly gained access to a Bible and read a Levitical (or similar) "eye for an eye" passage during the deliberation process. <u>Id.</u> at 358. The Fourth Circuit held that the state court's decision denying relief was not an unreasonable application of clearly established Supreme Court law because, among other things, "reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence." <u>Id.</u> at 364. According to the <u>Robinson</u> court, "the physical presence and reading of the Bible in the jury room [did not] require[] the MAR court to arrive at a different conclusion under clearly established Supreme Court case law." <u>Id.</u>

Here, Barnes' affidavits suggest that Jordan read from a Bible in the jury room during sentencing deliberations. Barnes' affidavits do not specify which passage Jordan read, but in general terms, it appears to have been the same verse indicating that individuals have a duty to follow the laws of the state discussed previously. Even taking these allegations as true, this is not the type of evidence entitling Barnes to habeas

21

relief.  See id. at 364; Lenz v. Washington, 444 F.3d 295, 312 (4th Cir. 2006).

Barnes has failed to demonstrate that the North Carolina court's decision to deny his claim was either contrary to, or an unreasonable application of, clearly established federal law. It will, accordingly, be denied.[12]

### C.    Ineffective Assistance of Counsel Claim

Barnes' next argument is that his Sixth Amendment right to effective assistance of counsel was violated when his trial counsel failed to investigate and present mitigating evidence at his sentencing.  Specifically, Petitioner contends that the North Carolina MAR court unreasonably applied clearly established federal law when it determined there was no ineffective assistance of counsel despite the fact that the jury never heard about Petitioner's good conduct in prison or certain

---

[12] Barnes' suggestion of subsequently decided authority, citing United States v. Lawson, 677 F.3d 629 (4th Cir. 2012), does not change this result.  Lawson involved a juror's use of the online encyclopedia Wikipedia to resolve the meaning of a disputed term during the deliberation process and reaffirmed the Fourth Circuit's position that on direct review "[t]he burden shifts to the [government] to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication" only after the defendant establishes that "there was an extrajudicial communication that was more than innocuous."  Id. at 642 (internal quotations and citation removed).  Lawson distinguished habeas cases, such as the present case, in which the presumption is inapplicable.  Id. at 644.  Because Barnes was unable to establish that Jordan's communication with her pastor and her bringing the Bible into the jury room was more than an innocuous communication, Lawson does not suggest that the North Carolina courts' decisions were contrary to or an unreasonable application of established federal law.

details about his dysfunctional childhood. Petitioner also argues that the Magistrate Judge's Recommendation denying his claim improperly ignored recent Supreme Court authority stating that counsel's limited investigation into readily available evidence of a client's background constitutes ineffective assistance of counsel under the Sixth Amendment. (Doc. 26 at 13–14 (citing Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003)).)

As noted by the Magistrate Judge, the standard for assessing an ineffective assistance of counsel claim is well-settled. A petitioner must show (1) counsel's deficient performance and (2) that such deficient performance was so serious that it denied the petitioner a fair trial whose result was reliable. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance is established when "counsel's representation fell below an objective standard of reasonableness" based on prevailing professional norms. Id. at 687–88. "Counsel's conduct is generally presumed to be a reasonable strategic choice, but is not reasonable to the extent that the choice of strategy does not rely upon either a full investigation of the law and facts or an abbreviated investigation of the law and facts limited only by reasonable professional judgments." Buckner v. Polk, 453 F.3d 195, 201 (4th Cir. 2006) (internal quotation and citation omitted). In a

23

capital case, counsel will be found to have acted reasonably when an effort is made to "discover all reasonably available mitigating evidence." Wiggins, 539 U.S. at 546 (emphasis removed). Prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 535. The burden for establishing prejudice is high, and "it is insufficient to show only that errors had some conceivable effect on the outcome of the proceeding, because virtually every act or omission of counsel would meet that test." Williams, 529 U.S. at 394.

In a capital case, a demonstration of prejudice requires that a petitioner show a "reasonable probability" that, in the absence of counsel's errors, the sentencing body would have determined that "the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. This burden is met when "at least one juror would have struck a different balance" when confronted with all the mitigating and aggravating evidence. Wiggins, 539 U.S. at 534. Where the issue is whether the state court has unreasonably applied Strickland standards to a claim of ineffective assistance of counsel, as it is here, "'double deference' is required – deference to the state court judgment granting deference to trial counsel's performance." Burr v. Lassiter,

24

Case No. 12-4, 2013 WL 871190, (4th Cir. Mar. 11, 2013).  As the
Supreme Court cautioned, "the question is not whether counsel's
actions were reasonable.  The question is whether there is any
reasonable argument that counsel satisfied Strickland's
deferential standard."  Harrington v. Richter, 131 S. Ct. 770,
788 (2011).

Petitioner claims five separate failures of his trial
counsel.  In his objections, however, Petitioner states his
argument generically to cover his "positive adjustment to
incarceration or many critical details [of] his dysfunctional
childhood."  (Doc. 26 at 12.)  He then limits his argument to
his specific discussion of the contention that his trial counsel
was ineffective in failing to present evidence of Petitioner's
good conduct during a prior incarceration.[13]  This contention
will be addressed in detail.

At the state MAR hearing, Petitioner presented records
showing that he successfully completed a welding program in May
1991 at Cleveland Community College while previously
incarcerated.  (Doc. 12-9.)  He also completed 180 hours of pre-
employment training through Rowan-Cabarrus Community College in

_____

[13]  Petitioner's other alleged grounds are (1) failure to interview or
call as a witness Della Barnes, Petitioner's mother; (2) failure to
properly prepare the testimony of witness Michael Barnes, Petitioner's
brother; (3) failure to prepare the testimony of witness Willie Mae
Barnes, Petitioner's grandmother; and (4) failure to call Anthony
Barnes, Petitioner's younger brother.

August 1991. (Id.) Further, prison documents show that he received merit points from the Cleveland Correctional Center for working overtime. (Id.) None of these records was presented by Petitioner's trial counsel at sentencing, and Barnes contends that had such mitigating information been presented, it would have led at least one juror to return a sentence less than death.

Pursuant to the Supreme Court's decision in <u>Skipper v. South Carolina</u>, evidence of a defendant's disposition toward making a peaceful adjustment to prison life is "by its nature relevant to the sentencing determination." 476 U.S. 1, 7 (1986). As such, evidence of Barnes' prior course work and good behavior in prison would likely have been admissible at his sentencing hearing. <u>See</u> <u>id.</u> However, even if this evidence would have been admissible, <u>Skipper</u>'s holding, contrary to Petitioner's argument, does not require that it be presented. <u>Skipper</u> only instructs that such evidence be considered "*potentially* mitigating." <u>Id.</u> at 5 (emphasis added). Thus, counsel was under no obligation to present all possible evidence regarding prior good behavior in prison. <u>Id.</u> at 7 n.2 ("We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating.").

Additionally, there is no support for finding that counsel's failure to present the specific evidence at issue here was deficient performance under <u>Strickland</u>. First, Petitioner's trial counsel *did* present evidence at sentencing relating to Petitioner's ability to successfully adjust to life in prison. During sentencing, Larry Murphy, a food services supervisor at Central Prison, testified about Petitioner's job as a head cook in the prison kitchen during his pre-trial detention. (Tr., Vol. VII at 464). Murphy told the jury that Petitioner had started as a general laborer but had worked his way up to head cook, a position requiring him to supervise three or four other people. (<u>Id.</u>) Murphy further stated that Petitioner "worked great, had no problems at all" and had a good attitude. (<u>Id.</u> at 464-65.) Any evidence regarding good behavior or education from a previous incarceration would have thus been cumulative, as Murphy's testimony established Petitioner's ability to productively function in the prison environment. <u>See</u> <u>Smith v. Quarterman</u>, 515 F.3d 392, 404 (5th Cir. 2008) (holding that counsel's failure to introduce records showing good behavior during prior incarcerations was not deficient performance when counsel called a correctional officer who testified about the petitioner's good behavior while incarcerated in the local jail).

27

Furthermore, evidence from a previous incarceration could have been damaging, not mitigating, if presented to the jury. See id. at 404 (noting that "good behavior during previous imprisonment constitutes evidence capable of both mitigating and aggravating [] punishment" as it can show a propensity not to abide by the laws of society). At the MAR hearing, Petitioner's trial counsel indicated that it would be beneficial to downplay the fact that Barnes had previously been incarcerated. (MAR Hearing Transcript ("MAR H'rg Tr.") at 76.) Thus, choosing not to present evidence regarding educational or merit credits earned during a prior incarceration would have been consistent with a reasoned strategy to minimize Petitioner's criminal history in front of the jury.

In addition to there being no showing that the state court unreasonably applied Strickland's standards, there is no evidence of prejudice because Barnes cannot show a "reasonable probability" that the results of his sentencing hearing would have been different if counsel did present his prison records. Counsel did in fact present evidence of Petitioner's ability to successfully conform to institutional settings. (Tr., Vol. VII at 464–465 (testimony of Larry Murphy).) As such, there is no reasonable probability that additional evidence of good behavior or coursework would have led even one juror to re-weigh the aggravating and mitigating factors. Because this evidence was

28

"double-edged" (i.e., both potentially aggravating and
mitigating), it cannot be said to have likely had a significant
mitigating effect had counsel presented it. See Ladd v.
Cockrell, 311 F.3d 349, 360 (5th Cir. 2002) (stating that
"double-edged" evidence (evidence from prior incarcerations) is
unlikely to have a significantly mitigating effect). Therefore,
the court finds that Barnes has failed to demonstrate that the
state court's decision to deny his ineffective assistance of
counsel claim on this basis was either contrary to, or an
unreasonable application of, clearly established federal law.
The claim will, accordingly, be denied.

It is not clear that Barnes has properly objected to any
other ground for his claim of ineffective assistance of counsel
relating to the presentation of mitigating evidence at
sentencing in order to invoke this court's de novo review; he
certainly has not specifically argued any of the evidence. See
Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982) ("Courts
have . . . held de novo review to be unnecessary in . . .
situations when a party makes general and conclusory objections
that do not direct the court to a specific error in the
magistrate's proposed findings and recommendation."). Rather,
he complains generally about counsels' failure to present
evidence of his "dysfunctional childhood." (Doc. 26 at 12.)
Because this is a death penalty case and to the extent it could

be contended that Barnes has properly raised other objections based on ineffective assistance of his counsel, the court will nevertheless address his remaining claims *de novo*.

Barnes argues that his counsel was ineffective for failing to interview or call his mother, Della Barnes, to testify at sentencing about his dysfunctional childhood. He contends that the state court failed to recognize that counsel's failure to call Della Barnes resulted from an incomplete investigation, not an informed tactical decision.

As previously noted, Strickland requires that counsel's performance meet an objective reasonableness standard based on prevailing professional norms. 466 U.S. at 688. With regard to a sentencing hearing, counsel must "conduct a thorough investigation of the defendant's background" to identify any potentially relevant mitigating evidence. Williams, 529 U.S. at 396. This does not mean that the entire universe of potentially mitigating evidence must be investigated and presented; instead, the court need only consider whether the investigation supporting counsel's decision not to introduce specific evidence was reasonable. Wiggins, 539 U.S. at 523; see also ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases, § 11.8.6 (1989) (stating that counsel should present "all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of

such evidence"). To determine if counsel's investigation was reasonable, the court will conduct an objective review of their performance, which includes a "context-dependent" consideration of the conduct from counsel's perspective at the time. Wiggins, 539 U.S. at 523.

In this case, the state court did not unreasonably apply the standards of Strickland, Wiggins, and Williams when it found that counsel conducted a reasonable investigation and decided not to call Della Barnes as a witness at sentencing. First, there is ample evidence that trial counsel investigated and considered, but ultimately rejected, the use of Della Barnes' testimony. At the MAR hearing, the State introduced the phone logs of William Fritts ("Fritts"), one of Petitioner's trial counsel. These logs showed that Fritts contacted Della Barnes twice — first on January 4, 1993, and again a few months later on March 24, 1993. (MAR H'rg Tr., State's Exs. 1 & 2.) The first of these phone calls lasted for 45 minutes, and the second lasted for 15 minutes, resulting in a total time of one hour. (Id.) Michael Lea, Fritts' co-counsel, also testified that Fritts had contacted Della Barnes and that it had been said she would not make a good witness. (Id. at 88). This evidence indicates that trial counsel investigated, yet rejected, the use of Della Barnes' testimony out of concern that she would have made a poor witness.

Additionally, Della Barnes' testimony would have been cumulative and not substantially different from that of the other witnesses called by Petitioner's trial counsel. At the MAR hearing, Della Barnes testified regarding the circumstances of Petitioner's childhood and her conviction for involuntary manslaughter when he was a child. (Id. at 10-27.) This testimony did not differ materially from the evidence that was available to the jury at sentencing. At sentencing, Petitioner's counsel presented no fewer than five witnesses who testified about Petitioner's dysfunctional childhood. Cf. Wiggins, 539 U.S. 510 (finding ineffective assistance of counsel when trial counsel presented *no evidence at all* of petitioner's dysfunctional background). Dr. William Scarboro, a licensed psychologist, testified that Barnes was neglected as a child and did not have a positive role model while growing up. (Tr., Vol. VII, at 503-24.) Dr. Scarboro also stated that Petitioner had a history of behavior problems that seemed to present at the time that Petitioner's mother went to prison. (Id.) The jury also heard from Vanessa Davis, Petitioner's former girlfriend (id. at 467-88), Ronnie Miller, Petitioner's cousin (id. at 488-502), Willie Mae Barnes, Petitioner's grandmother (id. at 526-532), and Michael Barnes, Petitioner's older brother (id. at 532-546). All four of these witnesses testified that Petitioner's father was absent from his life, further highlighting Petitioner's lack

of a positive role model. In addition, Dr. Scarboro, Willie Mae Barnes, and Michael Barnes all testified that Petitioner's mother served time in prison and was absent during part of Petitioner's childhood. Dr. Scarboro and Michael Barnes both specifically linked Della Barnes' incarceration to the emergence of Petitioner's behavior and attitude problems.

In sum, Della Barnes' potential testimony would not have added to the picture of a dysfunctional childhood painted by the numerous other witnesses presented by trial counsel. Further, her testimony could well have been damaging. Because trial counsel's mitigation strategy was to portray Petitioner as sympathetically as possible, testimony from his mother, a convicted felon who had served time in prison for manslaughter, could have been less helpful than the testimony of his grandmother, a more sympathetic witness.

Contrary to Petitioner's argument, the instant situation is unlike that in Rompilla v. Beard. In Rompilla, trial counsel completely failed to examine the petitioner's prior conviction file even when they knew the prosecutor intended to use it as aggravating evidence. 545 U.S. at 383-85. Had they examined the file, they would have uncovered evidence about the petitioner's troubled childhood and mental health, subjects not addressed at sentencing. Id. at 378, 391. Such a blatant lack of investigation is not the case here; instead, the record shows

33

that trial counsel investigated and rejected the use of Della Barnes' testimony. Also, unlike in Rompilla, the evidence raised in Barnes' post-conviction proceedings is not substantially different from that raised at sentencing. Indeed, the sentencing transcripts reveal that four other witnesses testified about the details of Petitioner's dysfunctional childhood, thus providing the jury with adequate information about Petitioner's upbringing. Therefore, because the use of Della Barnes' testimony was reasonably investigated by trial counsel and would have been cumulative even if presented, the court cannot say that the state court unreasonably applied clearly established federal law when it rejected Barnes' ineffective assistance of counsel claim.

Petitioner also contends that his trial counsel was ineffective for failing to properly prepare witnesses Willie Mae Barnes and Michael Barnes and for failing to call Anthony Barnes, Petitioner's younger brother, as a witness. However, at the state post-conviction evidentiary hearing, no evidence was presented by Petitioner on these claims. The State contends that Petitioner's failure to present evidence on these matters precludes this court from considering these issues. (Doc. 9 at 1-2.) However, because the MAR court reached these issues on the merits, this court will as well. See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("If the last state court to be

34

presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available.").

Regarding the testimony of Michael Barnes, the MAR court found that the witness was "effectively examined regarding some facts which had mitigating value to the jury concerning the defendant's family background." (MAR Order at 11.) However, Petitioner contends that counsel was ineffective at preparing Michael Barnes as a witness and "inexplicably failed" to solicit from him the fact that, as a child, Petitioner had helped care for his mentally retarded brother, James. (Doc. 12 at 26.)

The court has reviewed the transcript and cannot say that the MAR court's determination is unreasonable. Trial counsel testified at the MAR hearing that their primary mitigation strategy was to cast light on Petitioner's troubled childhood to explain and contextualize his conduct as an adult. Counsel's questioning of Michael Barnes followed this strategy. The examination revealed that Petitioner's childhood involved violence, alcohol abuse, and the absence of his parents. (Tr., Vol. VII at 536 (testimony of Michael Barnes that Petitioner's mother was incarcerated for three years when Petitioner was a child)); (id. at 538 (testimony of Michael Barnes that Petitioner began drinking around 11 or 12 years of age)); (id. at 540 (testimony of Michael Barnes that Petitioner's father was

absent and his mother's boyfriend was physically abusive).) The
fact that one additional circumstance, Petitioner's care of his
mentally retarded brother, was not developed is not enough to
conclude that the MAR court unreasonably applied Strickland.

Regarding the testimony of Willie Mae Barnes, Petitioner
argues that counsel failed to solicit information that her
daughter, Della Barnes (Petitioner's mother), did not provide
Willie Mae and Della's children with sufficient food or
financial support. (Doc. 12 at 26.) Petitioner argues that
this testimony would have helped the jury to understand better
Petitioner's childhood environment and thus provided important
mitigating evidence. (Id.)

A review of the transcript, as noted by the MAR court,
reveals there was no need to ask Willie Mae Barnes additional
questions that would have cast her daughter in a bad light.
Other witnesses testified that Petitioner's mother was in jail,
not present during part of his childhood, and did not serve as a
positive role model for Petitioner. Any additional evidence
regarding the failure of Petitioner's mother would have been
merely cumulative. Further, the transcript from the evidentiary
hearing shows that trial counsel questioned Willie Mae Barnes
effectively and used her testimony to establish information
about Petitioner's troubled childhood. (Tr., Vol. VII at 529
(testimony of Willie Mae Barnes that Petitioner and his brothers

36

were living by themselves after Della Barnes went to prison)); (id. at 531 (testimony of Willie Mae Barnes that Petitioner's father was not present during his childhood).) Again, counsel's failure to raise one additional circumstance, which would have been cumulative in light of the other presented evidence, does not rise to the level of objectively deficient performance necessary under Strickland.

Finally, Petitioner contends that the state court unreasonably applied clearly established federal law when it rejected Petitioner's claim that counsel was ineffective for failing to call Anthony Barnes. Petitioner argues that counsel failed to present mitigating evidence regarding Petitioner's willingness to do hard work and contends that Anthony Barnes would have testified that Petitioner showed a propensity to work hard by doing household chores and helping his mother move. However, no evidence was presented on this issue at the MAR evidentiary hearing. As such, the MAR court held that Petitioner "failed to make even a threshold showing of ineffectiveness or prejudice as to this allegation." (MAR Order at 11.)

This court agrees. When no evidence is presented on a claim to the MAR court, as was the case here, the federal habeas court cannot go beyond the record available to the state court. See Underwood v. Harkleroad, 411 F. App'x 569, 578 (4th Cir.

2011) (stating that the court's habeas review is narrow when no evidence on a claim was presented to the MAR court).[14]   Thus, like the MAR court, this court cannot find either deficient performance or prejudice for counsel's failure to call Anthony Barnes.[15]

In sum, Petitioner has failed to demonstrate that the rejection of his claim of ineffective assistance of counsel by the state courts was contrary to or an unreasonable application of clearly established federal law, and the claim is therefore denied.

### D.   **Brady** Claims

Petitioner's final objections relate to his claim that the prosecutor failed to disclose exculpatory information.   The exculpatory information identified by Petitioner includes the statements of witnesses Antonio Mason, Sheila McClain, and

---

[14]   Unpublished decisions of the Fourth Circuit have no precedential value but are cited for the weight they generate by the persuasiveness of their reasoning.   See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

[15]   Even if the court accepts Petitioner's allegations as true, it still would not find trial counsel ineffective for failure to call Anthony Barnes.   Petitioner claims that Anthony Barnes' testimony was necessary because "[n]o mitigating circumstances relating to his ability to work hard was presented to his sentencing jury."   (Doc. 12 at 27.)   A review of the sentencing transcript reveals this is not true.   Both Vanessa Davis' and Larry Murphy's testimony spoke to Petitioner's willingness to work hard.   (Tr., Vol. VII at 467-471) (testimony of Vanessa Davis that Petitioner was "an excellent worker"); (id. at 465) (testimony of Larry Murphy that Petitioner was a "good worker").   As such, Anthony Barnes' testimony would have been cumulative, and no prejudice against Petitioner resulted from trial counsel's failure to call him.

38

Teresa Scott, and a police log from the night the Tutterows were murdered. Petitioner alleges that this material was not timely disclosed to his trial counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963). Specifically, Petitioner contends that these Brady violations deprived him of the right to confront the witnesses against him, to a reliable guilt phase and sentencing proceeding, and to due process in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution.

As noted by the Magistrate Judge, Brady held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The prosecutor's duty to disclose such exculpatory evidence is applicable even in the absence of a request for the information by the accused. United States v. Agurs, 427 U.S. 97, 110-11 (1976). Brady encompasses evidence known to police investigators, even if such information is not known to the prosecutor. Kyles v. Whitley, 514 U.S. 419, 438 (1995).

To successfully show a Brady violation, a petitioner must establish three things. First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Second, the evidence must have been willfully or

39

inadvertently suppressed by the state (i.e., the state had the materials and failed to disclose them). Id. at 282; see also United States v. Stokes, 261 F.3d 496, 502 (4th Cir. 2001). Finally, prejudice against a petitioner must have resulted (i.e., the evidence at issue was "material"). Strickler, 527 U.S. at 282; see also Stokes, 261 F.3d at 502. Evidence is considered "material" and thus subject to Brady disclosure "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

In this case, the court finds that the state court did not act contrary to or unreasonably apply clearly established federal law when it determined that the evidence identified by Petitioner did not meet these standards.

### 1. Statement of Antonio Mason[16]

The first witness statement identified by Petitioner underlying an alleged Brady violation is that of Antonio Mason, who was interviewed by SBI Agent D.A. Gale on August 19, 1993, and recounted events he witnessed on the day of the Tutterow murders. In his statement, Antonio Mason stated that on the day

---

[16] Petitioner addresses the Magistrate Judge's conclusions regarding Antonio Mason's statement in two separate sections of his objections. (Doc. 26 at 18-21, 28-32.) Because Petitioner's arguments are related, they will be addressed together.

of the murders all three defendants (Petitioner, Robert Blakney ("Blakney"), and Frank Chambers ("Chambers")) were together at Sharon Mason's house, along with Antonio Mason, Sharon Mason, and Valerie Mason. (Doc. 12-12 at 3-4.) While there, the three defendants went into the back bedroom with Valerie Mason. (Id. at 4.) According to Antonio Mason's statement, when Valerie Mason came out, "[s]he said Bobby Blakeney said he had killed somebody." (Id.) Antonio Mason also recounted that the next day Blakney told him that "Chambers had shot the people, that he, himself, had not shot them." (Id. at 5.)

The Magistrate Judge's Recommendation rejected Petitioner's claim that the above referenced statements made by Antonio Mason were appropriate bases for a Brady violation. Specifically, the Magistrate Judge found that the MAR court did not unreasonably apply clearly established federal law when it determined that (1) Petitioner had failed to show that Mason's statement was not disclosed to Petitioner's trial counsel, and (2) that Petitioner had failed to show that the portions of the statement identified by him constituted Brady material. Because the court finds that the state court did not unreasonably apply clearly established federal law in determining that the identified statements were not Brady material, the court need not reach the issue of whether the statements were disclosed to Petitioner's trial

41

counsel.[17]

---

[17]   As noted by the Magistrate Judge, Petitioner has the burden to show
that any alleged Brady material was not turned over to his trial
counsel.   Strickler, 527 U.S. at 282.   The Magistrate Judge found that
Petitioner failed to meet that burden as "Petitioner failed to show
the state court that the State suppressed Mason's statement, or that
the defense did not have access to it."  (Doc. 22 at 50.)
     Trial counsel's affidavit before the MAR court stated that they
"do not recall whether we received this document at the time of trial
. . . We are sure that if we did get a copy, we received the statement
during trial, and not before . . ."  (Doc. 12-10.)   During the cross-
examination of Mason, Mr. Lea appeared confused regarding whether
Antonio Mason had given a statement to an SBI Agent.   The following
exchange took place:

     Q: Mr. Mason, when did you talk to the police about this
     situation, the day after it happened?
     A: Yes, sir, something like that.
     Q: You think it was the first time you talked to the police
     about it?
     A: Yes, sir.
     Q: Did you talk to them more than one time about that?
     A: Yes, sir.
     Q: Did you talk to a different policeman that day?
     A: Yes, sir.
     Q: Did you talk to anybody who identified himself as an SBI
     Agent?
     A: I believe so.
     . . .
     Mr. Lea: Your Honor, at this time we would -- we have one
     statement, but it doesn't appear that's all the statements
     we might be entitled to.

(Tr., Vol. I at 259-60).   However, Antonio Mason's statement was
clearly used by counsel for one of the co-defendants in his cross-
examination of Antonio Mason, indicating it was produced by the State
and available during trial.  (Tr., Vol. I at 267-92.)   An element of
Antonio Mason's statement to the SBI was also used by Mr. Fritts in
his cross-examination of Valerie Mason.   (Tr., Vol. II, at 35) ("Q:
And if your brother . . . said that Chambers had two guns in his
waistband, he would have been mistaken; is that correct?  A: Well, I
can't say he would have been mistaken . . .").
     A habeas petitioner challenging a state decision must show it was
based on an unreasonable determination of the facts in light of the
evidence presented in the State court.  28 U.S.C. § 2254(d)(2).   The
determination of a fact is presumed correct, and a petitioner must
rebut this presumption by clear and convincing evidence.   Id.
§ 2254(e)(1); Rice v. Collins, 546 U.S. 333, 338-39 (2006).

Petitioner points out that in determining that Antonio Mason's statement was not <u>Brady</u> material, the Magistrate Judge noted that the identified information was not "significantly exculpatory" as to Petitioner. (Doc. 22 at 50.) As Petitioner correctly notes, this is not a standard recognized under <u>Brady</u>. Instead, the evidence must only be favorable to the defendant either because it is (1) exculpatory or (2) impeaching. <u>Strickler</u>, 527 U.S. at 281-82. But even if the material at issue is exculpatory, there is no <u>Brady</u> violation unless there exists a reasonable probability that the result at trial would have been different had the evidence been disclosed. <u>Wood v. Bartholomew</u>, 516 U.S. 1, 5 (1995).

When examining a <u>Brady</u> claim through the lens of the AEDPA, the question the court must answer is: "[w]as the MAR court's holding . . . incorrect to a degree that [its] conclusion 'was

---

Petitioner's evidence before the MAR court focused on whether trial counsel received Antonio Mason's statement *prior to* trial, rather than at trial. (Doc. 26 at 18-19.) The record appears to support the conclusion that the MAR court's determination (that Petitioner failed to carry his burden to show that Antonio Mason's statement was not disclosed) was not unreasonable. (<u>See also</u> Amendments to Amended MAR at 18 (statement of Petitioner's post-conviction counsel that "[i]t is *unclear* whether all of these prior exculpatory statements by Blakney were disclosed to defense counsel" (emphasis added)).) However, because the court determines that the portions of Antonio Mason's statement identified by Petitioner are not exculpatory and, alternatively, do not raise a reasonable probability that the result of the proceedings would have been different, the court need not reach this issue. <u>See</u> <u>United States v. Jeffers</u>, 570 F.3d 557, 573 (4th Cir. 2009)(not reaching whether or not statements were disclosed because, regardless, they were not material under <u>Brady</u> and would not have made any difference in the trial).

so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement?'" Richardson v. Branker, 668 F.3d 128, 149 (4th Cir. 2012) (quoting Harrington, 131 S. Ct. at 786-87). Under this standard, the answer is no. Upon examination of the record, it is clear that the MAR court did not unreasonably apply Brady and its progeny when it determined that the identified statements were not Brady material. First, Antonio Mason's statement that Valerie Mason said that Blakney had "killed somebody" is not exculpatory as to Petitioner. The statement does not remove Petitioner from involvement in the Tutterows' deaths, especially considering that the trial evidence indicated that two shooters were involved. Further, it is not beyond fair-minded disagreement to say that a failure to disclose this statement does not undermine confidence in the verdict considering that the statement only "calls upon a weak inference from the absence of an affirmative declaration." (MAR Order at 5.) The same is true of Antonio Mason's statement that Robert Blakney said that Chambers had "shot the people."

Petitioner argues that even if neither portion of Antonio Mason's statement is exculpatory, taken together they are because they support the proposition that the two shooters were Blakney and Chambers, and not Petitioner. (Doc. 26 at 20-21.)

44

The court disagrees. Antonio Mason's statement that Blakney said he had "killed somebody," an admission of guilt by Blakney, is *contradicted* by Antonio Mason's statement that Blakney said Chambers, not Blakney, had been the shooter. (See Doc. 12-12 at 5 (statement of Antonio Mason that Blakney told him that "Chambers had shot the people, that he, himself, had not shot them").) Combined, these portions of Antonio Mason's statement do not exculpate Petitioner, because the evidence revealed there were two shooters involved in the Tutterows' murders and the statements attributed to Blakney do not exclude Petitioner from having been one of them.

Even if the court were to assume that the portions of the statement, when combined, have some exculpatory effect, Petitioner cannot demonstrate that there is a reasonable probability that he would not have been convicted and sentenced to death had the statement been disclosed. First, Antonio Mason's statement that Valerie Mason said Blakney said he had shot someone contains hearsay and therefore would not have been admissible at trial even if it had been disclosed. See Banks v. Workman, 692 F.3d 1133, 1142 (10th Cir. 2012) (no Brady violation when evidence at issue contained two levels of hearsay because it would not have been admissible at trial). Further, Valerie Mason was cross-examined as to the statements Robert Blakney made during the incident, and she repeatedly claimed

45

that he never stated that he had killed someone. (Tr., Vol. II at 22 ("Q: He did not say he had killed anybody, did he? A: No. Didn't nobody say they killed nobody.").) Blakney, when cross-examined at the sentencing phase of the trial,[18] also consistently denied having spoken to Valerie Mason about the killings. (Tr., Vol. VII at 161-63.) As such, it does not appear that Antonio Mason's statement would have made any discernible impact on, much less created a reasonable probability of altering, either the guilt or punishment phase of trial.

Finally, with regard to the second element of Antonio Mason's statement -- that Blakney said that Chambers had shot the Tutterows, -- Blakney testified consistently with this statement at the sentencing phase of the trial. (Id. at 41 ("[Blakney] said, 'what the **** are you shooting them for?' And Mr. Chambers said, he said, 'We had to.'")); (id. at 43 (Blakney testifying that "I did not come nowhere near Mr. or Mrs. Tutterow.").) Blakney was cross-examined on this point by counsel for Petitioner and Chambers, and his credibility was before the jury. (See, e.g., id. at 155, 184-85.) Thus, the court cannot say that there would be a reasonable probability of a different result had Antonio Mason's statement been available

---

[18] Neither Petitioner, Blakney, nor Chambers testified at the guilt/innocence phase of the trial.

to Petitioner's counsel (assuming it was not) or that the state court unreasonably applied clearly established federal law in determining that there was no <u>Brady</u> violation.

### 2. Statement of Sheila McClain

Petitioner's next argument is that the Magistrate Judge erroneously concluded that the state court did not unreasonably apply clearly established federal law in determining that Sheila McClain's statement does not underlie a <u>Brady</u> violation. Prior to trial, Sheila McClain, the sister of Petitioner's co-defendant Blakney, gave a statement recounting what Blakney had told her after the murders. Blakney told Sheila that he asked co-defendant Chambers why he had shot the victims, and Chambers responded, "I've already been in jail one time; I'm not going back." (Doc. 12-16.) Petitioner contends that this statement was not turned over to his trial counsel even though it contained exculpatory information under <u>Brady</u>.

In assessing this claim, the MAR court found that since McClain did not testify at trial, the State impliedly conceded the possibility that her statement may not have been provided since her statement was not deemed exculpatory or impeaching. (MAR Order at 5.) As such, the MAR court went on to determine whether the statement was <u>Brady</u> material and found it was not and that Petitioner had not proven prejudice.

The court agrees with the Magistrate Judge's conclusion that Petitioner failed to show that he was prejudiced by the State's failure to turn over Sheila McClain's statement. At the MAR hearing, the State introduced a letter sent to Petitioner's trial counsel from the prosecution over three months before trial. In that letter, the State advised Petitioner of the following statements made to non-law enforcement officers: "Defendant Blakney told both his mother and his sister that he did not participate in the shootings. Blakney stated that 'June' [(the nickname for Chambers)] did the shooting and when he asked why, 'June' said that he had already been in jail and he was not going back." (State Court Record, Ex. 12, Defs' Ex. 2.) This information is the same as that contained in Sheila McClain's statement. As such, because the same information was in fact received in another form by Petitioner's trial counsel, there is no indication that the outcome of the proceeding would have been different had counsel received the actual statement given by Sheila McClain. Thus, Petitioner has failed to show prejudice, and the Magistrate Judge correctly concluded that the state court did not unreasonably apply clearly established federal law.

### 3. Statement of Teresa Scott

Petitioner also contends that the prosecution failed to turn over the statement of Teresa Scott in violation of Brady.

At trial, Teresa Scott testified that she saw all three
Defendants -- Petitioner, Chambers, and Blakney -- together at
Cynthia Gwinn's apartment on the night of the murders. (Tr.,
Vol. II at 220-22.) She further testified that she saw all
three defendants leave the apartment together between 9:00 and
9:30 p.m. (Id. at 223.)

Following the murders, Teresa Scott was interviewed by two
law enforcement officers, Detective J.D. Barber and SBI Agent
Gale. Petitioner contends that the reports of Detective Barber
and Agent Gale are materially different, and yet only Detective
Barber's version was turned over to Petitioner's trial counsel.
Specifically, Detective Barber's version of Teresa Scott's
statement reads as follows:

> Ms. Scott stated that she was at Cynthia Gwinn's
> house last night on 10/29/92 and that she saw William
> Leroy Barnes, Bobby Blakeney [sic] and Frank Junior
> Chambers, also, known as Commodore all together . . .

> Ms. Scott stated that Commodore Chambers and Bobby
> Blakeney [sic] came to Ms. Gwinn's apt. after Cynthia
> Gwinn had gotten back from the store and that Cynthia
> Gwinn had asked Barnes, Chambers and Blakeney [sic]
> to leave and that all 3 left together.

(Doc. 12-13.) In contrast, Agent Gale's version of Teresa
Scott's statement is as follows:

> At approximately 7:30 p.m. last night, when it was
> dark, Commodore Chambers came to Apartment #9
> looking for James Chambers. Commodore Chambers is
> James Chambers' nephew. At approximately 9 p.m.

last night, Timmy Barnes[19] knocked on the door of
Apartment #9 and asked for Cynthia.  Cynthia had
gone to the store with James Chambers.  Kay Miller
and Greg Pulliam had taken Scott's granddaughter to
SpeeDee Mart to buy candy. When Timmy Barnes came
into the apartment, he said he was going to kill
Stag Bailey.  She does not know why he said this.
She did not see a gun on Barnes. She made Barnes
come in the apartment, sit down, and calm down.
When Cynthia came back into the apartment, she said
she did not want Timmy Barnes in her apartment, so
Barnes left. Scott does not remember Commodore
Chambers coming back into the apartment and does not
remember anyone else being in there.

(Doc. 12-14.)  Petitioner contends that only Detective Barber's
version of Teresa Scott's statement puts the three defendants
together before the murder, and that Agent Gale's version of the
statement, which was not turned over to the defense, was
exculpatory and materially inconsistent with Detective Barber's
version.

In assessing this claim, the state court found that
Petitioner did not meet his burden of proof to show that the
evidence was not disclosed by the prosecution.  The Magistrate
Judge noted that this finding is presumed to be correct, and
that Petitioner failed to meet his burden of rebutting the
presumption by clear and convincing evidence.  See 28 U.S.C.
§ 2254(e)(1).  Petitioner contends that the Magistrate Judge
erred, as "[a]ll the evidence at the MAR hearing established
that the defense was *never* provided with a copy" of Agent Gale's

---

[19]  "Timmy" was Petitioner's nickname.  (Doc. 1 at 7; Doc. 12-3 at 2.)

report. (Doc. 26 at 22.) Petitioner points to the testimony of his trial counsel at the MAR hearing to support his contention that Agent Gale's version of Teresa Scott's statement was never disclosed to him.

At the MAR hearing, both of Petitioner's lawyers -- Mr. Lea and Mr. Fritts -- testified about Agent Gale's version of Teresa Scott's statement. When asked about Agent Gale's version, Mr. Lea testified: "I think the statement we were given in this situation, based on the way the evidence came in, was the statement of Barber and not the statement of Gale . . . Now, that's an opinion. I don't remember that specifically but I think I would have remembered . . ." (MAR H'rg Tr. at 65.) Similarly, Mr. Fritts testified: "I don't think I had these others" in reference to the statement at issue. (Id. at 144.) Later, Mr. Fritts also testified that "I've got a pretty strong opinion that the one I got was [Barber's version]. If I got [Gale's version], I think I would have done something with it. I sure hope I would have." (Id. at 151.)

This testimony falls short of the clear and convincing standard that Petitioner alleges it satisfies. The statements of Mr. Lea and Mr. Fritts are far from unequivocal; instead, at best, they establish that trial counsel cannot remember whether or not they received Gale's statement but feel they may not have. Trial counsel's testimony indicates they are attempting

to reconstruct their memories based on what they now think they would have done with Gale's statement. It is impossible to tell if these perceptions are animated by hindsight or true memory. But regardless, under a clear and convincing standard, trial counsel's testimony is insufficient to show that the information at issue was never disclosed by the prosecution.

Even if the court assumes that Gale's version of Teresa Scott's statement was not disclosed to Petitioner's trial counsel, the statement does not meet the requirements of Brady. The differences between Detective Barber's version, which was disclosed to Petitioner, and Gale's version are not material. As noted, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles, 514 U.S. at 434. Instead, the court must only look to see if the government's suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678.

Both statements show that Scott placed Petitioner and Chambers at Gwinn's apartment before the murder. Additionally, as noted by the Magistrate Judge, both state that Scott said Chambers left Gwinn's apartment, just not at the same time as Petitioner in Gale's version. In fact, the only substantial difference between the two versions is that Gale's version has

52

only Barnes and Chambers at Gwinn's apartment, while Barber's version has Barnes, Chambers, and Blakney at Gwinn's apartment. But although this difference exists, it is not material under Brady. There is no indication that there is a "reasonable probability" of a different result if Gale's version had been disclosed. Evidence from two other witnesses shows that all three defendants were in fact together in Gwinn's kitchen and that they left the apartment together. (Tr., Vol. III at 135 (testimony of Greg Pulliam that "All three of them [(the defendants)] . . . went into the apartment")); (id. at 139 (testimony of Greg Pulliam that "All three of them [(the defendants)] left together and that was it")); (Tr., Vol. II at 294 (testimony of James Roger Chambers that Frank Chambers, Petitioner, and Blakney were all in Cynthia Gwinn's apartment); (id. at 295 (testimony of James Roger Chambers that Frank Chambers, Petitioner, and Blakney all left Cynthia Gwinn's apartment together).)

In sum, because Petitioner did not meet his burden to show that the evidence at issue was not disclosed and, even if it was not disclosed would be material under Brady, the court cannot say that the state court unreasonably applied clearly established federal law in finding that this claim was without merit. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (noting that the standard of unreasonable application of federal law is

53

a "substantially higher threshold" than the standard of an incorrect application of federal law). Thus, even if Petitioner presented a strong case that Agent Gale's version of Teresa Scott's statement was material under <u>Brady</u>, the court still cannot say that the state court's conclusion was so in error that it was beyond the possibility of fair-minded disagreement.

### 4. Police log[20]

Lastly, Petitioner argues that the Magistrate Judge wrongly concluded that the state court did not unreasonably apply clearly established federal law when it rejected his <u>Brady</u> claim based on the prosecution's failure to turn over a police log from the night of the murders. This log shows that Louise Edwards called the police and reported that her landlord's son, Marty Manning, "saw two of the men" walking towards the victims' house around 10:15 p.m. (Doc. 12-21.) Petitioner claims that the prosecutor failed to disclose this exculpatory information to Petitioner's trial counsel, thus constituting a <u>Brady</u> violation.

In reviewing this police log, the court agrees with the state court and Magistrate Judge that it fails to meet the materiality prong under the <u>Brady</u> analysis. The mere fact that a witness saw two men approaching the victims' home at the time

---

[20] The objections label this contention under heading "VII" although there is no heading VI. (Doc. 26 at 32.)

of the murder does not throw doubt on the outcome of Petitioner's trial or undermine confidence in the verdict. There was substantial other evidence introduced at trial that clearly placed the defendants together on the night of the murders (e.g., the testimony of James Roger Chambers, Teresa Scott, and Antonio Mason). Further, there is ample evidence showing that the defendants were together after the murders. (Tr., Vol. II at 12) (testimony of Valerie Mason that Chambers, Petitioner, and Blakney were together at Sharon Mason's house after the murders); (id. at 169) (testimony of Sharon Mason that the three defendants entered her home together after the murders); (Tr., Vol. I at 241) (testimony of Antonio Mason that the three defendants were together after the murders at Sharon Mason's house). In the face of this other evidence, the court cannot say that in finding no Brady violation the state court's decision was so lacking in judgment that reasonable jurists could not disagree. As such, Petitioner's claim is denied.

### E. Remaining Claims

When timely and specific objections are made to the Magistrate Judge's recommendations, this court reviews those findings and recommendations de novo. However, if no objection is made, the court will review the remaining claims for clear error. Diamond, 416 F.3d at 315.

After a thorough review of Barnes' remaining claims, the applicable law, and the Recommendation of the Magistrate Judge, the court finds no clear error.

**III. CONCLUSION**

The court has carefully reviewed those portions of the Recommendation of the United States Magistrate Judge to which objections were made and has made a *de novo* determination. The court's determination is in accord with the Recommendation, which is ADOPTED, as explained further herein.

IT IS THEREFORE ORDERED that the petition (Doc. 1) be DENIED.

In this capital case, Petitioner has made a sufficiently substantial showing of the denial of a constitutional right under 28 U.S.C. § 2253(c)(2) to warrant the grant of a certificate of appealability with respect to the issue whether a juror's contact with her pastor violated Petitioner's Sixth Amendment right to a fair trial. A certificate of appealability is therefore issued on this question. 28 U.S.C. § 2253(c)(3).

A Judgment will be entered contemporaneously with this Memorandum Opinion and Order.

/s/    Thomas D. Schroeder
United States District Judge

March 28, 2013