IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM LEROY BARNES,                )
                                     )
                Petitioner,          )
                                     )
        v.                           )        1:08cv271
                                     )
EDWARD THOMAS,[1] Warden,            )
Central Prison, Raleigh,             )
North Carolina                       )
                                     )
                Respondent.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Petitioner William Leroy Barnes ("Barnes" or "Petitioner") brings this habeas proceeding under 28 U.S.C. § 2254, challenging his underlying conviction and death sentence resulting from his role in the 1992 murders of B.P. and Ruby Tutterow.  This case returns to the court on remand from the Court of Appeals for the Fourth Circuit with instructions to conduct an evidentiary hearing with respect to Barnes's allegations of juror misconduct during the sentencing phase of his trial.  Barnes's petition was referred to the United States Magistrate Judge, who held an evidentiary hearing and entered a Recommendation to deny the petition.  (Doc. 54.)  Notice was served on the parties, and Barnes filed timely objections.  (Doc. 58.)  Barnes also moves for the appointment of

---

[1]  Edward Thomas is now the present Warden of North Carolina's Central Prison and has been substituted as Respondent.  See Fed. R. Civ. P. 25(d).

substitute counsel.  (Docs. 59, 60.)

After a thorough review and for the reasons set forth below, the court now adopts the Recommendation, as modified herein, denies Barnes's petition, and denies his motion to appoint substitute counsel.

## I.    BACKGROUND

In 1994, Barnes was convicted of first-degree murder and sentenced to death following a trial in the Superior Court of Rowan County, North Carolina.  Barnes sought to challenge his sentence and underlying conviction on multiple grounds, including raising a claim of juror misconduct arising from a juror's alleged communication with her pastor during the sentencing phase of the proceedings.  The Supreme Court of North Carolina affirmed Barnes's conviction and sentence on direct appeal.  State v. Barnes, 345 N.C. 184, 481 S.E.2d 44 (1997), cert. denied, 523 U.S. 1024 (1998).

In February 1999, Barnes sought state post-conviction relief on several grounds by filing a motion for appropriate relief ("MAR") in Rowan County Superior Court.  In his MAR petition, Barnes reasserted his claim of juror misconduct and presented additional evidence to support his claim that a sitting juror, Hollie Jordan ("Juror Jordan"), improperly communicated with her pastor during sentencing proceedings and then relayed information to the other jurors.  On May 31, 2007, the state MAR court denied this claim without conducting a hearing, adopting the same

2

reasoning as the Supreme Court of North Carolina. The Supreme Court of North Carolina subsequently denied review. See State v. Barnes, 362 N.C. 239, 660 S.E.2d 53 (2008).

Barnes filed his present petition on April 17, 2008. (Doc. 1.) On March 28, 2013, this court denied his petition but granted a certificate of appealability with respect to the single issue involving alleged juror misconduct. (Doc. 28 at 56.) On appeal, a divided panel of the Fourth Circuit held that the MAR court unreasonably applied clearly established federal law, as determined by the Supreme Court of the United States, by denying Barnes's juror misconduct claim without applying a presumption of prejudice and holding an evidentiary hearing pursuant to Remmer v. United States, 347 U.S. 227 (1954). Barnes v. Joyner, 751 F.3d 229, 252 (4th Cir. 2014). The Fourth Circuit remanded the case "for an evidentiary hearing to determine whether the state court's failure to apply the Remmer presumption and its failure to investigate Barnes' allegations of juror misconduct in a hearing had a substantial and injurious effect or influence on the jury's verdict." Id. at 253.

The magistrate judge held an evidentiary hearing during which Barnes presented four witnesses: Juror Jordan, Janine Fodor,[2]

---

[2] Janine Fodor represented Barnes in his direct appeal while she worked in the North Carolina State Appellate Defender's Office. (Doc. 47 at 23-24.) The magistrate judge accepted Fodor's testimony subject to several objections by Respondent. (Doc. 54 at 10 n.1, 10-11 n.2.) The

Ardith Peacock ("Juror Peacock"), and Leah Weddington ("Juror Weddington"). (Doc. 47.) Respondent did not present any witnesses. After thoroughly reviewing the evidence and relevant testimony from the evidentiary hearing, the magistrate judge issued a Recommendation denying Barnes's claim. (Doc. 54.) Barnes now objects to several aspects of the Recommendation. (Doc. 58.)[3] After the magistrate judge issued her Recommendation, Barnes filed a pro se motion requesting that the court appoint substitute counsel. (Docs. 59, 60.)

The court will first address Barnes's objections to the Recommendation before considering his motion for substitute

---

magistrate judge permitted Fodor's testimony regarding her review of the legal issues of the case but considered that proffer as an argument of counsel rather than opinion testimony. (Id. at 10 n.1.) During the evidentiary hearing, the magistrate judge sustained the Respondent's hearsay objection to Fodor's testimony regarding what Juror Jordan told Fodor about her consultation with Pastor Lomax during an interview, but permitted Barnes to make an offer of proof as to the challenged testimony. (Id. at 10-11 n.2.) The magistrate judge ultimately concluded that "[e]ven if the Court considers this testimony, the Court finds that the testimony of Juror Jordan herself is more direct and more credible than the general characterizations by Attorney Fodor of her recollection from the summary of her notes of her interviews with Juror Jordan." (Id.) Barnes has not raised any objection to this credibility determination or these evidentiary rulings, and the court does not find that the magistrate judge erred in making these findings.

[3] During the evidentiary hearing, the parties raised several objections to certain testimony regarding the jurors' mental thought processes under Federal Rule of Evidence 606(b). Consistent with her evidentiary rulings during the hearing, the magistrate judge held that certain portions of testimony should not be considered. (Doc. 54 at 10-11 n.2, 13 n.3, 14 n.4.) Barnes does not challenge these evidentiary rulings, nor does the court find that the magistrate judge erred in excluding such testimony. See United States v. Lawson, 677 F.3d 629, 646-47 (4th Cir. 2012).

counsel. Because the facts underlying Barnes's conviction, post-conviction proceedings, and evidentiary hearing are set forth in the Recommendation, they will be repeated here only insofar as necessary to address the objections raised.

## II. ANALYSIS

### A. Objections to Recommendation

Barnes raises several objections to the Recommendation. He first objects to the magistrate judge's "incomplete characterization" of the circumstances that gave rise to Juror Jordan's communications with her pastor, Tom Lomax ("Pastor Lomax"),[4] as well as the characterization of Jordan's communication with him and with the other jurors. (Doc. 58 at 2, 7.) Barnes also objects to the magistrate judge's finding that the state court's error in failing to apply the Remmer presumption was harmless, arguing that the magistrate judge failed to appropriately consider the evidence regarding Juror Jordan's communication with her pastor as well as the evidence in his case. (Doc. 58 at 14, 18.)

When considering a magistrate judge's report and recommendation, a district court must conduct a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.

---

[4] Pastor Lomax is deceased, and thus no testimony was provided from him. (Doc. 47 at 48.)

§ 636(b)(1); Fed. R. Civ. P. 72(b)(3). In doing so, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Fourth Circuit has recognized that "a 'de novo determination' is not necessarily the same as a de novo hearing and that the decision to rehear testimony is within the sole discretion of the district judge, even as to those findings based on the magistrate's judgment as to the credibility of the witnesses before [her]." Proctor v. State Gov't of N. Carolina, 830 F.2d 514, 518 n.2 (4th Cir. 1987) (citing United States v. Raddatz, 447 U.S. 667 (1980)). The district court must review the entire record, including the transcript, to determine whether the magistrate judge's findings are adequately supported by the record. See Johnson v. Knable, 1991 WL 87147, at *1 (4th Cir. 1991) (per curiam); United States v. Mallicone, No. 5:17-CR-9, 2017 WL 3575894, at *2 (N.D.W. Va. Aug. 18, 2017) ("[T]he first step is for the district judge to review the record, including the transcript, and to determine whether the entire record supports the magistrate judge's findings. If the magistrate judge's findings are supported by the record, the finding can be adopted by the district judge." (quoting United States v. Jones, 2011 WL 2160339, *5 (C.D. Ill. June 1, 2011)). Where a party fails to object to a recommendation, however, the court's review is for clear error. Diamond v. Colonial Life & Accident Ins. Co., 416

6

F.3d 310, 315 (4th Cir. 2005).

As to the governing law, the Fourth Circuit stated, "[i]t is clearly established under Supreme Court precedent that an external influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury." Barnes, 751 F.3d at 240 (collecting cases). The Supreme Court in Remmer "clearly established not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing, when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury." Id. at 242. In this case, the Fourth Circuit ultimately concluded that the state MAR court unreasonably applied clearly established federal law, as determined by the Supreme Court, by denying Barnes's juror misconduct claim without applying a rebuttable presumption of prejudice and ordering an evidentiary hearing. Id. at 251-52.

Nevertheless, "principles of comity and respect for state court judgments preclude federal courts from granting habeas relief to state prisoners for constitutional errors committed in state court absent a showing that the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" Richmond v. Polk, 375 F.3d 309, 335 (4th Cir. 2004) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). As the Fourth Circuit explained, "[t]he Remmer presumption is meant to protect against

the potential Sixth Amendment harms of extraneous information reaching the jury, but a state court's failure to apply the presumption only results in actual prejudice if the jury's verdict was tainted by such information." Barnes, 751 F.3d at 252 (quoting Hall v. Zenk, 692 F.3d 793, 805 (7th Cir. 2012)). Within the context of a federal habeas proceeding, however, "Barnes will not be entitled to the Remmer presumption" and must "affirmatively prove actual prejudice by demonstrating that the jury's verdict was tainted by the extraneous communication between Juror Jordan and Pastor Lomax." Id. at 252-53.

A habeas petitioner is entitled to relief if the court is in "grave doubt" as to the harmlessness of the error. O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "'Grave doubt' exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in 'virtual equipose' [sic] regarding the error's harmlessness." Barnes, 751 F.3d at 252 (quoting Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir. 2002)). In North Carolina, a court may not impose the death penalty unless the jurors unanimously agree to such a sentence. N.C. Gen. Stat. § 15A-2000(b). Thus, the court must determine whether it can say "with fair assurance" that the judgment was "not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946); Allen v. Lee, 366 F.3d 319, 345 (4th Cir. 2004) (Gregory, J., concurring) (noting the court must "assess whether

[it] can say 'with fair assurance,' that not a single resolute juror would have voted for a life sentence." (quoting Kotteakos, 328 U.S. at 765)).

In determining whether extraneous information that reached the jury was likely to have prejudiced a defendant, the court may consider several factors, including the nature of the extraneous information, the manner in which it reached the jury, and the strength of the State's evidence. Hall, 692 F.3d at 806-07 ("But in deciding whether extraneous information that reached the jury was likely to have prejudiced a defendant, there is more to consider than just the nature of the extraneous information; a court may also consider, among other things, the power of any curative instructions, and the strength of the legitimate evidence presented by the State." (internal brackets and citations omitted)); McNeill v. Polk, 476 F.3d 206, 226 (4th Cir. 2007) (King, J., concurring) (considering similar factors in determining whether petitioner was actually prejudiced by jury's use of dictionary definition (citing Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 924 (10th Cir. 1992)); McNair v. Campbell, 416 F.3d 1291, 1307-08 (11th Cir. 2005) (noting relevant factors include "the nature of the extrinsic evidence, how the evidence reached the jury, and the strength of the State's case").

### 1. Communication between Juror Jordan and Pastor Lomax

Barnes raises several objections to the magistrate judge's

characterization of Juror Jordan's communication with her pastor
and subsequent communication to the other jurors. Barnes first
claims that the magistrate judge failed to consider the
circumstances that gave rise to Juror Jordan's communications.
Barnes contends that the argument about the Bible and the jurors'
own salvation made by co-defendant Frank Junior Chambers's defense
attorney during his closing argument was precipitated by the
closing argument of the prosecutor[5] and thus placed competing
arguments before the jury about how the Bible should inform the
juror's decision on whether to impose the death penalty. (Doc. 58
at 6.) Barnes argues that the jury was composed of "very
religious" people[6] and at least one juror was "visibly upset" by
the closing argument by Chambers's counsel. (Doc. 58 at 6 (citing
Doc. 12-3 at 12).)[7] He further notes that Juror Jordan, whom

---

[5] Portions of the trial transcript which Barnes cites as the closing
argument of the prosecutor are actually the closing argument of counsel
for Barnes's co-defendant, Chambers. (See Doc. 58 at 3 (citing Trial
Tr. Vol. VII at 393-95 (arguing that the State was "asking you to go
back and commit premeditation, deliberation, and with malice in your
heart order the killing of those three men," and stating that "[y]ou do
not violate the laws of North Carolina when you return a death verdict"
and "I'll not comment on the laws of God at this time"), 401-02
(contending that the State has put the jurors, as "true believers," in
"the predicament" of having "[t]o explain [on judgment day] when your
soul is at stake" that "yes, I did violate one of your commandments").)

[6] Barnes relies on the fact that eleven jurors acknowledged a church
affiliation during voir dire. (Doc. 58 at 2.)

[7] During his closing argument, Chambers's counsel stated:

    If you're a true believer and you believe that Frank Chambers
    will have a second judgment day, then we know that all of us

10

Barnes characterizes as a "true believer," testified that her church "[p]layed a big role in her life" and she considered Pastor Lomax to be her spiritual guide and leader. (Id. at 5 n.4 (citing Doc. 54 at 11.) Relying on the Fourth Circuit's decision in this case, Barnes contends that "[a]gainst this backdrop, Jordan's improper communications with her pastor were both about the subject matter before the jury and tainted the jury verdict." (Id. at 6 (emphasis added).)

However, Barnes conflates the Fourth Circuit's finding that

---

will too. All of us will stand in judgment one day. And what words is it that a true believer wants to hear? ["]Well done, my good and faithful servant. You have done good things with your life. You have done good deeds. Enter into the Kingdom of Heaven. ["] Isn't that what a true believer wants to hear? Or does a true believer want to explain to God, ["]yes, I did violate one of your commandments. Yes, I know they are not the ten suggestions. They are the ten commandments. I know it says, Thou shalt not kill, but I did it because the laws of man said I could.["] You can never justify violating a law of God by saying the laws of man allowed it. If there is a higher God and a higher law, I would say not.

To be placed in the predicament that the State has asked you to place yourself in, is just that. To explain when your soul is at stake. ["]Yes, I know the three that I killed were three creatures of yours, God. And that you made them in your likeness. I know you love us all, but I killed them because the State of North Carolina said I could.["] Who wants to be placed in that position? I hope none of us. And may God have mercy on us all.

Barnes, 751 F.3d at 233. As the Fourth Circuit noted, "[t]he prosecution did not object at any point during this argument." Id. Apart from objecting to the prosecutor's statement that "you have nothing to feel guilty about for imposing the sentence that is required by the law," neither Barnes nor his co-defendants otherwise objected to the references to religion in the prosecutor's closing argument that Barnes contends precipitated this argument by Chambers's counsel. (See Trial Tr. Vol. VII at 359-61.)

the state court's adjudication of his juror misconduct claim was "an unreasonable application of clearly established federal law" with the independent inquiry into whether the error "actually prejudiced" him. Barnes, 751 F.3d at 252 (quoting Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011)). As the magistrate judge noted, the Fourth Circuit's decision focused on the first prong of this inquiry and expressly stated that based on the record presented it was "unclear whether Barnes can demonstrate actual prejudice or whether the MAR Court's unreasonable application of federal law was harmless." Id. at 252. To the extent that the magistrate judge may have failed to consider the nature of the closing argument made by the prosecutor, the court finds that it would not alter the outcome in this case.

Barnes also objects to the magistrate judge's finding that "[t]here is no evidence that Pastor Lomax knew any details regarding the facts of the case or gave any advice or statement to what jurors should do or the verdict they should return." (Doc. 54 at 19.) Barnes notes that Juror Jordan testified that she told him she was on a jury and mentioned the "horrific" crime scene pictures that were introduced during the closing argument. (Doc. 47 at 50-51.) However, the magistrate judge explicitly acknowledged this testimony in making her factual finding. (Doc. 54 at 19.) Moreover, Juror Jordan testified that she "just told him that the pictures were horrific" and "didn't specify which

pictures." (Doc. 47 at 50-51.) To the extent that Pastor Lomax was made aware of some facts regarding the case, it is true that there is no evidence that he "gave any advice or statement to what jurors should do or the verdict they should return" (Doc. 54 at 19); rather, he told Juror Jordan that the jurors would not burn in hell and "we had to live by the laws of the land." (Doc. 47 at 51.)

Barnes next objects to the Recommendation's finding that "there is no evidence that [Pastor Lomax] attempted to persuade Juror Jordan to vote for or against the death penalty, or that he suggested the Bible supported a particular sentence." (Id. at 19.) Barnes challenges the magistrate judge's characterization that the juror spoke with her pastor for "a few minutes" about the trial, noting that Jordan testified that she met with the pastor for "roughly an hour or two" and spent "15 to 30 minutes" discussing the Bible verses with the jurors. (Doc. 58 at 7-8.) He charges that it "defies common sense" to assume that most of the "roughly two hour conversation" centered on "family" and "other things," as Juror Jordan testified. (Id. at 8.) Barnes also points out that Juror Peacock testified that one of the Bible passages Jordan read was "an eye for an eye and a tooth for a tooth." (Id. at 9.) Barnes contends that "[i]nasmuch as the closing argument of Chambers' attorney was undeniably against the imposition of the death penalty, the Bible verses that rebutted

this closing argument are _ipso facto_ in favor of the death penalty." (_Id._ at 13.)

As to timing, it is Barnes who seeks to reject the only record evidence and thus speculate that Juror Jordan's conversation with her pastor lasted "roughly two hours" and concerned mostly a discussion about the case. Juror Jordan testified that her conversation regarding the case lasted "[j]ust the few minutes that [she] asked him would we burn in hell and he said no, we had to live by the laws of the land." (Doc. 47 at 51.) She testified that "[h]e told me some scriptures in the Bible, you know, that explained everything." (_Id._) Otherwise, the remainder of the conversation was about "family" and "other things." (_Id._ at 51- 52.) In the absence of further cross-examination (which was available) or other testimony (which was not elicited), the magistrate judge's finding is well-supported by the record.

Here, the evidence indicates that Juror Jordan offered the Bible verses to rebut the closing argument by Chambers's attorney. (Doc. 12-3 at 12; Doc. 47 at 54-55.) Juror Weddington testified during the evidentiary hearing that she recalled a female juror reading Bible verses out loud during the jury's sentencing deliberations but could not recall the juror's name or the verses read. (Doc. 47 at 74-75.) The following exchange then occurred:

> Q. Do you have any knowledge about what might have prompted the juror – the female juror to bring the Bible into the jury room?

> A.   I guess she was trying to convince someone to
> – it was okay to give him the death penalty.

(Doc. 47 at 75.)[8] Juror Peacock testified that she believed Juror Jordan offered the verses to rebut the closing argument offered by Chambers's attorney, but she could not say whether Juror Jordan offered the verses to promote a particular sentence, apart from providing the general message that the jurors should apply the law. (Doc. 47 at 70-72.) Notably, neither Jurors Peacock nor Weddington could confirm what passages were read or whether they were from the Old or New Testament. See Robinson v. Polk, 438 F.3d 350, 359 n.8 (4th Cir. 2006) (noting stark differences between "eye for an eye" passages in the Old and New Testament, but assuming for the sake of argument that the juror read from the Old Testament).

The magistrate judge characterized Juror Weddington's testimony as to Juror Jordan's purported motive for reading the Bible passages as speculation. (Doc. 54 at 15.) Barnes objects

---

[8] During the evidentiary hearing, the Respondent maintained a standing objection under Federal Rule of Evidence 606(b) and specifically objected to this testimony. (Doc. 47 at 75.) The magistrate judge acknowledged the objection and invited both parties to address the issue in the post-hearing briefing. (Doc. 54 at 13 n.3.) After noting the Respondent's failure to address the issue with any additional specificity in the post-hearing briefing, the magistrate judge overruled the Respondent's objections, concluding that the testimony fell within the exceptions in Rule 606(b)(2)(A) and (B). (Doc. 54 at 13 n.3.) The Respondent has not challenged this evidentiary ruling. Whether or not this statement falls within an exception under Rule 606(b)(2)(A) or (B), it is nevertheless sheer speculation.

to this characterization and contends that Juror Weddington's "prefatory remark that 'I guess' was merely superfluous, as her testimony was based on what she actually observed Jordan doing in relation to another juror." (Doc. 58 at 14.) Barnes notes that Weddington's statement conforms with a summary of Weddington's testimony provided in a sworn affidavit from Daniel Williams, an investigator retained by Barnes's counsel, (Doc. 12-3 at 6-7), as well as Juror Jordan's previous signed statement in which she stated that she "noticed that another juror, a female, seemed visibly upset by the [defense closing] argument, and that she (Jordan) brought in the Bible to remedy the effect of the argument." (Doc. 58 at 13 n.8 (citing Doc. 12-3 at 12).)

Regardless of whether Juror Weddington prefaced her statement with "I guess," her opinion regarding another person's motive can only be considered speculation, particularly where she could not recall the name of the juror who read the Bible verses or which verses were read. (Doc. 47 at 74-75.) Furthermore, the statement itself does not directly contradict Juror Jordan's own testimony that she did not communicate these Bible verses to convince jurors to impose a particular sentence, but rather to advise them that as jurors they should apply the law of the land and would not "burn in hell" if they imposed the death penalty. (Doc. 47 at 52 ("Just the closing argument as far as, like I said, if they got the death sentence for what they did and we sentenced them to death, were we

going to die because we're killing them.") and ("I just wanted to know if I was going to burn in hell for it."); at 55-56 ("The only thing was as far as burning in hell. That's the only reason I went and talked to him.")

### 2. Actual Prejudice and Harmless Error

Barnes next challenges the Recommendation's conclusion that the state court's error in failing to apply the <u>Remmer</u> presumption is harmless because Barnes suffered no actual prejudice as a result of the communication between Pastor Lomax and Juror Jordan. (Doc. 58 at 14.) Barnes claims that the magistrate judge relied on an "incorrect and overly narrow assessment of the evidence" regarding Juror Jordan's communication with her pastor in making this finding. (<u>Id.</u>) In addition, Barnes objects to what he terms as the Recommendation's "incomplete" consideration of the evidence in his case. (<u>Id.</u> at 18.) He contends that the evidence against him was "largely circumstantial and hardly overwhelming." (<u>Id.</u>) He further argues that when weighing the strength of the prosecution's case against the mitigating factors, the magistrate judge's assessment of the evidence is "fundamentally flawed." (<u>Id.</u> at 25.)

There is little indication that Pastor Lomax in his interaction with Juror Jordan or Juror Jordan in her interaction with the jury employed the Bible verses to support the imposition of a particular sentence as opposed to authorizing the jurors to

apply the law.  No witness testified that Juror Jordan ever claimed
to offer the Bible passages to encourage any juror to impose the
death penalty.  Barnes did present evidence during the state MAR
proceeding that Juror Jordan brought her Bible to the jury room
because a juror was "visibly upset" by the closing argument of
Chambers's attorney that jurors would "one day face God's judgment
for killing these defendants."  (Doc. 12-3 at 12; see id. at 7.)
And Juror Peacock testified that one of the Bible passages Jordan
read was an "eye for an eye and a tooth for a tooth."  (Doc. 47 at
61.)  However, Juror Peacock testified that Juror Jordan did not
state whether the Bible verses were offered for or against the
death penalty.  (Id. at 72.)  During the evidentiary hearing,
Barnes's counsel and Juror Peacock had the following exchange:

> Q.   Would it be fair to say that [Juror Jordan]
> brought the Bible passages in to rebut Chambers
> attorney's argument?
>
> A.   Yes.
>
> Q.   Okay.  And that it would be okay to impose
> the death penalty in the case, correct?
>
> A.   She didn't –
>
> Q.   That was –
>
> A.   She didn't say either way.  I did not hear
> her say either way.

(Doc. 47 at 72 (emphasis added).)  In addition, no witness could
recall what specific Bible verses were read or identify whether
they originated from the Old or New Testament.  (Doc. 47 at 54, 61

(recalling only "the eye for an eye and tooth for a tooth . . . – the passage that dealt with that"), 72, 75.)

This is a slim basis on which to conclude that either Pastor Lomax or Juror Jordan relied on the Bible to advocate for any particular sentence other than the one based on a correct application of the law. Cf. Oliver v. Quarterman, 541 F.3d 329, 340, 344 (5th Cir. 2008) (holding that Sixth Amendment violation arose from Bible reading by jurors during deliberations "where the passage the jury read described the defendant's method of killing," but concluding that petitioner failed to present clear and convincing evidence to rebut state court's factual finding that the reading did not influence the decision); Robinson v. Polk, 444 F.3d 225, 227 (4th Cir. 2006) (Wilkinson, J., concurring) ("If the presence of a Bible in the jury room drives the collective discussion, and renders a capital sentence the result of religious command, then in my view, an important line has been crossed.").

In that regard, this case can be distinguished from other cases in which an extraneous influence was found to deprive a petitioner of his constitutional right to a fair trial. Cf. Parker v. Gladden, 385 U.S. 363, 363–64 (1966) (per curiam) (holding that petitioner was entitled to post-conviction relief where bailiff told one juror in the presence of other jurors that "wicked fellow [the petitioner] . . . is guilty" and on another occasion that "[i]f there is anything wrong (in finding petitioner guilty) the

Supreme Court will correct it"); Stockton v. Com. of Va., 852 F.2d 740, 745-46 (4th Cir. 1988) (holding that the state failed to rebut the presumption of prejudice from improper third party contact, where restaurant owner approached a group of jurors during lunch, inquired about their sentencing deliberations, and told them that "they ought to fry the son-of-a-bitch"). In the absence of additional evidence that either Pastor Lomax or Juror Jordan employed Bible verses to actively encourage jurors to impose the death penalty, the logical conclusion is that the extraneous influence encouraged the jurors to decide the case based on the facts presented and the law of North Carolina and not based on the religious constraints the defense counsel sought to impose.[9] This weighs against any finding that the extraneous influence had a substantial and injurious effect or influence in determining the jury's verdict. See Frye v. Warden, San Quentin State Prison, No. 2:99-CV-0628 KJM CKD, 2015 WL 300755, at *77 (E.D. Cal. Jan. 22, 2015) ("Because the most logical interpretation of Juror Fairfield's statement is that the writing directed her to follow the law, and it can hardly be said that this message was

_____

[9] To be sure, while the closing argument by Chambers's attorney effectively placed the spiritual implications of imposing the death penalty before the jury, Barnes, 751 F.3d at 249, there is no evidence to indicate that the trial court instructed the jurors that this factor was at all relevant. See Barnes, 345 N.C. at 227, 236, 481 S.E.2d at 68, 73 (summarizing trial court's instructions). Moreover, there is no indication that after Juror Jordan's discussion of the Bible passages for "15 or 30 minutes" in the jury room (Doc. 47 at 55), any juror subsequently discussed them.

objectively prejudicial to petitioner, this court finds Juror Fairfield's contact with her minister and consideration of any extraneous evidence did not have a substantial and injurious effect or influence in determining the jury's verdict." (citation omitted)). Cf. Fields v. Brown, 503 F.3d 755, 781 (9th Cir. 2007) (en banc) (holding that juror's notes compiling arguments "for" and "against" the death penalty based on Bible verses did not amount to a "substantial and injurious effect in determining the jury's verdict"); McNair, 416 F.3d at 1309 (affirming denial of § 2254 petition based on jury misconduct arising from the reading of Bible passages by the jury foreman, relying in part on the state court's factual finding that the Bible passages "merely had the effect of encouraging the jurors to take their obligations seriously and to decide the question of guilt or innocence based only on the evidence" (internal quotations omitted)).

Furthermore, the strength of the State's evidence mitigates against finding any prejudice resulting from the contact between Juror Jordan and Pastor Lomax. In this case, the State produced substantial evidence linking Barnes to the crime, including the eyewitness testimony placing him with the co-defendants before the crime as well as contemporaneous statements that indicated a willingness to kill someone on the day of the murders. See Barnes, 345 N.C. at 242, 481 S.E.2d at 76-77 (summarizing the relevant evidence against Barnes in the light most favorable to the State

21

and holding that "the jury could reasonably find that Barnes killed the victims after premeditation and deliberation"). The State also produced evidence that Barnes disposed of one of the murder weapons used in the offense, and there was gunshot residue on Barnes's hands at the time of his arrest, which tended to show that he had fired or handled a handgun soon after it had been fired within a period of time close to the killings. See id. Furthermore, despite Barnes's denial, the North Carolina Supreme Court found that "during court proceedings in November, Barnes wore a gold necklace and a watch belonging to the Tutterows," the victims. Id. at 202, 481 S.E.2d at 53.

During the sentencing hearing, Barnes's co-defendant, Robert Lewis Blakeney, testified that he did not shoot the Tutterows but that Barnes and co-defendant Chambers shot them while he was in another room of the house. Id. at 223, 481 S.E.2d at 65. While Barnes now attacks Blakeney's "blame shifting" confession as unreliable (Doc. 58 at 20), Barnes chose not to testify during the sentencing hearing and failed to offer any evidence challenging his co-defendant's testimony. Id. at 223-24, 481 S.E.2d at 65-66. In addition, the State introduced evidence at sentencing tending to show that Barnes had previously committed a violent, attempted robbery of a sixteen-year-old girl. Id. at 237-38, 481 S.E.2d at 74.

Ultimately, the jury found four aggravating circumstances as

to both Barnes and Chambers: (1) both had previously been convicted of a felony involving the use or threat of violence; (2) the murders were committed for pecuniary gain; (3) the murders were part of a course of conduct involving other violent crimes; and (4) the murders were "especially heinous, atrocious, or cruel." Id. at 249-50, 481 S.E.2d at 81. One or more jurors found several mitigating factors as to Barnes during sentencing, which related primarily to his difficult childhood and resulting inability to develop into an adequately adjusted adult. Id. at 250, 481 S.E.2d at 81. The jury found that Blakeney was only an accomplice in or accessory to the capital felony murder and his participation was relatively minor. Id. at 236–37, 481 S.E.2d at 73. It recommended the death penalty for Barnes and Chambers, but it sentenced Blakeney to life imprisonment. Id. at 199, 481 S.E.2d at 51.

Even though the jury did find some mitigating factors as to Barnes at sentencing, these factors related primarily to his childhood and were overshadowed by the aggravating factors and overall strength of the State's case. As the Supreme Court of North Carolina noted, the evidence tended to show that "defendants Barnes and Chambers robbed and viciously murdered two elderly victims. In the course of the murders and the events that followed, Barnes and Chambers showed an utter disregard for the value of human life." Id. at 251, 481 S.E.2d at 82. The fact that the jury voted *against* the death penalty for co-defendant

Blakeney provides further evidence that the improper contact did not prevent the jury from judging each co-defendant individually or otherwise precluded them from rejecting the death penalty as an appropriate punishment, as the magistrate judge noted in her Recommendation. (Doc. 54 at 23.) Thus, the State's strong evidence of guilt weighs against a finding of prejudice in this instance. See Brecht, 507 U.S. at 639 (holding government's improper use of petitioner's post-Miranda silence for impeachment purposes did not substantially influence the jury's verdict, relying in part on the fact that "the State's evidence of guilt was, if not overwhelming, certainly weighty").

Under these circumstances, the court has no "grave doubt" that the extraneous influence arising from the improper communication between Pastor Lomax and Juror Jordan did not substantially influence the jury's decision as to whether Barnes should receive the death penalty, and thus was harmless. O'Neal, 513 U.S. at 436-37. Put another way, mindful that a unanimous verdict is required to impose the death penalty, Allen, 366 F.3d at 345 (Gregory, J., concurring), it can be said with "fair assurance" that the extraneous influence did not have a "substantial and injurious effect or influence in determining the jury's verdict," Kotteakos, 328 U.S. at 765. Therefore, the court finds that any error by the state MAR court's "failure to apply the Remmer presumption and its failure to investigate Barnes'

allegations of juror misconduct in a hearing," <u>Barnes</u>, 751 F.3d at 253, was harmless.

**B.  Motion to Appoint Substitute Counsel**

After the objections were filed by counsel, Barnes filed two pro se motions for the appointment of counsel pursuant to 18 U.S.C. § 3599(a)(2) to assert a claim under <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012).  (Docs. 59, 60.)  In addition, Barnes claims that his appointed counsel are colleagues with counsel who represented him on direct appeal.  (Doc. 60 at 1.)  He further cites the "lack of [c]onstant adequate [c]ommunication with Petitioner and Petitioner's grave concerns that [p]ost-conviction counsel is deliberately attempting to derail Petitioner from relief[.]"  (<u>Id.</u> at 2.)

Barnes's counsel take no position on the relief sought but represent that they "have consistently and thoroughly represented Mr. Barnes" throughout his § 2254 proceedings, including successfully obtaining an evidentiary hearing for him on his juror misconduct claim, handling that hearing, and filing objections to the magistrate judge's Recommendation.  (Doc. 61 at 1-2.)  Counsel represent that they have provided Barnes with all copies of their filings.  (<u>Id.</u> at 2.)

While 18 U.S.C. § 3599 entitles indigent defendants to the appointment of counsel in habeas proceedings for capital cases, habeas petitioners are not entitled to the counsel of their choice.

Christeson v. Roper, 135 S. Ct. 891, 893–94 (2015). Nevertheless, "a court may 'replace' appointed counsel with 'similarly qualified counsel . . . upon motion' of the petitioner." Id. at 894 (quoting 18 U.S.C. § 3559(e)). "Substitution of that federally-appointed counsel is warranted only when it would serve 'the interests of justice.'" Lambrix v. Sec'y, Fla. Dep't of Corr., 756 F.3d 1246, 1259 (11th Cir. 2014) (quoting Martel v. Clair, 565 U.S. 648, 658 (2012)); see 18 U.S.C. § 3006A(c).

When considering a motion to substitute counsel, a court should consider both "the timeliness of the motion" and "the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's responsibility, if any, for that conflict)." Christeson, 135 S. Ct. at 894 (quoting Martel, 565 U.S. at 658). However, "a district court is not required to appoint substitute counsel just so that a state prisoner can file a futile petition" or "pursue wholly futile claims that are conclusively time barred or could not form the basis for federal habeas relief." Lambrix, 756 F.3d at 1259 (citations omitted).

Barnes's request is untimely. He filed the present motion on March 12, 2018, nearly ten years after filing his initial petition, over five years after the Supreme Court's decision in Martinez, and only after the magistrate judge issued her Recommendation denying his claim. Barnes offers no explanation for his delay.

Even if his untimeliness could be excused, Barnes fails to identify any viable claim. To the extent Barnes's motion for new counsel is predicated on a desire to pursue a claim pursuant to Martinez, such a claim is futile because it exceeds the scope of the Fourth Circuit's remand in this case. The Fourth Circuit remanded this matter to this court "for an evidentiary hearing to determine whether the state court's failure to apply the Remmer presumption and its failure to investigate Barnes' allegations of juror misconduct in a hearing had a substantial and injurious effect or influence on the jury's verdict." Barnes, 751 F.3d at 253. The resolution of that issue by this court does not involve questions of procedural default or otherwise implicate Martinez. To the extent Barnes is attempting to assert a new claim, the request exceeds the scope of the remand and would violate the mandate of the Fourth Circuit. See Doe v. Chao, 511 F.3d 461, 465 (4th Cir. 2007); Briggs v. Pennsylvania R. Co., 334 U.S. 304, 306 (1948) ("[A]n inferior court has no power or authority to deviate from the mandate issued by an appellate court."). Barnes has not offered any suggestion that the court should deviate from the mandate rule due to "exceptional circumstances." Doe, 511 F.3d at 467.[10]

---

[10] Even if such a claim were considered to fall within this court's remand jurisdiction, it would be futile on the merits. "Because a prisoner does not have a constitutional right to counsel in state post-conviction proceedings, ineffective assistance in those proceedings does not

To the extent Barnes's request for the appointment of counsel is predicated on a conflict of interest outside his request to pursue a <u>Martinez</u> claim, he fails to identify any actual conflict aside from noting that appointed counsel are colleagues with the counsel who represented him on direct appeal. (Doc. 60 at 1.) Barnes thus fails to identify a sufficient conflict of interest to warrant the appointment of substitute counsel. <u>Cf.</u> <u>Christeson</u>, 135 S. Ct. at 895 (holding that district court erred in denying motion to substitute counsel due to "a significant conflict of interest" where petitioner's argument in favor of tolling the

---

qualify as cause to excuse a procedural default." <u>Davila v. Davis</u>, 137 S. Ct. 2058, 2062 (2017) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991)). In <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012) and <u>Trevino v. Thaler</u>, 569 U.S. 413 (2013), the Supreme Court recognized a narrow exception to this rule, which "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim — ineffective assistance of trial counsel — in a single context — where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." <u>Id.</u> at 2062-63. Unlike the petitioner in <u>Martinez</u>, Barnes did raise a claim of ineffective assistance of trial counsel in his post-conviction MAR proceeding, and this claim was not subject to procedural default. In his federal petition, he again raised this issue, and this court held that he failed to demonstrate that the rejection of this claim by the state courts was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. (Doc. 28 at 38.) Accordingly, any attempt to rely on <u>Martinez</u> to raise or re-raise such claims would be futile. <u>Lambrix</u>, 756 F.3d at 1260-61 ("[T]he <u>Martinez</u> rule relates to excusing a <u>procedural default</u> of ineffective-trial-counsel claims in an initial § 2254 petition and does not apply to cases like [petitioner's]—where ineffective-trial-counsel claims were reviewed <u>on the merits</u> in the initial § 2254 proceeding.") To the extent Barnes now seeks to raise a new claim of ineffective assistance of trial counsel under <u>Martinez</u>, it would be time-barred under 28 U.S.C. § 2254(d). <u>Id.</u> at 1262 (holding that any new ineffective assistance of trial counsel claim was time-barred, noting that "<u>Martinez</u> does not alter the statutory bar against filing untimely § 2554 [sic] petitions").

statute of limitations depended on establishing that his current attorneys had effectively abandoned his case).

Finally, Barnes cites a "lack of [c]onstant adequate [c]ommunication with Petitioner and Petitioner's grave concerns that [p]ost-conviction counsel is deliberately attempting to derail Petitioner from relief[.]" (Doc. 60 at 2.) While Barnes appears to claim that his counsel failed to adequately keep him informed regarding the status of the proceedings, his counsel stated in their response that he has been given copies of all filings in this case. (Doc. 61 at 2.) Barnes has offered no other evidence or specific factual support for his conclusory claims. Nor does his counsel's conduct in proceedings before the court suggest any attempt to prevent Barnes from obtaining relief – to the contrary, counsel have been zealous advocates for his claims.

Accordingly, Barnes's motion for new counsel will be denied, as it has not been demonstrated to best serve the interests of justice.

### C.  Certificate of Appealability

When denying a habeas petition under 28 U.S.C. § 2254, the court must determine whether the petitioner is entitled to a certificate of appealability with respect to one or more of the issues presented in the petition. Rules Governing § 2254 Cases, R. 11(a). Under the Antiterrorism and Effective Death Penalty Act of 1996, a district court may issue a certificate of appealability

"only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Allen, 366 F.3d at 323 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484. "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." Miller-El v. Cockrell, 537 U.S. 322, 342 (2003). The standard for granting a certificate has been described as "low." Frost v. Gilbert, 835 F.3d 883, 888 (9th Cir. 2016) (citation omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail." Buck v. Davis, 137 S. Ct. 759, 774 (2017) (quoting Miller-El, 537 U.S. at 338). Further, within the context of capital cases, courts have recognized that the severity of the sentence is an appropriate consideration when deciding whether to issue a certificate. See,

e.g., <u>Smith v. Dretke</u>, 422 F.3d 269, 273 (5th Cir. 2005) ("Because the present case involves the death penalty, any doubts as to whether a [certificate of appealability] should [be] issued must be resolved in [the petitioner's] favor." (quoting <u>Hernandez v. Johnson</u>, 213 F.3d 243, 248 (5th Cir. 2000))); <u>Jermyn v. Horn</u>, 266 F.3d 257, 279 n.7 (3d Cir. 2001) (noting "in a capital case, the nature of the penalty is a proper consideration" (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983))).

In light of the Fourth Circuit's determination that Juror Jordan's communication with Pastor Lomax about the spiritual implications of imposing the death penalty concerned "the matter before the jury," and because this is a capital case, a review of the complete record persuades the court to conclude that, while it is confident in its determination, a reasonable jurist could at least debate the court's resolution of the constitutional claim. Therefore, the court will issue a certificate of appealability on the issue of whether the extraneous communication between Juror Jordan and Pastor Lomax had a "substantial and injurious effect or influence in determining the jury's verdict," or rather was harmless.

## III. CONCLUSION

The court has carefully reviewed those portions of the Recommendation of the United States Magistrate Judge to which objections were made, whether or not specifically addressed

herein, and has made a *de novo* determination.    The court's determination is in accord with the Recommendation, which is ADOPTED, as modified herein.

IT IS THEREFORE ORDERED that Barnes's petition (Doc. 1) be DENIED as to the single claim on remand from the Court of Appeals for the Fourth Circuit.

IT IS FURTHER ORDERED that Barnes's motion for the appointment of substitute counsel (Docs. 59, 60) be DENIED.

For the reasons noted, the court will grant a certificate of appealability on the issue of whether the extraneous communication between Juror Jordan and Pastor Lomax had a "substantial and injurious effect or influence in determining the jury's verdict," or rather was harmless.  See 28 U.S.C. § 2253(c)(2).

A Judgment will be entered contemporaneously with this Memorandum Opinion and Order.

/s/    Thomas D. Schroeder
United States District Judge

August 2, 2018